| | |
|---|---|
| BEN ARTIS, | ) |
| DIANE ARTIS, | ) |
| ANNIE JACOBS, | ) |
| LUCY SIDBERRY, | ) |
| ETHEL NEWKIRK, | ) |
| CLIFFORD NEWKIRK, | ) |
| LEOLA JACOBS, | ) |
| GERTIE JACOBS, | ) |
| EDNA ALLISON, | ) |
| LENORA NICHOLSON, | ) |
| EDDIE NICHOLSON, | ) |
| JOYCE MESSICK, | ) |
| WILLIE MESSICK, | ) |
| JOHN TAYLOR, | ) |
| JAMES JACOBS, | ) |
| JIMMY CARR, | ) |
| PHYLLIS WRIGHT, | ) |
| DONNIE MESSICK, | ) |
| LENORA HOLMES, | ) |
| JAMES HOLMES, and | ) |
| ESTELLA WALKER, | ) |
| | ) |
| PLAINTIFFS, | ) |
| | ) |
| v. | ) |
| | ) |
| MURPHY-BROWN, LLC, | ) |
| | ) |
| DEFENDANT. | ) |

## COMPLAINT

Plaintiffs hereby file their Complaint against the Defendant Murphy-Brown, LLC ("Murphy-Brown") and allege as follows:

### I. INTRODUCTION

1.     The Plaintiffs are residents of Pender County.  During the pertinent times they have resided in close proximity to thousands of hogs owned by the Defendant kept in one or

1

more Concentrated Animal Feeding Operations ("CAFOs" or "hog facilities"). There are four hog facilities within close proximity of these Plaintiffs. These facilities are:

    i.      Paul Stanley No. 6, adjacent to plaintiffs Ben and Diane Artis;

    ii.     Paul Stanley No. 7, adjacent to plaintiff Jimmy Jacobs;

    iii.    Paul Stanley No. 8, adjacent to the New Hope Missionary Church where a number of the plaintiffs are members; and

    iv.    M&D Sow Farm.

Collectively, these four facilities are estimated to hold over 10,000 of Defendant's hogs at any given time.

2.     Hogs generate multiple times more manure than humans. Defendant's hogs at the CAFO facilities generate many times more sewage than entire towns. Yet Defendant has failed to take adequate steps to manage the number of hogs or otherwise abate the obnoxious, recurrent odors and other causes of nuisance. The hog waste includes ammonia, hydrogen sulfide and numerous other elements that are very foul-smelling and can also cause disease. This has impaired the Plaintiffs' use and enjoyment of their properties.

3.     The presence of Defendant's hogs has also caused periodic swarms of flies and other pests. Large flies periodically descend upon Plaintiffs' property, interfering with activities. These insects are vectors for disease.

4.     Defendant's hogs also necessitate large trucks crawling up and down the streets near Plaintiffs' homes. The country roads normally would never be subjected to having repeated episodes of large tractor-trailers and other big trucks taking feed to the hogs, trucking in live hogs, and trucking out live and dead hogs. These trucks cause further nuisance.

2

5.     The "lagoon and spray" waste disposal system is outmoded and has been banned for new farms.  The combination of the hog sheds, waste pits under slatted floors, waste lagoons and spray fields causes periodic foul odor and spreads germs and injurious substances. Defendant is a large enterprise with the ability to end the nuisance.  Defendant's parent company Smithfield Foods, Inc. ("Smithfield") was sold to a Chinese-backed multinational, Shuanghui, in late 2013 in a transaction estimated to have a value in excess of $7 billion, and reported record profits for the first quarter of 2014.   However, Defendant has not abated the nuisance.

## II.  PARTIES

### A.     Plaintiffs.

6.     Plaintiff **Ben Artis** is a resident of North Carolina who resides at 7350 Piney Woods Road in Willard, Pender County, North Carolina.

7.     Plaintiff **Diane Artis** is a resident of North Carolina who resides at 7350 Piney Woods Road in Willard, Pender County, North Carolina.

8.     Plaintiff **Annie Jacobs** is a resident of North Carolina who resides at 7525 Piney Woods Road in Willard, Pender County, North Carolina.

9.     Plaintiff **Lucy Sidberry** is a resident of North Carolina who resides at 7679 Piney Woods Road in Willard, Pender County, North Carolina.

10.     Plaintiff **Ethel Newkirk** is a resident of North Carolina who resides at 7151 Piney Woods Road in Willard, Pender County, North Carolina.

11.     Plaintiff **Clifford Newkirk** is a resident of North Carolina who resides at 7151 Piney Woods Road in Willard, Pender County, North Carolina.

12.     Plaintiff **Leola Jacobs** is a resident of North Carolina who resides at 8036 Piney Woods Road in Willard, Pender County, North Carolina.

3

13. Plaintiff **Gertie Jacobs** is a resident of North Carolina who resides at 8038 Piney Woods Road in Willard, Pender County, North Carolina.

14. Plaintiff **Edna Allison** is a resident of North Carolina who resides at 8038 Piney Woods Road in Willard, Pender County, North Carolina.

15. Plaintiff **Lenora Nicholson** is a resident of North Carolina who resides at 8134 Piney Woods Road in Willard, Pender County, North Carolina.

16. Plaintiff **Eddie Nicholson** is a resident of North Carolina who resides at 8162 Piney Woods Road in Willard, Pender County, North Carolina.

17. Plaintiff **Joyce Messick** is a resident of North Carolina who resides at 8107 Piney Woods Road in Willard, Pender County, North Carolina.

18. Plaintiff **Willie Messick** is a resident of North Carolina who resides at 8107 Piney Woods Road in Willard, Pender County, North Carolina.

19. Plaintiff **John Taylor** is a resident of North Carolina who resides at 8061 Piney Woods Road in Willard, Pender County, North Carolina.

20. Plaintiff **James Jacobs** is a resident of North Carolina who resides at 6506 Piney Woods Road in Willard, Pender County, North Carolina.

21. Plaintiff **Jimmy Carr** is a resident of North Carolina who resides at 6464 Piney Woods Road in Willard, Pender County, North Carolina.

22. Plaintiff **Phyllis Wright** is a resident of North Carolina who resides at 6369 Piney Woods Road in Willard, Pender County, North Carolina.

23. Plaintiff **Donnie Messick** is a resident of North Carolina who resides at 5897 Piney Woods Road in Willard, Pender County, North Carolina.

4

24. Plaintiff **Lenora Holmes** is a resident of North Carolina who resides at 3926 Piney Woods Road in Willard, Pender County, North Carolina.

25. Plaintiff **James Holmes** is a resident of North Carolina who resides at 3926 Piney Woods Road in Willard, Pender County, North Carolina.

26. Plaintiff **Estella Walker** is a resident of North Carolina who resides at 486 Rhyne Road in Willard, Pender County, North Carolina.

**B.** **Defendant**

27. Defendant **Murphy-Brown, LLC**, is a limited liability company organized under the law of Delaware. Defendant's sole member is John Morrell & Company ("Morrell"), a corporation incorporated under the law of Delaware and with its principal office located at 200 Commerce Street, Smithfield, VA 23430. Morrell is wholly-owned subsidiary of Smithfield, a corporation incorporated under the law of Virginia and with its principal office located at the same address as Morrell. During the pertinent times, Defendant has conducted business in numerous states including North Carolina.

**III. JURISDICTION AND VENUE**

28. The Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4.

29. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which a substantial part of property that is the subject of the action is situated.

30. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action in which the matter in controversy, inclusive of monetary damages and the value of injunctive relief, exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

## IV. FACTUAL BACKGROUND

### A. Background Regarding the Plaintiffs.

31.     During the pertinent times, the Plaintiffs have suffered injury and harm as a direct result of the thousands of swine placed near their homes by Murphy-Brown.  Defendant's thousands of hogs generate feces and urine that fall onto slatted floors and adhere to hog bodies, dry into particulate dust, adhere to skin cells from pigs, and drip and trickle under the slatted floor into holding ponds below the floors that hold raw feces and urine.  Stench rises from below the floor and from throughout the hog sheds, and the dust, skin cells, dander, particulates, dried fecal matter and stench from below-floor manure is sent out into the environment by large fans set in hog shed walls or by other means.

32.     The urine and feces go into giant holding ponds outdoors from which it evaporates and may leak and spill.  The uncovered cesspools they are free to evaporate odor into the air and attract flies.  The slurry or liquid containing the urine and feces is also sprayed into the air and onto fields around the hog sheds causing odorous fecal and urinous mist to drift through the air, go onto neighboring lands, and moisture and matter to fall and puddle on the soil so that more odor rises off it.  Sites must spray large quantities or else the "lagoons" will overflow. One or more Plaintiffs have witnessed spraying and spray mist. The spraying regularly occurs and causes stench.  The sites also breed and attract flies and other insects.  Dead hogs are placed in "dead boxes" where they rot until picked up by "dead trucks."  Large hog trucks carry hogs into and out of the facilities.  All of these activities cause temporary, periodic, abatable nuisance odor, annoyance, dust, noise and loss of use and enjoyment of homesteads.  The stench and associated nuisance also embarrasses and humiliates the Plaintiffs.

6

33.     Plaintiffs have suffered episodes of noxious odor, flies and pests, nausea, burning and watery eyes, stress, anger, worry, loss of property value, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities, cookouts, gardening, lawn chores, drifting of odorous mist and spray onto their land, inability to keep windows and doors open, difficulty breathing and other harms.

34.     Plaintiffs have employed measures and incurred expenses to try to protect themselves from the odors, pests, and nuisance from the hog sites and large hog trucks that pass up and down their rural roads.  They variously engage in keeping windows and doors closed and running air conditioner during mild weather, caulking and employing other sealants on windows and doors, purchasing cans of spray insecticides, paying to have their yards sprayed with pesticides, purchasing flypaper strips, purchasing bottled water so as to avoid using well water, purchasing scented candles or incense, and purchasing air fresheners, purifiers, and deodorizers.

35.     Plaintiffs have suffered decline in property values; smells from hog feces, urine, body odor, and corpses; the sight of dead, bloated, and decaying hogs; liquid dripping from passing hog trucks and "dead trucks;" increased pest populations; and other aspects of the nuisance.  The Plaintiffs feel angry, fearful and worried about their and their children's health.

36.     Many of the affected neighbors are African-Americans whose roots in the area can be traced sometimes back to Reconstruction or even earlier. These African-American rural communities were here long before Murphy-Brown and the CAFOs.  Further, many in these minority communities are low-income and live in homes or mobile homes ill-equipped to combat the foul smells and other recurring nuisances from Defendant's hogs.   When the thousands of hogs were first trucked in, Defendant and its predecessors were well aware they were putting the hogs in minority and low-income communities especially vulnerable to the nuisance.

37.     Members of low-income rural communities traditionally have engaged in activities like hanging out their clothes to dry to save utility and appliance costs. They often tend gardens in their yards for extra food. Running a fan or opening the windows can save air conditioning costs. The hog nuisance gets in the way of all these activities. Also, extended families of related relatives live in the same neighborhood. They like to walk over to each other's homes and socialize and have cookouts together or sit on the porch together. The hog nuisance interferes with these activities as well.

38.     The nuisance from the trucks is serious in itself. On information and belief, the conditions for the hogs inside of the transport trucks is often crowded and dirty. The trucks inside can become smeared with raw feces and urine and stench from the hot crowded hogs. The odor and waste spilled from the trucks cause episodes of nuisance.

39.     Defendant never asks for the Plaintiffs' permission before bringing new loads of hogs into the neighborhood or allowing spraying of waste in the air which creates vapor. Nor did Defendant's predecessors ask for Plaintiffs' permission before siting the CAFOs or their spray fields or cesspools. To the contrary, Defendant and its predecessors went out of their way to encourage and set up the CAFOs. In fact on information and belief, from time to time Murphy-Brown or its predecessors have even assisted with procuring loans to facilitate the construction of a CAFO, or have provided materials to construct facilities and dig lagoons.

40.     On information and belief, for one or more CAFOs, Murphy-Brown and its predecessors have helped pick the site, have come over and staked off the lot to have the hog houses and lagoons built, and have even paid for the materials to build the lagoons and hog houses. From time to time Murphy-Brown or its predecessors have specified use of the "reel and gun" system of spray irrigation even though it causes more vapor and nuisance than other

8

systems, and Murphy-Brown technicians, veterinarians, truckers and site representatives come by on a regular basis and micromanage the growers. Murphy-Brown checks as often as every week on lagoon levels and spray events but never warns the neighbors or gets their consent. This is despite the fact that Defendant is aware that neighbors live right next to its hogs.

### i.     Ben and Diane Artis.

41.     **Ben and Diane Artis** live in their marital home adjacent to the Paul Stanley 6 hog facility which houses Murphy-Brown hogs. Their property, which comprises approximately 1.5 acres, is separated from the spray field of the hog facility by only a shallow ditch.

42.     Upon information and belief, the hog facility behind their home began housing Defendant's hogs in or about 1994. Ever since, their property has at times been overrun by foul odors created by the waste of Murphy-Brown's hogs. These odors are unpredictable and at times make it nearly impossible for them to enjoy being outdoors at their home.

43.     In addition to the spray field being just beyond their backyard, the driveway for the facility is fewer than 100 yards from their property, subjecting them to the noises and odors created by the large hog trucks entering and exiting from the hog facility.

44.     There is only a ditch and thin row of vegetation separating the Artises from the facility's spray field. They can see the facility and the spray field from not only their back and side yards, but from inside their home looking out of any one of the windows on the entire back side of their home.

45.     A number of years ago, a problem at the facility led to a large amount of hog effluent and fecal matter flooding the ditches surrounding the Artises' property and running onto their property. The odor was nearly unbearable. The effluent was eventually pumped from the

9

ditches and removed from the property, but the Artises continue to fear that it is only a matter of time before it will happen again.

46.     In addition to being a Baptist preacher, Mr. Artis runs a small shrub and flower business on his property.  In order to properly maintain his investment, he spends a great deal of time outdoors and at times experiences foul odors emanating from the Defendant's hogs.  Because of these recurring and unpredictable odors, Mrs. Artis spends the vast majority of her time inside the home.

47.     Due to the close proximity of this facility and its spray field, the Artises do not open their windows for any length of time to let in fresh air.  The chances are too great that the foul odors could come into their home.  For that reason, their windows generally stay closed which causes them to run their air conditioning more often than they would if not for the nuisance created by the Defendant's hogs which creates a much higher utility bill.

### ii.     Annie Jacobs.

48.     **Annie Jacobs** is 101 years old and was raised on the property where she now lives and has lived continuously since the 1970s.  The home in which Ms. Jacobs currently lives was built by her parents in the 1920s.  Her sister, Cora Jackson, lived with her until her recent death at the age of 93.  Ms. Jacobs is the aunt of fellow plaintiff and Cora Jackson's daughter, Lucy Sidberry.

49.     Ms. Jacobs' home is approximately 100 yards from the driveway of the Paul Stanley No. 6 facility.  Therefore, she has witnessed many large hog trucks pass by her home, at times leaking hog effluent onto the road in front of her home and leaving a foul odor behind it.  Her home is within approximately 10 yards of the road, so whenever a large hog truck goes by, she not only hears the truck, but also the squealing of the hogs.

10

50.     On a recurring basis, she has experienced bouts of foul odor emanating from the Defendant's hogs, significantly impacting her ability to fully enjoy her property.  The impact of the Defendant's hogs on her life, however, is not limited to the confines of her property.

51.     She, along with much of her family, is a member of the New Hope Missionary Church.  The church, which was established well over 100 years ago and has been at its current site for approximately 40 years, is adjacent to the Paul Stanley No. 8 facility and is approximately three miles from her home.  Therefore, whether Ms. Jacobs is at her home or at her church, she feels the effects of the recurring nuisance created by the Paul Stanley hog facilities which house thousands of Defendant's hogs.

52.     Having grown up here, the vast majority of her 101 years was very pleasant here, typical of her rural farm life, and free from the nuisance created by thousands of hogs being kept so close, and their raw, untreated waste being sprayed even closer.  She is saddened that, in her latter years, she has had to deal with those obnoxious smells and trucks passing by her home so often.

### iii.     Lucy Sidberry.

53.     **Lucy Sidberry** grew up on the family land where she now lives and just a few doors down from her aunt and fellow plaintiff, Annie Jacobs.  She too is very close to the Paul Stanley No. 6 facility.

54.     Ms. Sidberry was mostly raised by her aunt, Ms. Jacobs, so she recalls very well the time before the hog facilities and their respective spray fields were sited in their rural country community, so close to their home.

55.     In the years prior to the hog facility, Ms. Sidberry would regularly raise her windows when the weather was nice to allow in fresh, cool air.  However, due to the recurring

11

and unpredictable nature of the odors emanating from the Defendant's hogs, Ms. Sidberry stopped doing this to keep the odor out of her home. This requires her to run her air conditioning more than she would otherwise, resulting in a significantly higher utility bill.

56.     Like Ms. Jacobs, Lucy Sidberry is also a member of the New Hope Missionary Church which is adjacent to the Paul Stanley No. 8 facility, so she has experienced many an episode of foul odor not only at her home, but at her church. She regularly attends on Sunday mornings when services are being held and also regularly attends for Bible study along with occasions such as funerals. Because the church is adjacent to the spray field for the facility, it is not unusual for her and others to smell the odors emanating from the Defendant's hogs.

### iv.     Ethel and Clifford Newkirk.

57.     **Ethel Newkirk** and her adult son, **Clifford Newkirk**, reside together on Piney Woods Road just across the street from the Paul Stanley No. 6 facility and across the street from plaintiffs Ben and Diane Artis. Although the No. 6 facility is the closest, the Paul Stanley No. 7 facility is also very close. It also houses Murphy-Brown's hogs. Even closer than the facilities themselves are the spray fields where the hogs' waste is sprayed on a regular basis.

58.     Both Ethel and Clifford have lived in this home virtually their entire adult lives, dating to well before the hog facilities were sited so close to them. Now at the ages of 68 and 47, respectively, Ethel and Clifford recall a time when their property was not overrun, at times, by the foul odors coming from Defendant's hogs and their waste.

59.     Living roughly halfway between the Paul Stanley No. 6 and No. 7 facilities, they are subjected to many large hog trucks going to and from these facilities. The trucks, likewise, create a nuisance and, along with the odors emanating from Defendant's hogs, significantly and unreasonably impact their full enjoyment and use of their property.

12

### v.     **Leola Jacobs, Gertie Jacobs, and Edna Allison.**

60.     **Leola Jacobs**, **Gertie Jacobs**, and **Edna Allison** are sisters and live on the same piece of family property on which they all were reared. They inherited this property from their parents.

61.     All now retired and having previously worked out-of-state, they have all lived together on this piece of family land since they all moved home in the early 1990s to care for their ailing father who died in 1995.

62.     Each of their lives has been significantly impacted by the unpredictable and recurring odors created by the Defendant's hogs. In addition, Defendant's hog trucks pass by their property on a frequent basis, leaving a trail of odor and, at times, effluent on the road. Each has, at times, gotten behind one of the trucks in their cars and gotten effluent splashed on their windshields.

63.     These nuisances have significantly impacted their ability to fully enjoy and use their property. For example, Gertie Jacobs' daughter and family live in Winston-Salem. When they visit Gertie's home, they typically cannot have cookouts or any type of gathering outside because of the unpredictable odors.

64.     Even inside their homes, they take precautions to keep the odors out. For example, Leola's stove has a vent which opens to the outside. When the odors and swarms of flies are present, she has to close the vent and use air fresheners and deodorizers in her home.

65.     They keep their windows closed virtually at all times. Even when the odors are not present, they keep the windows closed because, at any time, the odor could arise and come into their home. For them, it is not worth taking that risk.

66.     The three sisters are members of the New Hope Community Church which, as mentioned above, is adjacent to Paul Stanley No. 8. Services are held every second and fourth Sunday of each month as well as regular Bible studies, choir rehearsals, and the occasional funeral and other events. Therefore, in addition to the indignity of the hog odor being present at times on their property, each of them has been impacted significantly by the odor emanating from Defendant's hogs while at church. Having to, at times, live by the odor and, at times, attend church by the odor has saddened them, but it is their home place and their home church and they have no intent, nor the financial ability, to leave.

67.     Around the time the Paul Stanley No. 8 facility was built – the first of the three facilities – the church members signed a petition to try to keep the hog farm from being sited so close to the church. Unfortunately, they were not successful, and the hog farm was built, and it has been raising Defendant's hogs and spraying their waste onto the field adjacent to the church.

### vi.      Lenora and Eddie Nicholson.

68.     **Lenora Nicholson** resides on Piney Woods Road beside her adult son and fellow plaintiff, **Eddie Nicholson**. The Nicholsons came to Piney Woods Road from New York, New York in the late 1970s and have resided here ever since.

69.     Although now 81 years old, Ms. Nicholson still works full-time. When she leaves in the morning or returns in the evening, she at times experiences bouts of odor emanating from the Defendant's hogs. In addition, living close to the road which passes by each of the three Paul Stanley facilities, the Nicholsons frequently hear, see, and smell large Murphy-Brown hog trucks passing in front of their home, at times leaving a trail of effluent and odor. The Nicholsons have each been behind one of these Murphy-Brown trucks and had their respective vehicles splashed

14

with hog effluent and overrun by the accompanying odors. Both have had to wash their cars many times after having gotten behind a hog truck of this type.

70.     The Nicholsons have been significantly affected and bothered by the intermittent nuisance created by the Defendant's swine and have employed measures and incurred expenses to try to protect themselves from the odors, pests, and nuisance created by the Defendant's hogs.

       **vii.**     **Joyce and Willie Messick.**

71.     **Joyce Messick** resides with her brother, **Willie Messick**, on Piney Woods Road. Mr. Robinson has lived on this family property since well before the nearby Paul Stanley hog facilities were constructed. Their mother and fellow plaintiff, Donnie Messick, lives approximately two miles from them on the same road near another of the Paul Stanley hog facilities.

72.     The recurring nuisance created by the Defendant's hogs has significantly impacted their use and enjoyment of their property. They enjoy cooking out in their yard on occasion, however, when the odor is present, they either quickly cook and take their food inside, or simply cook inside because the odor is so unpleasant.

73.     Living so close to the facilities and on the same road as the facilities, they are routinely subjected to the noise and odors created by the passing Murphy-Brown trucks going to or coming from the Paul Stanley facilities, which at times leave a trail of effluent on the road.

74.     To minimize the impact of the odors on their property, they keep their windows closed, run their air conditioning, and use various air sanitizers to keep the odor out of their home. Before the facilities' construction, they enjoyed keeping their windows up during pleasant weather and allowing in fresh air. They rarely do this anymore due to the unpredictable and foul nature of the odors.

75.     Having lived here for many years before the hog facilities were constructed, they recall very well life on their family property without the burden of the odors and the passing hog trucks and hope that one day, they can again enjoy their property as they once did.

viii.     **John Taylor.**

76.     **John Taylor** is the first cousin of the above-mentioned Joyce and Willie Messick and lives next door to them, also on family property. Mr. Taylor has lived on this property all of his 65 years of life. He inherited this property from his parents and now lives alone.

77.     Mr. Taylor, like the other plaintiffs, remembers a peaceable life and community here before the hog facilities created such an impactful nuisance. This nuisance bothers him most when he is outside when the odor is present or a large Murphy-Brown hog truck passes while he is trying to enjoy some fresh air or cook outside.

ix.     **James Jacobs.**

78.     **James ("Jimmy") Jacobs** lives directly adjacent to the Paul Stanley No. 7 facility. In fact, his home is but a few feet from the driveway of the farm. He and his late wife built the home in the early 1970s, but he now lives there alone.

79.     When he and his wife built their home, they were only surrounded by peaceful farm land, growing tobacco, corn, and other typical crops for the area. Now, with a hog-waste spray field fewer than 100 yards of his home, he can no longer enjoy his property as he once did.

80.     Upon information and belief, the dead hogs from the other Paul Stanley facilities, Nos. 6 and 8, are hauled regularly to the No. 7 facility beside Mr. Jacobs. Approximately each morning of an early hour, around 5:00-6:00 a.m., a large truck enters and exits the driveway to pick up the dead hogs. This creates a loud racket that wakes him at times. In addition to these "dead trucks" entering and exiting the driveway so close to his home so often, other trucks also

16

frequently use this driveway as it is the only path to the facility. The photograph below depicts Mr. Jacobs standing at the eastern border of his property, only a few feet from his home looking toward the hog facility where Defendant's hogs are kept. Seen in this photo, taken on June 30, 2014, is Mr. Jacobs, the gravel driveway of the farm on which the trucks frequently travel as well as an active "traveling gun" sprayer applying the untreated hog waste to the fields:



81.     In addition to the odors emanating from the facility and the noise created by the hog trucks entering and exiting, flies have become a recurring, periodic nuisance. Before the facility was built and housed Defendant's hogs, flies were not a problem in the area. Ever since, they have become a recurring nuisance. Mr. Jacobs says that, at times, if he leaves his door open for just a few minutes, he will have a house full of flies. Again, this was not an issue with which Mr. Jacobs had to deal prior to the hog facility and its spray field being sited so close to him.

82.     Having lived here for more than 20 years prior to the hog facility's construction, he knows what life was like on his property before the facility and now after. Before, he and his wife experienced a much higher quality of life, not subjected to the periodic odors, flies, and noise coming from the Defendant's hogs and trucks. Now, however, he never knows when he walks out the door if the odor will be there or if a swarm of flies will be present.

17

**x.** **Jimmy Carr.**

83.    **Jimmy Carr** lives next door to plaintiff Jimmy Jacobs and is also extremely close to the Paul Stanley No. 7 hog facility.

84.    Now 51 years old, he grew up on Piney Woods Road about a half-mile from where he currently lives, but moved to his current home prior to the Paul Stanley No. 7 facility being constructed.

85.    Like Mr. Jacobs, he lives very close to this facility and even closer to its driveway and spray field.  Every morning, around approximately 5:30 a.m., a large truck enters the driveway and drives past his and Mr. Jacob's home to pick up dead hogs from the Paul Stanley facilities.  This large truck driving down a dirt and gravel driveway creates a lot of noise, at times waking Mr. Carr, and leaves a trail of odor from the dead Murphy-Brown hogs.  In addition to these "dead trucks," large Murphy-Brown tractor trailers haul hogs in and out of the facility, creating additional nuisance.

86.    Due to the recurring odor and other nuisances created by the Defendant's hogs, Mr. Carr almost never raises his windows.  Prior to the farm being sited here, he would frequently raise his windows at night to let in fresh air when the weather was appropriate.  Now, he no longer does that because of the risk of the odor drifting his way and into his home.

87.    Having grown up in this small community, he remembers when the area was unburdened by the presence of so many of Defendant's hogs.  Having three children, he hopes to one day leave his property to them and that, by then, the nuisance created by Defendant's hogs will have been abated.

18

### xi.      Phyllis Wright.

88.     **Phyllis Wright** lives very close to the Paul Stanley No. 7 facility and even closer to its entrance and spray fields where the waste created by Defendant's hogs are sprayed.

89.     She has owned her current home since the early 1980s and has experienced a recurring and foul odor coming from the Defendant's hogs at the Paul Stanley facilities. In addition, she often hears, sees, and smells the "dead truck" as it enters and exits the facility almost every morning to remove the dead hogs from the Paul Stanley facilities.

90.     At times, when she leaves for work or church, and returns from either, she experiences a bout of odor coming from the Defendant's hogs. This bothers her tremendously and is not something she had to endure prior to the facility's construction. Moreover, she can no longer hang clothes on the clothesline due to the unpredictability of the odor from the facility. In earlier years when she hung clothes out to dry, they would absorb the odor and would have to be rewashed, so she no longer hangs them out to dry.

91.     She no longer opens her windows, either, to let in fresh air. If the odor were to drift onto her property while her windows were open, the odor would come into her home, so she simply keeps her windows and doors closed and uses air fresheners and other deodorizers to ensure the odor is kept out of her home.

### xii.      Donnie Messick.

92.     **Donnie Messick** lives in the home she and her late husband built approximately 60 years ago. Unfortunately, about 20 years ago, the Defendant began keeping its hogs close to her home at the Paul Stanley facilities which now create a recurring nuisance in the form of foul odors and noise from large trucks passing by her home going to or coming from the facilities as

well as other nuisances.  Her husband passed away in 1999, but she lives with her 21 year-old great-grandson, whom she raised.

93.     Prior to the construction of the facilities which house Defendant's swine so close to her, she was able to hang clothes on her line and raise her windows and doors when the weather was nice to let in fresh air.  She no longer does that due to the recurring nuisance created by the swine.  In addition to the odor, large hog trucks pass by her home virtually every day, sometimes multiple times per day either coming from or going to the Murphy-Brown hog facilities, at times leaking effluent onto the road which passes in front of her home.

xiii.     **Lenora and James Holmes.**

94.     **James Holmes** built his and his wife's (**Lenora Holmes**) current home in approximately 1978 on land which he inherited from his parents and has lived there ever since. Their home is located fewer than 200 yards from the Paul Stanley No. 8 facility on Piney Woods Road.

95.     Mr. Holmes works often in his yard and at times smells foul odors coming from the Defendant's hogs.  Ms. Holmes, although she has been battling Parkinson's Disease for a number of years, is still able to walk once in a while.  Because they live so close to the facility, she has little choice but to walk near it, and has been, at times, impacted by the same foul odors coming from the swine.

96.     Mr. and Mrs. Holmes avoid raising their windows because, in the past, when they have, odors from the facility have come into their home, which is extremely unpleasant for them. To minimize the impact of the odor on their home, they utilize various air fresheners and deodorizers.

20

xiv.     **Estella Walker.**

97.     **Estella Walker** lives in the home she built with her late husband on Rhyne Road very close in proximity to the Paul Stanley No. 8 facility.  She has lived on her current property since she and her husband married in 1960 and began raising their family.

98.     Ever since the facility was built in or around 1986, she and her late husband suffered from recurring bouts of foul odor emanating from the Defendant's swine.  The odor comes and goes from her property.  When the odor is not present and drifting from the facility, her home is pleasant and she can sit on her porch.  However, the odor is very unpredictable and when the odor does come, she cannot do anything outside.  In fact, she and her husband stopped having cookouts at their home due to the odor and swarms of flies that they believe came from the facility, and started having cookouts at their daughter's home which is several miles away to get away from the nuisance created by Defendant's swine.

99.     Around the time the Paul Stanley No. 8 facility was planned to be built, Ms. Walker signed a petition organized at the nearby New Hope Missionary Church, where she has been a member for many years, opposing the Defendant's hogs being placed so close to her home and her church.  Unfortunately, the petition did not prevent the facility from being built, and Murphy-Brown or its predecessors have kept hogs there ever since, creating a recurring nuisance to Ms. Walker and other community members.

**B.  Background on the Facilities.**

100.     Upon information and belief, the three Paul Stanley facilities (Nos. 6, 7, and 8) are "contract" farmers for Murphy-Brown LLC, the Defendant, and are owned by Pagle Corp., the president of which is Paul Stanley of Willard, North Carolina.  The North Carolina Department of Energy and Natural Resources ("DENR") inspects the facilities but only on an

21

annual basis and also issues the permits to the facilities. The identifying alphanumeric code for the No. 6, 7 and 8 facilities are AWS 710090, AWS 710017, and AWS 710043, respectively. Paul Stanley No. 6 and 7 are each allowed to hold up to 3,672 of Defendant's swine while the No. 8 facility can hold up to 1,800.

101. Upon information and belief, these facilities were originally owned by Gary Pridgen, who owned them until 2012 when Pagle Corp. purchased them. Throughout the years, each of these farms have had compliance issues with land application or spraying of the hog waste. On several occasions, the facilities have oversprayed hog effluent onto the fields causing ponding and even runoff into ditches which connect to some of the Plaintiffs' property.[1]

102. While DENR can only inspect the facilities on an annual basis, and does not go in the hog sheds, the Defendant inspects or visits the facilities much more frequently and has open access to the entire site. Upon information and belief, a representative or employee of Defendant visits each site on a weekly basis or, in some cases, more frequently and the site personnel must constantly report information to Defendant.

103. Also located just off Piney Woods Road and in close proximity of some of the plaintiffs is M&D Sow Farm, owned by James Hope of Burgaw, North Carolina. Its DENR identifying number is AWS 710052 and is allowed to hold up to 1,000 of Murphy-Brown's hogs as a contract grower.

**C.    Background on Hog Manure and Causes of Nuisance.**

104. Hogs generate multiple times more feces and urine per day than a human being. The General Accounting Office has estimated that 7.5 million hogs in five eastern NC counties produce 15.5 million tons of manure each year.

---

[1] An example of this was included in the recitation of facts for plaintiffs Ben and Diane Artis.

105.     Furthermore, Murphy-Brown's diet and antibiotic regimen is meant to promote aggressive growth, causing more manure to be generated in less time.

106.     A hog may grow from birth to 250 pounds in about six months or less before it is slaughtered.   A piglet usually feeds from its mother until it is four to six weeks old and weighs about 25 or 30 pounds. Then it eats feed grain and is known as a feeder pig.  It takes about six months for a pig to reach market weight of 250 pounds.  A slaughter-weight hog is thus about fifty percent heavier than an average person.

107.     The hog odors can be smelled at extremely low concentrations that cannot be measured with available instruments.

108.      Dietary manipulation can reduce odor.  Murphy-Brown supplies all the feed and sets the ingredients and additives for its hogs.  On information and belief, Murphy-Brown has tailored the diet without regard to reducing the odor and nuisance.

109.     The presence of Defendant's hogs also causes periodic swarms of flies and other insects and pests.  Plaintiffs find that flies periodically come onto Plaintiffs' properties.  These flies were not prevalent before the thousands of hogs were placed at the CAFO.  These insects and pests are also scientifically found to be vectors for disease and germs.

110.     In addition, ever since the hogs have been built, large trucks periodically crawl up and down the streets with hogs and feed.  They cause noise, dust, and lights from headlights and they pass even in the middle of the night.  When the trucks bring hogs in and out this can create extra odor.  When the "dead trucks" come, they can create foul odor and leak foul substances. These trucks are the opposite of what one would expect to see in a rural country neighborhood.

111.     The dead hogs themselves are a nuisance. Animals in confinement under high-density circumstances present a ready environment for disease.  Many swine facilities have used

vaccines and antibiotics not only to promote growth but also to counteract the health effects of crowded conditions but the crowded often hot conditions still lead to significant mortality rates. The pigs are susceptible to infection, microbes, parasites, or fungi,

112. The mortality rates from the CAFOs as well as periodic diseases such as Porcine Epidemic Diarrhea Virus (PEDV) result in there being many dead hogs from time to time placed in "dead boxes." These are dumpsters full of dead animals left out in the open, often in plain view, so that neighbors see rotting animal corpses in their neighborhoods. These "dead boxes" attract buzzards, flies and vermin. Periodically a "dead truck" picks up the dead hogs to drive them to a rendering plant. This increases the nuisance to the neighbors.

### D. Murphy-Brown's Control Over its Hogs.

113. Defendant is a large and sophisticated company and precisely monitors the activities occurring at the facilities holding its hogs. Defendant, through standardized procedures and equipment, monitors the number of hogs at each site, the amount of feed used, the growth rate, the amount of feces and urine going into the cesspools, and the "freeboard", i.e., the distance between the surface of the cesspool and the top of the earthen rim surrounding it.

114. Defendant has publicized in the past how it exercises detailed control over the operations of the facilities that hold its hogs. Defendant uses trucks to haul its hogs from one site to another depending on what is most efficient and profitable for Defendant. Defendant has also used tanker trucks to haul manure and flush water from one lagoon to another at different sites for reasons including when the volume that is being generated threatens to flood a lagoon.

115. Murphy-Brown was formed in 2000 from an acquisition by Smithfield of companies owned by Wendell Murphy, Sr. (the founder of the business), the Murphy family, and Murphy businesses including Murphy Family Farms (collectively "Murphy"), as well as

24

Brown's of Carolina. Mr. Murphy is credited with adopting the CAFO design of mechanized

farms that had first been invented for raising poultry in other states. However, hogs generate a

great deal of manure, and North Carolina is more densely populated than many other states.

Defendant and its predecessor's efforts and Smithfield's opening of massive processing plants

increased the number of hogs until counties like Duplin and Sampson became the most densely-

packed hog counties in the entire United States, as the illustration below reflects:[2]



116.    The close confinement of hogs also means epidemics can spread through hog

populations and diseases, such as Porcine Epidemic Diarrhea Virus, have led to "PED" signs

outside facility gates at various times. Studies reflect how the closely packed hogs and untreated

sewage cause illnesses such as MRSA, release germs and bacteria into the environment, and

causes hydrogen sulfide, ammonia and other harmful substances to spread. Hydrogen sulfide

---

[2] Source: UNC Gillings School of Public Health, website page at http://gillingsproject.wordpress.com/c-a-f-o-s-concentrated-animal-feeding-operations-and-our-state-of-north-carolina/ (accessed Oct. 16, 2014).

was used as a poison gas in World War I and can cause harm even at low doses. Ammonia can cause respiratory and other illnesses. Both are released from untreated hog sewage.

117.    Studies have linked hog CAFOs to childhood asthma and other conditions. All of this creates a reasonable fear of health effects in the Plaintiffs and is one reason why their property values have decreased. While Defendant causes odors, harmful chemicals and other nuisance to go onto Plaintiff's properties, Defendant pays them no license fee to do so and maximizes profit by making Plaintiffs absorb the environmental cost that Defendant should bear.

118.    Recognizing the unsustainable and injurious nature of the "lagoon and sprayfield" system, North Carolina, in 1997, banned further construction of CAFOs that use the design. This ban was re-enacted in 2007. Under this "moratorium," in fact hog producers are free to build new facilities so long as, among other things, they will not cause odor to cross onto neighboring land. On information and belief, no new CAFOs have been built using the old design, in an admission of its nuisance-causing nature.

119.    The 1997 moratorium was enacted only after CAFO construction began to threaten the Pinehurst golf course. The bill was sponsored by North Carolina State House Representative Richard Morgan who was reported to describe his concern "about industrial-style hog farms cropping up near golf courses in Moore County" and that his aim was to "draw a distinction between farming and the mass production of swine." Indeed, the CAFOs are not traditional family farms by any measure and rather are animal factories.

120.    Under the "lagoon and spray" design, hogs step, sit, and lie on the raw manure and it gets on their bodies closely packed in the sheds. The hogs squish and push it down through the slatted floor. It drips into a holding pond below the floor where it sits like an unflushed toilet and the urine and feces mix. Some sites use a method of periodically flushing

26

the waste out with water, while others use a "pull-plug" system in which the waste is periodically drained.  Large fans at the ends of the sheds ventilate to keep the hogs from suffocating on the gases.  The hogs create dust that dries and turns into floating particles, and smells from the feces and urine goes into the air and is blown out by the fans.  The fans have no filters or scrubbers to take out the fumes and germs.

121.     After manure collects under the slatted floors, it gets flushed or drained out through pipes into the nearby open-air, uncovered, artificial cesspool filled with millions of gallons of hog urine, feces, and flush water.  Because the cesspool is uncovered, it is free to evaporate bad odors into the air.  There is no effort to separate out solids from liquids or treat the waste in a contained digester.  There is no effort to capture the methane and odorous gases or use it as biogas for electricity.  Defendant refuses to reduce the crowded hog counts while aware that more hogs means more waste means more nuisance.

122.     The manure fills the "lagoons" and is spread on the fields.  Often this is done by a "traveling gun" system in which liquid is sprayed up into the air.  Other times, a "center-pivot" system is used, which ejects it into the air by means of pressurized spraying.  The use of subsurface injection or "knifing" the effluent into the ground can help reduce odor.  In other States Defendant as abandoned spray guns but not here. The photo below shows an example of a spray irrigation system; the way it gives off vapor is plainly seen:[3]

---

[3] Source:  North Carolina Riverkeepers & Waterkeepers Alliance, website page at
http://www.riverlaw.us/hurricanefloyd/hurricanehanna.html.



123.    In 2000, due to widespread concerns about lagoon and spray CAFO environmental harm, damage, vulnerability to hurricanes, odor and other ill effects, North Carolina commissioned a multi-year study known as the "Smithfield Agreement." This agreement allocated funds for research into superior alternatives to the lagoon and spray system. Various candidate technologies were reviewed for feasibility.  In 2003, under the Agreement, the non-partisan RTI institute issued a report regarding the nuisance and other bad impacts of the lagoon-and-sprayfield CAFOs.  The report found that the sites have a negative impact on "measures of human well-being." It found:  "Odor emissions from hog farms are a continuing concern in North Carolina, particularly for residents living in close proximity to farms."  It noted how "using data on housing prices in nine counties in southeastern North Carolina … found that proximity to hog farms had a significantly negative impact on housing values and that these effects varied by the size of the operation."  Finally it noted "disease-transmitting vectors."

124.    In December 2005, a majority of the ten members of the economics subcommittee under the Smithfield Agreement found that "the range of benefits predicted to flow" from new

28

technology appeared to justify increased costs.  By contrast, a minority of the members insisted that any new technology that "raises the net cost of production in North Carolina is not economically feasible."  The minority report was signed by Bart Ellis of Smithfield Foods, Inc., Dave Townsend of Premium Standard Farms (acquired by Smithfield), Bundy Lane of Frontline Farmers (a group supported by Murphy), Richard Eason, President, Cape Fear Farm Credit (a company that upon information and belief benefited from CAFO construction loans set up by Smithfield), and Dennis Dipietre, Economic Advisor, Premium Standard Farms (later acquired by Smithfield).  Because of the staunch opposition of these Smithfield-aligned representatives, the Smithfield Agreement ultimately failed to lead to the adoption of new control technologies for the swine CAFOs in North Carolina.

125.    Meanwhile, in States such as Missouri and Colorado, hog CAFOs have adopted controls to abate the nuisance and stop the harm to the neighbors.  Murphy-Brown has hog sites in those States and has implemented control measures there.

126.    Murphy-Brown is a multi-state corporation, wholly-owned by an even larger multinational corporation which itself is owned by a Chinese-controlled enterprise (formerly Shuanghui, now WH Group) after an acquisition valued at more than $7 billion.  The Smithfield integrated annual report for 2012 describes how Murphy-Brown is "the world's largest producer of pork" and fiscal 2012 sales for Murphy-Brown were $3.1 billion.  Defendant is much larger than and earns far greater revenues and profits from the hog operations than the local growers.

127.    In one "integrated" enterprise,  Smithfield owns the hogs through Murphy-Brown, owns the processing plants through its Smithfield Packing subsidiary, and controls other aspects of the pork production process.  The relationship between Murphy-Brown and its contract growers is part of "vertical integration" in which Murphy-Brown is the "integrator."

29

128.    Smithfield has touted how "Smithfield manages every aspect of the pork production process. Vertical integration is a key point of difference and a unique selling proposition for our products and brands, allowing us to drive changes through the supply chain." Murphy-Brown micromanages and controls the local growers, but has not abated the nuisance.

129.    The growers must follow the orders and rules from Murphy-Brown or risk losing the hogs, which they never even own.  The 2012 annual report describes how "All company-owned and contract farms are subject to random third-party audits and site assessments" and how "Members of our production management staff … visit every contract and company-owned farm at least once a month."  Murphy-Brown constantly sends specialists to the site such as engineers, technicians, inspectors, and veterinarians and controls relevant details of operation.

130.    As of 1995, it was reported that a typical contract grower borrowed anywhere from $200,000 to $1 million to construct hog sheds.  Murphy specifies the CAFO design and equipment.  Murphy financed or facilitated the financing for many growers.  While the grower carries the debt for a multi-year loan term, under the form contracts, Murphy can pull its hogs out at any time for a variety of reasons.  The CAFOs are "single use" facilities designed for raising hogs and no other purpose.  Wendell Murphy, Sr. has described the situation with words to the effect of "once you pour the concrete, you are committed."

131.    Mr. Murphy and his family businesses continue to this day to be heavily involved with Smithfield.  According to a Smithfield Foods Form 10-KT/A filed April 28, 2014, the current Smithfield Board of Directors consists of "Long Wan" (more commonly known in the media as Wan Long; Chairman of the Board since September 26, 2013 and Chairman of the Board of WH Group/Shuanghui), Larry Pope, Shuge Jiao and Zhijun Yang.  Wendell Murphy, Sr. was until recently also a Smithfield Director and continues to be heavily involved with the

30

company via his family business.  The Form 10-KT/A states that Smithfield and Murphy-Brown continue to have business relationships with entities owned in whole or part by Mr. Murphy and his family members and for fiscal 2013, Smithfield paid $23.1 million to those entities. According to reported corporate filings, in 2004, various Smithfield transactions with the family of Mr. Murphy added up to around $41 million. By 2012, corporate filings reflected approximately $52 million of transactions with business interests controlled by the Murphy family, including a $23.3 million payment to DM Farms of Rose Hill, LLC, 100% owned by Murphy's son, Wendell H. "Dell" Murphy Jr.

132.    Over the years Murphy has required some or all growers to accept terms under which if a grower fell into some lower percentage of all the growers on various metrics, such as the lowest 25%, Murphy could cancel the contract. These provisions incentivize the contract growers to work to maximize growth of the hogs at the expense of all other considerations. Meanwhile, at all times Murphy-Brown still owns the hogs.  This system sometimes known as the "tournament" system pits contract growers against each other to cut costs and raise productivity above all other considerations.  The system is palpably unreasonable as there will always be a bottom fourth of growers even if they all perform well.  On information and belief, the metrics Defendant uses to rank the growers do not include such things as, whether the odors, flies and fumes are harming the neighbors.  Defendant during the pertinent times has known that its "tournament" system and other aspects of its management of the growers, the feed and the hogs causes the nuisance to increase.

133.    Murphy has admitted the control it has over the hog CAFOs and its direct involvement in the swine sites.  In 2011, Wendell Murphy, Sr. described that "The typical livestock or poultry agreement is that the farmer or contract producer provide the facilities and

labor, but in this case, to enhance the idea, to cause more people to come forward, we agreed to supply their materials... the fence and the posts, the feeders, everything." However in grower bankruptcy proceedings Murphy-Brown has also contended that it had no duty to keep pigs at the site if it wanted to remove them for a variety of reasons.

134.    Smithfield controls an estimated 90 percent of all hog production in North Carolina. Murphy-Brown owns the hogs at as many as two-thirds of all North Carolina sites. State records confirm Defendant's control over the hogs and the odors and nuisance that they cause. On multiple occasions, when a grower has encountered problems, Murphy-Brown has intervened to contest any efforts to impose fines or require changes, and has closely controlled and supervised any corrections.

135.    Defendant and its parent Smithfield deny they are following any Chinese government directives. In fact they are.

136.    Smithfield's former Chairman of the Board Larry Pope in 2013 testimony to Congress stated that "[t]he Chinese government has absolutely no ownership stake or management control in Shuanghui." However, a 2014 report by the Center for Investigative Reporting found that in actuality, the Bank of China financed the deal; the Bank is government-controlled; in its annual report, the Bank highlighted the Smithfield takeover as its "social responsibility;" in 2011, the Chinese government "issued a five-year plan directing food companies such as Shuanghui to obtain more meat for their production lines by purchasing overseas businesses;" Zhang Taixi, the President of Shuanghui, "like other senior management at Shuanghui, was appointed to his position by the Chinese government;" "Shuanghui, according to its own documents, is required to carry out China's five-year plan;" and "[i]n effect, the Chinese government does exercise management control."

137.    Wan Long is now Smithfield's Chairman of its Board of Directors.  Mr. Long has

is also the Chairman and CEO of Shuanghui.

138.    For whatever reason, Shuanghui recently changed its formal English-language

name to "WH Group."  According to English-language Shuanghui (now "WH Group") websites

Wan Long is simply a businessman with "40 years of experience in the meat packing industry."

The English-language website mentions nothing about any government control or affiliation.[4]

139.    However, Shuanghui also has a Chinese-language website.  Translated into

English, the official Mandarin website for Shuanghui describes Wan Long as a member of the

"Communist Party," as a "senior political worker," as a "senior consultant… at the National

People's Congress," and as a former member of the People's Liberation Army.[5]

140.    In accordance with China's five year plan, Shuanghui has announced that its top

priority is to increase exports to China and on information and belief Smithfield pork is already

sold there.   Its Chairman and CEO Wan Long states: "Following our acquisition of Smithfield in

2013 we will focus on growth initiatives, such as increasing exports from the United States to

Asia, building a global trading platform and exploring opportunities to work with Smithfield to

develop premium products for the Chinese market."

141.    Larry Pope in testimony to Congress in 2013 stated that "[t]he new combined

company expects to meet the growing demand for pork in China by exporting high-quality pork

products from the US. This means more production for US producers…."  He also stated that

"China is responsible for 50 percent of the world's pork consumption and their demand is still

growing…. At Smithfield, we see this valuable market as an undeniable opportunity to grow our

---

[4] Source: http://www.wh-group.com/en/about/leadership.php.
[5] See http://www.shuanghui.net/.  A computer translation of pertinent Shuanghui website text can be found at: http://www.microsofttranslator.com/bv.aspx?from=&to=en&a=http%3A%2F%2Fwww.shuanghui.net%2Fwww%2F zongcai%2F.

business and produce more here in the US." He also stated that "This transaction is about exporting high-quality meat products from the US to China."

142.     More recently, in 2014 Mr. Pope described: "Half of all the world's pork is eaten in that one country [i.e., China] and growing, and growing steadily. Every two or three years, China's consumption demand grows by the whole size of the U.S. market." He described that by gearing up to ship more pork to China, Smithfield was "carrying out the government's five-year plan, which is to improve the quality and the security of their food supply."

143.     In short, it is clear that Murphy-Brown following the directives of its owners intends to increase pork production pursuant to Chinese government directive. North Carolina produces more hogs for Smithfield than most or all other States.  Clearly a massive increase in exports is foreseen as Shuanghui paid 30% more than market value for Smithfield's stock.  An increase in pork production in North Carolina, in which Smithfield controls upwards of 90% of hog production, will greatly increase the nuisance to the Plaintiffs.

144.     Furthermore, the economic opportunity to increase exports to China increases the reasonability of expecting Defendant to abate the nuisance herein.

**E.     Evidence of Negligent, Willful and Wanton Conduct.**

145.     Murphy-Brown and its predecessors, in placing tens of thousands of hogs at the facilities, acted negligently and in willful disregard of the harm known to be caused by the hogs. Over the years, Defendant has continued to cause its hogs to create nuisance and injury without taking action to end the nuisance despite repeated episodes of damage and mounting scientific research verifying the harm suffered by the Plaintiffs.

146.     The 2012 Smithfield annual report claims that "Murphy-Brown is committed to … protecting the environment…"  However, the studies, reports, incidents and complaints that

have amassed since Murphy first started the CAFO system clearly show predictable nuisance caused by swine sites to nearby neighbors. Defendant has not stopped the nuisance, even after Plaintiffs have complained and even sent nuisance mediation demands over a year ago.

147. From the early 1990s to the present, due chiefly to Defendant and its predecessors' efforts, hog production greatly expanded and CAFOs were placed near community members such as the Plaintiffs. Production in North Carolina tripled between 1990 and 1995, growing from 5 million hogs produced in 1990 to 15 million in 1995. The hogs at the subject facilities were part of this rapid expansion. Multiple spills, lagoon breaches, episodes of odor and harm have occurred. Numerous reports have confirmed the injury suffered by community members. The Legislature has banned any new CAFOs using the Defendant's old system due to the indisputable evidence of harm and damage to neighbors and the environment.

148. Defendant and its predecessors have acted improperly during prior incidents caused by the CAFOs. As an example, on May 8, 1991, a 10-acre feces and urine cesspool ruptured on Murphy's Magnolia No. 1 facility in Duplin County. After the lagoon collapsed, tons of water flowed into Millers Creek. According to news reports, Wendell Murphy, Sr. knew about the incident within hours and personally visited the site. It took four days to find and patch the leak. But Murphy never notified the State about the spill.

149. Mr. Murphy in a news article dated February 19, 1995 stated there was "not one shred, not one piece of evidence anywhere in this nation" that hog lagoons were harming the groundwater." In fact, hog CAFOs do harm the groundwater. Studies have reviewed lagoons in the coastal plain of North Carolina and found seepage losses to the surficial aquifer.

150. Mr. Murphy as reported on February 24, 1995 represented that CAFOs increased property values: "Wendell Murphy, founder and chairman of Murphy Family Farms, rejects

35

claims that hog farms devalue nearby property. In fact, he says the opposite is true: 'Property values have gone up, and I mean seriously gone up, as a result of this industry being here.' … 'If somebody has property near us and they say their property is worth less and they have to leave -- tell us about it. We'll buy it.'" Those statements were inaccurate. Numerous studies have shown that swine sites hurt property values. According to subsequent news reports, when one or more CAFO neighbors later sought to take Mr. Murphy up on his offer to buy their properties, Mr. Murphy backed out and refused to do so.

151. In August of 1997, Smithfield was fined $12.6 million for violating the U.S. Clean Water Act. This was reported to be the largest fine ever imposed under the Clean Water Act. Smithfield was found to be dumping into the Pagan River, a tributary flowing into the Chesapeake Bay. The company's failures resulted in more than 5,000 violations of permit limits over five years. These violations caused harm to the water quality of the Pagan River, the James River, and the Chesapeake Bay. Further, the Courts found that the company had falsified documents and destroyed water quality records.

152. In April 1999, a spill at Vestal Farms, owned by Murphy, dumped over a million gallons of water in Duplin County. Murphy and the NC Pork Council claimed the spill was caused by vandals. The State found zero evidence to back up Murphy's claim. In fact there was vegetation growing near the lagoon, tree roots weakened the wall, and there were erosion issues. Murphy had been warned to clear the trees. The State concluded that excessive seepage through the dike wall was the probable cause. Nearly two million gallons spilled into a tributary of the Northeast Cape Fear River. Murphy was fined $40,650.

153. In September 1999, Hurricane Floyd caused flooding in Eastern North Carolina. Many hog farms flooded and thousands of dead pigs floated to nearby areas. This hurricane and

36

other rain events have caused flooding from hog facilities and highlighted the vulnerabilities in our state. However in 2011, Wendell Murphy, Sr. stated the harm caused by the hog facilities in the hurricane was "minimal."

154. Murphy has added special controls at sites in other states and has publically admitted that it was to "reduce the level of odor produced by the farms." Defendant has added controls at some sites in North Carolina such as the Mitchell Norris facility in Bladen County due to odor and has installed a partial lagoon cover at Kenansville Farm in Duplin County "to respond to odor complaints from neighbors." Defendant is aware that the hog sites cause odor and nuisance, but willfully refuses to install improvements where its hogs are stored herein.

155. In contrast to Defendant's assertions that its hogs do not cause nuisance or injury, numerous scientific reports and studies have found that they do. These reports show that Defendant has actual knowledge of the nuisance caused by its swine, or is willfully blind to that fact. They also support the fact that the Plaintiffs suffer adverse effects from the odors such as nausea, congestion, wheezing and difficulty breathing, loss of enjoyment, and have reasonable fears regarding the effect of the nuisance upon them and their families, including young children or grandchildren, elderly and disabled family members, and other loved ones.

156. Because Murphy recklessly failed to perform proper studies to determine the harmful effects of the swine CAFOs before building them in the 1980s-early 90s, scholars were obligated to work to assess the health risks after the fact. Numerous studies have now documented the injuries and harms and the nuisance caused by hog CAFOs.

157. Defendant knew from those studies, its own experience, from neighbor complaints, from lawsuits, governmental enforcement actions, consent orders and verdicts against it, in multiple states, that hog urine and feces causes a nuisance to neighbors, hog

37

emissions contain disease-causing pathogens and chemicals, and this is harmful to humans. Defendant's ongoing failure to take reasonable steps to abate the nuisance caused by its hogs reflects willful and wanton conduct under the circumstances. After over than 15 years of a moratorium on new construction of harmful lagoon and spray facilities, Murphy-Brown still sends its hogs to such facilities under a one-sided contract grower system designed to maximize integrator profit without abating the nuisance.

## <u>COUNT I: RECURRING, TEMPORARY, ABATABLE,<br>PRIVATE NUISANCE</u>

158. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

159. Plaintiffs, and each of them, are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences or for other legitimate uses.

160. Defendant, during the pertinent times, owned and materially controlled the hogs in close proximity to Plaintiffs' properties so as to cause a private nuisance.

161. Plaintiffs' right to use and enjoy their properties has been impaired by recurring foul and offensive odors; hog manure and urine; flies or other insects; buzzards or other scavenger animals; vectors of disease; trucks that cause noise and lights at night and foul smells; dead hogs; and other sources of nuisance.

162. The nuisance periodically caused by Defendant's swine has substantially impaired Plaintiffs' use and enjoyment of their property, and has caused anger, embarrassment, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of opportunity to

38

continue to develop properties, injury to and diminished value of properties, physical and mental discomfort, and reasonable fear of disease and adverse health effects.

163.    Defendant has engaged in improper or negligent operation of swine sites during some or all of the pertinent times, causing harm to the Plaintiffs.

164.    Defendant's conduct has been unreasonable.  Reasonable persons, generally, looking at Defendant's conduct, the problems caused by it, the character of the neighborhood, the nature, utility and social value of the use of land, and the extent, nature, and recurrent nature of the harm to Plaintiffs' interests, would consider Defendant's conduct to be unreasonable.

165.    The invasions, harms and injuries complained of herein by Plaintiffs are more than slight inconveniences or petty annoyances, but rather substantial invasions, harms, and injuries to Plaintiffs' comfort, property, and use of their land.

166.    Defendant had actual knowledge during some or all of the pertinent times that the subject hogs were causing a nuisance.

167.    Defendant knew or should have known that foul and offensive odors, hog manure and urine, flies and other insects, and other causes of nuisance from their hogs would recurrently encroach upon and invade Plaintiffs' properties, and substantially impair Plaintiffs' use and enjoyment of their properties.

168.    While knowing that practicable technologies and methods are readily available to abate the nuisances and problems, Defendant has failed to abate the foul and offensive odors and other causes of nuisance.

169.    During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendant stood in a

principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facility in a manner which caused a nuisance to the Plaintiffs.

170. Alternatively, during the pertinent times, Defendant's own direct involvement in material aspects of the operation of the facilities and management of the hogs renders Defendant independently liable for the nuisance with regard to the Plaintiffs.

171. Alternatively, during the pertinent times, Defendant employed contract growers to do work which Defendant knew or had reason to know would likely involve the creation of a nuisance, and is therefore subject to liability for harm resulting to Plaintiffs. *See* Restatement (Second) Torts § 427B ("One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance.").

172. Defendant's conduct described above constitutes a series of recurring temporary abatable private nuisances, which Defendant has failed to remedy within a reasonable period of time, and for which Defendant is liable.

173. As a result of Defendant's liability for private temporary recurring abatable nuisance, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

174. In accordance with Fed. R. Civ. P. 9(g), Plaintiffs hereby plead special damages including the diminished value and lost rental value of their homesteads and properties. Plaintiffs show that as homeowners and occupants of their family properties, they are of the opinion that one impact of Defendant's nuisance has been to reduce their property values. Numerous studies and reports have determined that hog CAFOs lower nearby property values. Plaintiffs allege that each of their homes and properties has lost significant value as a result of

the proximity of Defendant's hogs and the stench and nuisance that they cause, to be shown at trial. These damages are in addition to all other allowable damages which the jury may award.

## COUNT II: NEGLIGENCE

175. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

176. At all pertinent times, Defendant had a duty to exercise reasonable care as to the ownership, maintenance, and control of the hogs that it recurrently sent in groups to swine facilities.

177. During all pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facilities in a negligent manner which caused injury to the Plaintiffs.

178. Alternatively, during the pertinent times, Defendant's direct involvement in material aspects of the operation of facilities and the management of the hogs renders Defendant independently liable for its breaches of its duty of due care with regard to the Plaintiffs.

179. Defendant has recurrently breached its duty of due care each time it has sent new large groups of its hogs to the CAFOs. As a direct and proximate result of Defendant's breach of its duty of care, the Plaintiffs have been injured.

180. During the pertinent times, Defendant knew or should have known that its actions and omissions were causing and contributing to cause harm to the Plaintiffs.

181. Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate Plaintiffs for the negligence of Defendant.

## COUNT III: PUNITIVE DAMAGES

182.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

183.    Defendant's above-described recurring conduct, acts, omissions, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

184.    Pursuant to N.C. Gen. Stat. § 1D-15(a), Defendant is properly liable for punitive damages in this action in that Defendant is liable for compensatory damages and has committed one or more aggravating acts or omissions justifying an award of punitive damages, including without limitation, recurring acts of egregious and reckless behavior, and specific instances of willful and wanton conduct.

185.    The recurring conduct, acts, omissions, negligence, and impropriety of the Defendant were willful, wanton, malicious, and in reckless disregard for the rights and interests of the Plaintiffs and justify an award of punitive damages.   Accordingly, Plaintiffs demand judgment against Defendant for punitive damages in an amount to be determined at trial.

## COUNT IV: INJUNCTIVE AND EQUITABLE RELIEF

186.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

187.    In addition to their claims for monetary damages, the Plaintiffs respectfully request entry of injunctive and equitable relief requiring the Defendant to implement and continue measures to alleviate and abate the nuisance-causing conditions alleged herein.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury of all claims so triable.

42

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court:

A.      Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B.      Award the Plaintiffs punitive damages;

C.      Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses or fees to which they may be entitled by law;

D.      Award the Plaintiffs appropriate injunctive and equitable relief; and

E.      Award the Plaintiffs such other and further relief as is just and proper.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.

Respectfully submitted, this the 17th day of October, 2014.

By:     s/Mona Lisa Wallace
        Mona Lisa Wallace
        NCSB #9021
        John Hughes
        NCSB #22126
        Wallace & Graham, P.A.
        525 North Main Street
        Salisbury, NC  28144
        Phone: 704-633-5244
        Fax: 704-633-9434
        mwallace@wallacegraham.com
        jhughes@wallacegraham.com

43