| | |
|---|---|
| BEN ARTIS, | ) |
| DIANE ARTIS, | ) |
| LUCY SIDBERRY, | ) |
| LEOLA JACOBS, | ) |
| GERTIE JACOBS, | ) |
| EDNA ALLISON, | ) |
| LENORA NICHOLSON, | ) |
| EDDIE NICHOLSON, | ) |
| JOYCE MESSICK, | ) |
| WILLIE MESSICK, | ) |
| JOHN TAYLOR, | ) |
| JAMES JACOBS, | ) |
| JIMMY CARR, | ) |
| PHYLLIS WRIGHT, | ) |
| LENORA HOLMES, and | ) |
| JAMES HOLMES, and | ) |
| | ) |
| PLAINTIFFS, | ) |
| | ) |
| v. | ) |
| | ) |
| MURPHY-BROWN, LLC d/b/a SMITHFIELD | ) |
| HOG PRODUCTION DIVISION, | ) |
| | ) |
| DEFENDANT. | ) |

## THIRD AMENDED COMPLAINT

Plaintiffs hereby file their Third Amended Complaint against the Defendant Murphy-Brown, LLC d/b/a Smithfield Hog Production Division and allege as follows:

## I.  INTRODUCTION

1.     The Plaintiffs are residents of Pender County.  During the pertinent times they have resided in close proximity to thousands of hogs owned by the Defendant kept in one or more Concentrated Animal Feeding Operations ("CAFOs" or "hog facilities").  There are three

1

hog facilities within close proximity of these Plaintiffs which are or during pertinent time were operating. These facilities are:

    i.    The **Paul Stanley 5 (now Greenwood 1)** facility, adjacent to Plaintiffs Ben and Diane Artis. It has Permit Number AWS710090, a facility address of 7448 Piney Woods Road, Watha NC 28478, and its approximate GPS coordinates are latitude 34.5728, longitude -78.0742.

    ii.    The **Paul Stanley No. 6 (now Greenwood 2)** facility, adjacent to Plaintiff Jimmy Jacobs. It has Permit Number AWS710017, a facility address of 6500 Piney Woods Road, Watha NC 28478, and its approximate GPS coordinates are latitude 34.5717, longitude -78.0572.

    iii.    The **Paul Stanley No. 7** facility, adjacent to the New Hope Missionary Church where a number of the plaintiffs are members. It has Permit Number: AWS710043, a facility address of 2772 Piney Woods Road, Watha 28478, and its approximate GPS coordinates are latitude 34.563599, longitude -78.018109.

Collectively, these facilities hold thousands of Defendant's hogs at any given time.

2.    Hogs generate multiple times more manure than humans. Defendant's hogs at the CAFO facilities generate many times more sewage than entire towns. Yet Defendant has failed to take adequate steps to manage the number of hogs or otherwise abate the obnoxious, recurrent odors and other causes of nuisance. The hog waste includes ammonia, hydrogen sulfide and numerous other elements that are very foul-smelling and can also cause disease. This has impaired the Plaintiffs' use and enjoyment of their properties.

3.    The presence of Defendant's hogs has also caused periodic swarms of flies and other pests. Large flies periodically descend upon Plaintiffs' property, interfering with activities. These insects are vectors for disease.

4.    Defendant's hogs also necessitate large trucks crawling up and down the streets near Plaintiffs' homes. The country roads normally would never be subjected to having repeated

episodes of large tractor-trailers and other big trucks taking feed to the hogs, trucking in live hogs, and trucking out live and dead hogs. These trucks cause further nuisance.

5.     The "lagoon and spray" waste disposal system is outmoded and has been banned for new farms. The combination of the hog sheds, waste pits under slatted floors, waste lagoons and spray fields causes periodic foul odor and spreads germs and injurious substances. Defendant is a large enterprise with the ability to end the nuisance. It is a corporation with operations in multiple states and is a wholly-owned subsidiary of a multi-state corporation known as Smithfield Packaged Meats. Sun Merger Sub, Inc., a Virginia corporation and a wholly owned subsidiary of Shuanghui International Holdings, Limited, merged with and into Smithfield Foods, Inc. on September 26, 2013. As a result of that merger, Smithfield Foods, Inc. became a wholly owned subsidiary of Shuanghui International Holdings, Limited, which changed its name to WH Group Limited in 2014. Smithfield Foods, Inc. reported sales for the first quarter of 2014 of $3.4 billion and net income of $105.3 million, and a subsidiary of Shuanghui International Holdings, Limited paid $34 per share to the former shareholders of Smithfield Foods, Inc. for 138,696,747 shares of Smithfield Foods, Inc.'s Common Stock.

## II. PARTIES

### A. Plaintiffs.

1.     Plaintiff **Ben Artis** is a resident of North Carolina who resides at 7350 Piney Woods Road in Willard, Pender County, North Carolina.

2.     Plaintiff **Diane Artis** is a resident of North Carolina who resides at 7350 Piney Woods Road in Willard, Pender County, North Carolina.

3.     Plaintiff **Lucy Sidberry** is a resident of North Carolina who resides at 7679 Piney Woods Road in Willard, Pender County, North Carolina.

3

4.     Plaintiff **Leola Jacobs** is a resident of North Carolina who resides at 8036 Piney Woods Road in Willard, Pender County, North Carolina.

5.     Plaintiff **Gertie Jacobs** is a resident of North Carolina who resides at 8038 Piney Woods Road in Willard, Pender County, North Carolina.

6.     Plaintiff **Edna Allison** is a resident of North Carolina who resides at 8038 Piney Woods Road in Willard, Pender County, North Carolina.

7.     Plaintiff **Lenora Nicholson** is a resident of North Carolina who resides at 8134 Piney Woods Road in Willard, Pender County, North Carolina.

8.     Plaintiff **Eddie Nicholson** is a resident of North Carolina who resides at 8162 Piney Woods Road in Willard, Pender County, North Carolina.

9.     Plaintiff **Joyce Messick** is a resident of North Carolina who resides at 8107 Piney Woods Road in Willard, Pender County, North Carolina.

10.     Plaintiff **Willie Messick** is a resident of North Carolina who resides at 8107 Piney Woods Road in Willard, Pender County, North Carolina.

11.     Plaintiff **John Taylor** is a resident of North Carolina who resides at 8061 Piney Woods Road in Willard, Pender County, North Carolina.

12.     Plaintiff **James Jacobs** is a resident of North Carolina who resides at 6506 Piney Woods Road in Willard, Pender County, North Carolina.

13.     Plaintiff **Jimmy Carr** is a resident of North Carolina who resides at 6464 Piney Woods Road in Willard, Pender County, North Carolina.

14.     Plaintiff **Phyllis Wright** is a resident of North Carolina who resides at 6369 Piney Woods Road in Willard, Pender County, North Carolina.

15. Plaintiff **Lenora Holmes** is a resident of North Carolina who resides at 3926 Piney Woods Road in Willard, Pender County, North Carolina.

16. Plaintiff **James Holmes** is a resident of North Carolina who resides at 3926 Piney Woods Road in Willard, Pender County, North Carolina.

**B.**    **Defendant**

17. Defendant **Murphy-Brown, LLC d/b/a Smithfield Hog Production Division** is a limited liability company organized under the law of Delaware, whose sole member is Smithfield Packaged Meats, a corporation incorporated under the law of Delaware. Smithfield Packaged Meats's principal office is located in Ohio. Smithfield Packaged Meats is a wholly-owned subsidiary of Smithfield Foods, Inc., a corporation incorporated under the law of Virginia with its principal office located at 200 Commerce Street, Smithfield, VA 23430. Defendant has conducted business in North Carolina.

**III.  JURISDICTION AND VENUE**

18. The Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4.

19. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which a substantial part of property that is the subject of the action is situated.

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

## IV. FACTUAL BACKGROUND

### A. Background Regarding the Plaintiffs.

21.     During the pertinent times, the Plaintiffs have suffered injury and harm as a direct result of the thousands of swine placed near their homes by Murphy-Brown. Defendant's thousands of hogs generate feces and urine that fall onto slatted floors and adhere to hog bodies, dry into particulate dust, adhere to skin cells from pigs, and drip and trickle under the slatted floor into holding ponds below the floors that hold raw feces and urine. Stench rises from below the floor and from throughout the hog sheds, and the dust, skin cells, dander, particulates, dried fecal matter and stench from below-floor manure is sent out into the environment by large fans set in hog shed walls or by other means.

22.     The urine and feces go into giant holding ponds outdoors from which it evaporates and may leak and spill. The uncovered cesspools they are free to evaporate odor into the air and attract flies. The slurry or liquid containing the urine and feces is also sprayed into the air and onto fields around the hog sheds causing odorous fecal and urinous mist to drift through the air, go onto neighboring lands, and moisture and matter to fall and puddle on the soil so that more odor rises off it. Sites must spray large quantities or else the "lagoons" will overflow. One or more Plaintiffs have witnessed spraying and spray mist. The spraying regularly occurs and causes stench. The sites also breed and attract flies and other insects. Dead hogs are placed in "dead boxes" where they rot until picked up by "dead trucks." Large hog trucks carry hogs into and out of the facilities. All of these activities cause temporary, periodic, abatable nuisance odor, annoyance, dust, noise and loss of use and enjoyment of homesteads. The stench and associated nuisance also embarrasses and humiliates the Plaintiffs.

6

23.     Plaintiffs have suffered episodes of noxious odor, flies and pests, nausea, burning and watery eyes, stress, anger, worry, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities, cookouts, gardening, lawn chores, drifting of odorous mist and spray onto their land, inability to keep windows and doors open, difficulty breathing and other harms.

24.     Plaintiffs have employed measures and incurred expenses to try to protect themselves from the odors, pests, and nuisance from the hog sites and large hog trucks that pass up and down their rural roads.  They variously engage in keeping windows and doors closed and running air conditioner during mild weather, caulking and employing other sealants on windows and doors, purchasing cans of spray insecticides, paying to have their yards sprayed with pesticides, purchasing flypaper strips, purchasing scented candles or incense, and purchasing air fresheners, purifiers, and deodorizers.

25.     Plaintiffs have suffered smells from hog feces, urine, body odor, and corpses; the sight of dead, bloated, and decaying hogs; liquid dripping from passing hog trucks and "dead trucks;" increased pest populations; and other aspects of the nuisance.  The Plaintiffs feel angry, fearful and worried about their and their children's health.

26.     Many of the affected neighbors are African-Americans whose roots in the area can be traced sometimes back to Reconstruction or even earlier. These African-American rural communities were here long before Murphy-Brown and the CAFOs.  Further, many in these minority communities are low-income and live in homes or mobile homes ill-equipped to combat the foul smells and other recurring nuisances from Defendant's hogs.   When the thousands of hogs were first trucked in, Defendant and its predecessors were well aware they were putting the hogs in minority and low-income communities especially vulnerable to the nuisance.

7

27.     Members of low-income rural communities traditionally have engaged in activities like hanging out their clothes to dry to save utility and appliance costs. They often tend gardens in their yards for extra food. Running a fan or opening the windows can save air conditioning costs. The hog nuisance gets in the way of all these activities. Also, extended families of related relatives live in the same neighborhood. They like to walk over to each other's homes and socialize and have cookouts together or sit on the porch together. The hog nuisance interferes with these activities as well.

28.     The nuisance from the trucks is serious in itself. On information and belief, the conditions for the hogs inside of the transport trucks is often crowded and dirty. The trucks inside can become smeared with raw feces and urine and stench from the hot crowded hogs. The odor and waste spilled from the trucks cause episodes of nuisance.

29.     Defendant never asks for the Plaintiffs' permission before bringing new loads of hogs into the neighborhood or allowing spraying of waste in the air which creates vapor. Nor did Defendant's predecessors ask for Plaintiffs' permission before siting the CAFOs or their spray fields or cesspools. To the contrary, Defendant and its predecessors went out of their way to encourage and set up the CAFOs. In fact on information and belief, from time to time Murphy-Brown or its predecessors have even assisted with procuring loans to facilitate the construction of a CAFO, or have provided materials to construct facilities and dig lagoons.

30.     On information and belief, for one or more CAFOs, Murphy-Brown and its predecessors have helped pick the site, have come over and staked off the lot to have the hog houses and lagoons built, and have even paid for the materials to build the lagoons and hog houses. From time to time Murphy-Brown or its predecessors have specified use of the "reel and gun" system of spray irrigation even though it causes more vapor and nuisance than other

systems, and Murphy-Brown technicians, veterinarians, truckers and site representatives come by on a regular basis and micromanage the growers. Murphy-Brown checks as often as every week on lagoon levels and spray events but never warns the neighbors or gets their consent. This is despite the fact that Defendant is aware that neighbors live right next to its hogs.

### i. Ben and Diane Artis.

31. **Ben and Diane Artis** live in their marital home adjacent to one of the Paul Stanley/Greenwood facilities which houses Murphy-Brown hogs. Their property, which comprises approximately 1.5 acres, is separated from the spray field of the hog facility by only a shallow ditch.

32. Upon information and belief, the hog facility behind their home began housing Defendant's hogs in or about 1994. Ever since, their property has at times been overrun by foul odors created by the waste of Murphy-Brown's hogs. These odors are unpredictable and at times make it nearly impossible for them to enjoy being outdoors at their home.

33. In addition to the spray field being just beyond their backyard, the driveway for the facility is fewer than 100 yards from their property, subjecting them to the noises and odors created by the large hog trucks entering and exiting from the hog facility.

34. There is only a ditch and thin row of vegetation separating the Artises from the facility's spray field. They can see the facility and the spray field from not only their back and side yards, but from inside their home looking out of any one of the windows on the entire back side of their home.

35. A number of years ago, a problem at the facility led to a large amount of hog effluent and fecal matter flooding the ditches surrounding the Artises' property and running onto their property. The odor was nearly unbearable. The effluent was eventually pumped from the

9

ditches and removed from the property, but the Artises continue to fear that it is only a matter of time before it will happen again.

36.     In addition to being a Baptist preacher, Mr. Artis runs a small shrub and flower business on his property.  In order to properly maintain his investment, he spends a great deal of time outdoors and at times experiences foul odors emanating from the Defendant's hogs. Because of these recurring and unpredictable odors, Mrs. Artis spends the vast majority of her time inside the home.

37.     Due to the close proximity of this facility and its spray field, the Artises do not open their windows for any length of time to let in fresh air.  The chances are too great that the foul odors could come into their home.  For that reason, their windows generally stay closed which causes them to run their air conditioning more often than they would if not for the nuisance created by the Defendant's hogs which creates a much higher utility bill.

38.     Over the last several years, Mr. and Mrs. Artis have inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste.  Each has frequently smelled strong, foul odors of hogs.  The smells get worse when the weather is hot.  Sometimes the odors have been unbearable.  The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

39.     Over the last several years, Mr. and Mrs. Artis have been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property.  It has unreasonably interfered with their use and enjoyment of the property because they must smell a nauseating smell while engaging in normal activities on the property.

40.     The foul odor has affected the ability of Mr. and Mrs. Artis to use and enjoy their land by limiting their ability to enjoy time in activities outdoors.  For example, the foul odors have kept them from cooking outside.  Also, they like to spend time with family relatives outdoors but their ability to do so enjoyably is injured by the hog odors.

41.     Because of nuisances such as the odors from the hogs housed at the nearby swine facilities, the increase in the number of flies, and land-spraying operations to dispose of the waste generated from Defendant's hogs, over the last several years, Mr. and Mrs. Artis have each been limited in when they can open their doors and windows because of the horrible smell and the flies.

        **ii.**    **Lucy Sidberry.**

42.     **Lucy Sidberry** grew up on the family land where she now lives and just a few doors down from her aunt Annie Jacobs.  Residing at 7679 Piney Woods Road, she lives very close to one of the Paul Stanley/Greenwood facilities.

43.     Originally, no large hog sites existed in the area.  Thus an aerial photo dating from February 1993 reflects that the Stanley/Greenwood facility is not yet there.

44.     The site has for years used spray guns to dispose of the hog waste when the site's open-air cesspool gets to be too full.  For example, an aerial photo dating from October 2010 shows some spraying in progress.  An aerial photo dating from October 2014 again shows spraying in progress.  Of all the methods of irrigating with the waste liquid, spraying up into the air is the most damaging in terms of causing odor, ammonia release and other nuisance.  Yet, it is the cheapest.

45.     Ms. Sidberry was mostly raised by her aunt, Ms. Jacobs, so she recalls very well the time before the hog facilities and their respective spray fields were sited in their rural country community, so close to their home.

46.     In the years prior to the hog facility, Ms. Sidberry would regularly raise her windows when the weather was nice to allow in fresh, cool air.  However, due to the recurring and unpredictable nature of the odors emanating from the Defendant's hogs, Ms. Sidberry largely stopped doing this to keep the odor out of her home.  This requires her to run her air conditioning more than she would otherwise, resulting in a significantly higher utility bill.  She used to be able to regularly raise up her windows at night when she slept to keep her home cool.

47.     Like Ms. Jacobs, Lucy Sidberry is also a member of the New Hope Missionary Church which is adjacent to the Paul Stanley 7 facility, so she has experienced many an episode of foul odor not only at her home, but at her church, when Paul Stanley 7 was active.  She regularly attends on Sunday mornings when services are being held and also regularly attends for Bible study along with occasions such as funerals.  Because the church is next to the spray field for the facility, it has not been unusual for her and others to smell the odors emanating from the Defendant's hogs when the site held hogs.

48.     Over the last several years, Ms. Sidberry has inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste.  She has frequently smelled strong, foul odors of hogs.  The smells get worse when the weather is hot.  Sometimes the odors have been unbearable.  The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

49.     Over the last several years, she has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the

property. It has unreasonably interfered with her use and enjoyment of the property because she must smell a nauseating smell while engaging in normal activities on the property.

50. The foul odor has affected the ability of Ms. Sidberry to use and enjoy her land by limiting her ability to enjoy time in activities outdoors. For example, the foul odors have kept her from cooking outside. Also, the foul smells force her to keep her windows closed and to stay indoors and to avoid outdoor activities.

51. Lucy Sidberry was born in 1948. She spends a lot of her time at her home. The smells and the flies hurt her enjoyment of her time at home.

52. She sees truckloads of hogs going by all the time. The trucks bring the hogs out and in to the hog farm. The trucks cause a bad odor. It is like they leave a trail of stink by her home.

53. The best way she can describe the smell is that it is a stink. She had even been able to smell it indoors.

54. She has found that the smell can be very bad when they are spraying the waste in the air onto the fields. She has seen sometimes when the spraying occurs.

55. The bad odors hurt her ability to enjoy family gatherings, yard work, outside playtime with children and grandchildren, and just sitting out to enjoy the weather.

56. The flies hurt her ability to have cookouts and to eat outside, because the flies get all on the food.

57. Because of the flies and the bad odors, Ms. Sidberry has to keep the windows closed a lot of the time, keep the door closed, she cannot air out the house, and she has to buy products like fly spray and air fresheners.

58.     As another example of the impact Defendant has had on the use of her property, Ms. Sidberry used to dry her clothes using a clothesline in her yard.  Ever since she began smelling the hog odor in her clothes, and having to then re-wash those clothes, she bought an electric dryer and largely stopped using her clothesline.

59.     As a recent example of the impactful nature of the odor coming from the Defendant's hogs, in early December 2014, Mr. Sidberry was outside decorating her home for Christmas when one of the large Murphy-Brown hog truck came by her home to turn into the facility closest to her.  The odor coming from Defendant's truck was so bothersome that she had to go inside to escape it.  This is only one example of the reason Ms. Sidberry spends much less time outside enjoying her property than she once did, before the Defendant created such a nuisance.

60.     Another example is one afternoon recently, Ms. Sidberry and a friend of hers wanted to cook out, yet the odor from the hogs was so bad, they decided against it and ate inside to escape the nuisance.

### iii.   Leola Jacobs, Gertie Jacobs, and Edna Allison.

61.     **Leola Jacobs**, **Gertie Jacobs**, and **Edna Allison** are sisters and live on the same piece of family property on which they all were reared.  They inherited this property from their parents.

62.     All now retired and having previously worked out-of-state, they have all lived together on this piece of family land since they all moved home in the early 1990s to care for their ailing father who died in 1995.

63.     Each of their lives has been significantly impacted by the unpredictable and recurring odors created by the Defendant's hogs.  In addition, Defendant's hog trucks pass by

their property on a frequent basis, leaving a trail of odor and, at times, effluent on the road. Each has, at times, gotten behind one of the trucks in their cars and gotten effluent splashed on their windshields.

64. These nuisances have significantly impacted their ability to fully enjoy and use their property. For example, Gertie Jacobs' daughter and family live in Winston-Salem. When they visit Gertie's home, they typically cannot have cookouts or any type of gathering outside because of the unpredictable odors.

65. Even inside their homes, they take precautions to keep the odors out. For example, Leola's stove has a vent which opens to the outside. When the odors and swarms of flies are present, she has to close the vent and use air fresheners and deodorizers in her home.

66. They keep their windows closed virtually at all times. Even when the odors are not present, they keep the windows closed because, at any time, the odor could arise and come into their home. For them, it is not worth taking that risk.

67. Over the last several years, each of the sisters has inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste. Each has frequently smelled strong, foul odors of hogs. The smells get worse when the weather is hot. Sometimes the odors have been unbearable. The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

68. Over the last several years, each sister has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property. It has unreasonably interfered with their use and enjoyment of the property because they must smell a nauseating smell while engaging in normal activities on the property.

69.     The foul odor has affected the ability of each sister to use and enjoy her land by limiting her ability to enjoy time in activities outdoors.  For example, the foul odors have kept each from cooking outside.  Also, they like to spend time with family relatives outdoors but their ability to do so enjoyably is injured by the hog odors.

70.     The three sisters are members of the New Hope Community Church which, as mentioned above, is adjacent to Paul Stanley 7.  Services are held every second and fourth Sunday of each month as well as regular Bible studies, choir rehearsals, and the occasional funeral and other events.  Therefore, in addition to the indignity of the hog odor being present at times on their property, each of them has been impacted significantly by the odor emanating from Defendant's hogs while at church.  Having to, at times, live by the odor and, at times, attend church by the odor has saddened them, but it is their home place and their home church and they have no intent, nor the financial ability, to leave.

71.     Around the time the Paul Stanley 7 facility was built – the first of the three facilities – the church members signed a petition to try to keep the hog farm from being sited so close to the church.  Unfortunately, they were not successful, and the hog farm was built, and it has been raising Defendant's hogs and spraying their waste onto the field adjacent to the church.

### iv.      Lenora and Eddie Nicholson.

72.     **Lenora Nicholson** resides on Piney Woods Road beside her adult son and fellow plaintiff, **Eddie Nicholson**.  The Nicholsons came to Piney Woods Road from New York, New York in the late 1970s and have resided here ever since.

73.     Although now 81 years old, Ms. Nicholson has recently worked full-time.  When she leaves in the morning or returns in the evening, she at times experiences bouts of odor emanating from the Defendant's hogs.  In addition, living close to the road which passes by each

of the three Paul Stanley facilities, the Nicholsons frequently hear, see, and smell large Murphy-Brown hog trucks passing in front of their home, at times leaving a trail of effluent and odor. The Nicholsons have each been behind one of these Murphy-Brown trucks and had their respective vehicles splashed with hog effluent and overrun by the accompanying odors. Both have had to wash their cars many times after having gotten behind a hog truck of this type.

74.     The Nicholsons have been significantly affected and bothered by the intermittent nuisance created by the Defendant's swine and have employed measures and incurred expenses to try to protect themselves from the odors, pests, and nuisance created by the Defendant's hogs.

75.     Over the last several years, the Nicholsons have inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste. They have frequently smelled strong, foul odors of hogs. The smells get worse when the weather is hot. Sometimes the odors have been unbearable. The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

76.     Over the last several years, the Nicholsons have been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property. It has unreasonably interfered with their use and enjoyment of the property because they must smell a nauseating smell while engaging in normal activities on the property.

77.     The foul odor has affected the ability of the Nicholsons to use and enjoy their land by limiting their ability to enjoy time in activities outdoors. For example, the foul odors have kept them from cooking outside. Also, they like to spend time with family relatives outdoors but their ability to do so enjoyably is injured by the hog odors.

78.     **Joyce Messick** resides with her brother, **Willie Messick**, on Piney Woods Road. Mr. Robinson has lived on this family property since well before the nearby Paul Stanley hog facilities were constructed. Their mother Donnie Messick lives approximately two miles from them on the same road near another of the Paul Stanley hog facilities.

79.     The recurring nuisance created by the Defendant's hogs has significantly impacted their use and enjoyment of their property.  They enjoy cooking out in their yard on occasion, however, when the odor is present, they either quickly cook and take their food inside, or simply cook inside because the odor is so unpleasant.

80.     Living so close to the facilities and on the same road as the facilities, they are routinely subjected to the noise and odors created by the passing Murphy-Brown trucks going to or coming from the Paul Stanley facilities, which at times leave a trail of effluent on the road.

81.     To minimize the impact of the odors on their property, they keep their windows closed, run their air conditioning, and use various air sanitizers to keep the odor out of their home.  Before the facilities' construction, they enjoyed keeping their windows up during pleasant weather and allowing in fresh air.  They rarely do this anymore due to the unpredictable and foul nature of the odors.

82.     The Messicks have been significantly affected and bothered by the intermittent nuisance created by the Defendant's swine and have employed measures and incurred expenses to try to protect themselves from the odors, pests, and nuisance created by the Defendant's hogs.

83.     Over the last several years, the Messicks have inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste.  They have frequently smelled strong, foul odors of hogs.  The smells get worse when the weather is hot.  Sometimes

18

the odors have been unbearable. The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

84. Over the last several years, the Messicks have been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property. It has unreasonably interfered with their use and enjoyment of the property because they must smell a nauseating smell while engaging in normal activities on the property.

85. The foul odor has affected the ability of the Messicks to use and enjoy their land by limiting their ability to enjoy time in activities outdoors. For example, the foul odors have kept them from cooking outside. Also, they like to spend time with family relatives outdoors but their ability to do so enjoyably is injured by the hog odors.

86. Having lived here for many years before the hog facilities were constructed, they recall very well life on their family property without the burden of the odors and the passing hog trucks and hope that one day, they can again enjoy their property as they once did.

### vi. John Taylor.

87. **John Taylor** is the first cousin of the above-mentioned Joyce and Willie Messick and lives next door to them, also on family property. Mr. Taylor has lived on this property all of his 65-plus years of life. He inherited this property from his parents and now lives alone.

88. Mr. Taylor, like the other plaintiffs, remembers a more peaceable life and community here before the Defendant's hogs created such an impactful nuisance. This nuisance bothers him most when he is outside when the odor is present or a large Murphy-Brown hog truck passes while he is trying to enjoy some fresh air or cook outside. In addition to the odor

created by Defendant's hogs, the presence of flies and gnats on his property has increased substantially.

89.     He recalls once recent instance from last summer when a large hog truck passed in front of his home leaking out hog effluent so badly that it virtually covered one side of the road in front of his home.  Passing cars had to drive in the left lane to bypass the waste that had leaked into the road.  Although the trucks typically cause odor to drift onto his property when they pass, this time it was particularly foul.

90.     Mr. Taylor was born in 1949.  Mr. Taylor has pancreatic cancer and no longer works.  He therefore spends much more time now at his home than he did while he was working and thus is impacted more frequently by the nuisance created by the Defendant's hogs.  He has always been an outdoor person and enjoys being in his yard or sitting on his porch.  He used to regularly cook and eat outdoors on his property but he rarely does his any longer.  When the odor and/or swarms of flies are present or when the large hog trucks pass by hauling Defendant's hogs, he is simply unable to enjoy his property like he was prior to the Facilities' construction.

91.     Over the last several years, Mr. Taylor has inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste.  He has frequently smelled strong, foul odors of hogs.  The smells get worse when the weather is hot.  Sometimes the odors have been unbearable.  The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

92.     Over the last several years, Mr. Taylor has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property.  It has unreasonably interfered with his use and enjoyment of the property because he must smell a nauseating smell while engaging in normal activities on the property.

93.     The foul odor has affected the ability of Mr. Taylor to use and enjoy his land by limiting his ability to enjoy time in activities outdoors.  For example, the foul odors have kept him from cooking outside.  Also, he likes to spend time with family relatives outdoors but his ability to do so enjoyably is injured by the hog odors.

94.     The best way he can describe the nuisance, is that there is a smell that is bad and that makes you want to vomit, and also, flies.

95.     The odors and the flies cause the worst problems when he wants to cook or to eat outside.  The odors can get worse in the warm weather.

96.     The odors get in the way of family gatherings, barbeques, and chores outside.  For example, if he tries to have a cookout outside, and the smell gets really bad, then they all have to go inside.  Also, the flies get all over the people and on the food.  They have to keep the windows closed and the door closed when that happens.

   **vii.**     **James Jacobs.**

97.     **James (“Jimmy”) Jacobs** lives directly adjacent to one of the Paul Stanley/Greenwood facilities.  In fact, his home is but a few feet from the driveway of the farm.  He and his late wife built the home in the early 1970s, but he now lives there alone.

98.     When he and his wife built their home, they were only surrounded by peaceful farm land, growing tobacco, corn, and other typical crops for the area.  Now, with a hog-waste spray field fewer than 100 yards of his home, he can no longer enjoy his property as he once did.

99.     Upon information and belief, from time to time the dead hogs from one or more of the other Paul Stanley facilities were hauled regularly to the facility beside Mr. Jacobs.  Approximately each morning of an early hour, around 5:00-6:00 a.m., a large truck enters and exits the driveway to pick up the dead hogs.  This creates a loud racket that wakes him at times.

21

In addition to these "dead trucks" entering and exiting the driveway so close to his home so often, other trucks also frequently use this driveway as it is the only path to the facility. Photos reflect use of a "traveling gun" sprayer applying the untreated hog waste to the fields.

100.     In addition to the odors emanating from the facility and the noise created by the hog trucks entering and exiting, flies have become a recurring, periodic nuisance. Before the facility was built and housed Defendant's hogs, flies were not a problem in the area. Ever since, they have become a recurring nuisance. Mr. Jacobs says that, at times, if he leaves his door open for just a few minutes, he will have a house full of flies. Again, this was not an issue with which Mr. Jacobs had to deal prior to the hog facility and its spray field being sited so close to him.

101.     Having lived here for more than 20 years prior to the hog facility's construction, he knows what life was like on his property before the facility and now after. Before, he and his wife experienced a much higher quality of life, not subjected to the periodic odors, flies, and noise coming from the Defendant's hogs and trucks. Now, however, he never knows when he walks out the door if the odor will be there or if a swarm of flies will be present.

102.     Over the last several years, Mr. Jacobs has inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste. He has frequently smelled strong, foul odors of hogs. The smells get worse when the weather is hot. Sometimes the odors have been unbearable. The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

103.     Over the last several years, Mr. Jacobs has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property. It has unreasonably interfered with his use and enjoyment of the property because he must smell a nauseating smell while engaging in normal activities on the property.

104.    The foul odor has affected the ability of Mr. Jacobs to use and enjoy his land by limiting his ability to enjoy time in activities outdoors.  For example, the foul odors have kept him from cooking outside.  Also, he likes to spend time with family relatives outdoors but his ability to do so enjoyably is injured by the hog odors.

### viii.    Jimmy Carr.

105.    **Jimmy Carr** lives next door to plaintiff Jimmy Jacobs and is also extremely close to one of the Paul Stanley/Greenwood hog facilities.

106.    Now over 50 years old, he grew up on Piney Woods Road about a half-mile from where he currently lives, but moved to his current home prior to the Paul Stanley facility being constructed.

107.    Like Mr. Jacobs, he lives very close to this facility and even closer to its driveway and spray field.  Every morning, around approximately 5:30 a.m., a large truck enters the driveway and drives past his and Mr. Jacob's home to pick up dead hogs from the Paul Stanley facilities.  This large truck driving down a dirt and gravel driveway creates a lot of noise, at times waking Mr. Carr, and leaves a trail of odor from the dead Murphy-Brown hogs.  In addition to these "dead trucks," large Murphy-Brown tractor trailers haul hogs in and out of the facility, creating additional nuisance.

108.    Due to the recurring odor and other nuisances created by the Defendant's hogs, Mr. Carr almost never raises his windows.  Prior to the farm being sited here, he would frequently raise his windows at night to let in fresh air when the weather was appropriate.  Now, he no longer does that because of the risk of the odor drifting his way and into his home.

109.    Having grown up in this small community, he remembers when the area was unburdened by the presence of so many of Defendant's hogs.  Having three children, he hopes to

one day leave his property to them and that, by then, the nuisance created by Defendant's hogs will have been abated.

110.     Over the last several years, Mr. Carr has inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste.  He has frequently smelled strong, foul odors of hogs.  The smells get worse when the weather is hot.  Sometimes the odors have been unbearable.  The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

111.     Over the last several years, Mr. Carr has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property.  It has unreasonably interfered with his use and enjoyment of the property because he must smell a nauseating smell while engaging in normal activities on the property.

112.     The foul odor has affected the ability of Mr. Carr to use and enjoy his land by limiting his ability to enjoy time in activities outdoors.  For example, the foul odors have kept him from cooking outside.  Also, he likes to spend time with family relatives outdoors but his ability to do so enjoyably is injured by the hog odors.

   **ix.**    **Phyllis Wright.**

113.     **Phyllis Wright** lives very close to one of the Paul Stanley/Greenwood facilities and even closer to its entrance and spray fields where the waste created by Defendant's hogs are sprayed.

114.     She has owned her current home since the early 1980s and has experienced a recurring and foul odor coming from the Defendant's hogs at the Paul Stanley/Greenwood facilities.  In addition, she often hears, sees, and smells the "dead truck" as it enters and exits the facility almost every morning to remove the dead hogs from the Paul Stanley facilities.

115. At times, when she leaves for work or church, and returns from either, she experiences a bout of odor coming from the Defendant's hogs. This bothers her tremendously and is not something she had to endure prior to the facility's construction. Moreover, she can no longer hang clothes on the clothesline due to the unpredictability of the odor from the facility. In earlier years when she hung clothes out to dry, they would absorb the odor and would have to be rewashed, so she no longer hangs them out to dry.

116. She no longer opens her windows, either, to let in fresh air. If the odor were to drift onto her property while her windows were open, the odor would come into her home, so she simply keeps her windows and doors closed and uses air fresheners and other deodorizers to ensure the odor is kept out of her home.

117. Over the last several years, Ms. Wright has inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste. She has frequently smelled strong, foul odors of hogs. The smells get worse when the weather is hot. Sometimes the odors have been unbearable. The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

118. Over the last several years, she has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property. It has unreasonably interfered with his use and enjoyment of the property because he must smell a nauseating smell while engaging in normal activities on the property.

119. The foul odor has affected the ability of Ms. Wright to use and enjoy his land by limiting her ability to enjoy time in activities outdoors. For example, the foul odors have kept her from cooking outside. Also, she likes to spend time with family relatives outdoors but her ability to do so enjoyably is injured by the hog odors.

### x. **Lenora and James Holmes.**

120. **James Holmes** built his and his wife's (**Lenora Holmes**) current home in the 1970s on land which he inherited from his parents and has lived there ever since. Their home is located fewer than 200 yards from one of the Paul Stanley/Greenwood facilities on Piney Woods Road.

121. Each of them is regularly and significantly impacted by the recurring foul odor emanating from the Defendant's hogs and their waste which is sprayed very close to their home.

122. Mr. Holmes was born in 1939 and is in his 70s. His wife was born in 1947. In his retirement Mr. Holmes spends a great deal of time at home, where the nuisance and the foul odors frequently affect him.

123. Mr. Holmes works often in their yard and at times smells the foul odors coming from the Defendant's hogs.

124. Ms. Holmes, although she has been battling Parkinson's Disease for a number of years, is still able to walk for exercise once in a while.

125. Because they live so close to the facility, she has little choice but to walk near it, and has been, at times, greatly bothered by the same foul odors coming from the Defendant's hogs.

126. Mr. and Mrs. Holmes now avoid raising their windows because, in the past, when they have, odors from the facility have come into their home, which is extremely unpleasant for them. To minimize the impact of the odor on their home, they utilize various air fresheners and deodorizers and run their air conditioning more frequently which raises their utility bill. More specifically, they used to enjoy leaving their windows open at night to let in fresh air while they slept on pleasant evenings. Due to the recurring odors coming from the hogs, however, they no

26

longer leave their windows open while they sleep and instead must run their air conditioning or heat.

127. Mr. and Mrs. Holmes are both embarrassed by the odor when guests come to visit. For example, shortly after Thanksgiving 2014, Mr. Holmes's stepson visited them for the weekend. His stepson grew up on this property, but graduated from high school and enlisted in the U.S. Navy around the time the Paul Stanley facility was built, so he never had to live so close to the Defendant's hogs. When he visited them recently, he commented to Mr. and Mrs. Holmes about the odor and how bad it was, which embarrassed them. They have had other guests on their property comment about the smell, as well, which is very unpleasant for them.

128. Before the odor began recurrently drifting onto their property, the Holmeses would regularly enjoy their yard having barbeques and sitting on their front porch enjoying nice weather. Rarely do they do either any longer because of the recurring odors and swarms of flies and gnats on their property due to the Defendant's hogs.

129. Over the last several years, Mr. and Mrs. Holmes have inhaled periodic foul odors that came onto the property from the Defendant's hogs and their waste. Each has frequently smelled strong, foul odors of hogs. The smells get worse when the weather is hot. Sometimes the odors have been unbearable. The odors have been stronger and fouler than normal smells in the country and have been more than a petty annoyance.

130. The best way that they can describe the odors is that they are pretty rough, they can get to be nauseating, and they can cause headaches.

131. Over the last several years, they have been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the

property.  It has unreasonably interfered with their use and enjoyment of the property because they must smell a nauseating smell while engaging in normal activities on the property.

132.    The foul odor has affected the ability of Mr. and Mrs. Holmes to use and enjoy their land by limiting their ability to enjoy time in activities outdoors.  For example, the foul odors have kept them from cooking outside.  Also, they like to spend time with family relatives outdoors but their ability to do so enjoyably is injured by the hog odors.

133.    They have also been harmed by episodes of flies.  The flies come from the hogs and go onto their land and into their home.  The best way they can describe the flies is that they can be horrible.

134.    Because of the flies and the fumes, they have been hurt in their ability to have family gatherings, and barbeques.

135.    They have seen the waste being applied to the fields near the hogs.

136.    They would like to pass their land down to their children.

**B.  Background on the Facilities.**

137.    Upon information and belief, the three facilities (**Paul Stanley 5/now Greenwood 1, Paul Stanley 6/now Greenwood 2, and Paul Stanley 7**) are or during pertinent times were "contract" facilities for the Defendant.  During some or all pertinent time, Defendant has housed swine at Paul Stanley 5-7 and Greenwood 1-2.  The site under Permit AWS 710090, Paul Stanley 5 (now Greenwood 1), can house 3,672 swine.  The site under Permit AWS 710017, Paul Stanley 6 (Greenwood 2), can house 3,672 swine.  The site under Permit AWS 710043, Paul Stanley 7, can if operational house 1,800 swine. Over time the contract growers for Paul Stanley 5-6 (Greenwood 1-2) and Paul Stanley 7 are or have been Pagle Corp. or Greenwood Livestock LLC.  Upon information and belief, these facilities were originally owned by Gary

Pridgen, who owned them until 2012 when Pagle Corp. purchased them. More recently, two of the facilities was acquired by Greenwood Livestock LLC. Throughout the years, each of these farms have had compliance issues with land application or spraying of the hog waste. On several occasions, the facilities have oversprayed hog effluent onto the fields causing ponding and even runoff into ditches which connect to some of the Plaintiffs' property.

138.    While DENR can only inspect the facilities on an annual basis, and does not go in the hog sheds, the Defendant inspects or visits the facilities much more frequently and has open access to the entire site. Upon information and belief, a representative or employee of Defendant visits each site on a weekly basis or, in some cases, more frequently and the site personnel must constantly report information to Defendant.

139.    The Stanley No. 6 facility has had past issues with ponding in the spray fields. In 2011, for example, per DENR records, there were incidents of "ponding in spray fields," "ponding waste for more than 4 hours" and "incorrect application." Overhead photos of the facility fields from 2011 likewise appear to show standing water.

140.    Likewise, the Stanley 7 facility has had wastewater problems. In March 2014, a neighbor of the facility described seeing pink-tinted sludge or water in a nearby ditch that had a foul smell. In 2011, the DENR records spoke of "runoff issues." Overhead photos reflect recent spraying, soggy land as well as lagoons with different colors and with visible build-up on the surface and at the edges.

C.    **Background on Hog Manure and Causes of Nuisance.**

141.    Hogs generate multiple times more feces and urine per day than a human being. The General Accounting Office has estimated that 7.5 million hogs in five eastern NC counties produce 15.5 million tons of manure each year.

142.    Furthermore, Defendant's diet and antibiotic regimen is meant to promote aggressive growth, causing more manure to be generated in less time.

143.    A hog may grow from birth to 250 pounds in about six months or less before it is slaughtered.   A piglet usually feeds from its mother until it is four to six weeks old and weighs about 25 or 30 pounds. Then it eats feed grain and is known as a feeder pig.  It takes about six months for a pig to reach market weight of 250 pounds.  A slaughter-weight hog is thus about fifty percent heavier than an average person.

144.    The hog odors can be smelled at extremely low concentrations that cannot be measured with available instruments.

145.     Dietary manipulation can reduce odor.  Defendant supplies all the feed and sets the ingredients and additives for its hogs.  On information and belief, Defendant has tailored the diet without regard to reducing the odor and nuisance.

146.    The presence of Defendant's hogs also causes periodic swarms of flies and other insects and pests.  Plaintiffs find that flies periodically come onto Plaintiffs' properties.  These flies were not prevalent before the thousands of hogs were placed at the CAFO.  These insects and pests are also scientifically found to be vectors for disease and germs.

147.    In addition, ever since the hogs have been built, large trucks periodically crawl up and down the streets with hogs and feed.  They cause noise, dust, and lights from headlights and they pass even in the middle of the night.  When the trucks bring hogs in and out this can create extra odor.  When the "dead trucks" come, they can create foul odor and leak foul substances. These trucks are the opposite of what one would expect to see in a rural country neighborhood.

148.    The dead hogs themselves are a nuisance. Animals in confinement under high-density circumstances present a ready environment for disease.  Many swine facilities have used

vaccines and antibiotics not only to promote growth but also to counteract the health effects of crowded conditions but the crowded often hot conditions still lead to significant mortality rates. The pigs are susceptible to infection, microbes, parasites, or fungi,

149.    The mortality rates from the CAFOs as well as periodic diseases such as Porcine Epidemic Diarrhea Virus (PEDV) result in there being many dead hogs from time to time placed in "dead boxes." These are dumpsters full of dead animals left out in the open, often in plain view, so that neighbors see rotting animal corpses in their neighborhoods. These "dead boxes" attract buzzards, flies and vermin. Periodically a "dead truck" picks up the dead hogs to drive them to a rendering plant. This increases the nuisance to the neighbors.

### D.    Defendant's Control Over its Hogs.

150.    Defendant is a large and sophisticated company and precisely monitors the activities occurring at the facilities holding its hogs. Defendant, through standardized procedures and equipment, monitors the number of hogs at each site, the amount of feed used, the growth rate, the amount of feces and urine going into the cesspools, and the "freeboard", i.e., the distance between the surface of the cesspool and the top of the earthen rim surrounding it.

151.    Defendant has publicized in the past how it exercises detailed control over the operations of the facilities that hold its hogs. Defendant uses trucks to haul its hogs from one site to another depending on what is most efficient and profitable for Defendant. Defendant has also used tanker trucks to haul manure and flush water from one lagoon to another at different sites for reasons including when the volume that is being generated threatens to flood a lagoon.

152.    Murphy-Brown was formed in 2000 from an acquisition by Smithfield of companies owned by Wendell Murphy, Sr. (the founder of the business), the Murphy family, and Murphy businesses including Murphy Family Farms (collectively "Murphy"), as well as

Brown's of Carolina. Mr. Murphy is credited with adopting the CAFO design of mechanized farms that had first been invented for raising poultry in other states. However, hogs generate a great deal of manure, and North Carolina is more densely populated than many other states. Defendant and its predecessor's efforts and Smithfield's opening of massive processing plants increased the number of hogs until counties like Duplin and Sampson became the most densely-packed hog counties in the entire United States, as studies reflect.

153. Overhead views reflecting the relative locations of the Plaintiffs' homes and the hogs show how the hogs are densely packed in at several sites around them.

154. The close confinement of hogs also means epidemics can spread through hog populations and diseases, such as Porcine Epidemic Diarrhea Virus, have led to "PED" signs outside facility gates at various times. Studies reflect how the closely packed hogs and untreated sewage cause illnesses such as MRSA, release germs and bacteria into the environment, and causes hydrogen sulfide, ammonia and other harmful substances to spread. Hydrogen sulfide was used as a poison gas in World War I and can cause harm even at low doses. Ammonia can cause respiratory and other illnesses. Both are released from untreated hog sewage.

155. Studies have linked hog CAFOs to childhood asthma and other conditions. All of this creates a reasonable fear of health effects in the Plaintiffs. While Defendant causes odors, harmful chemicals and other nuisance to go onto Plaintiff's properties, Defendant pays them no license fee to do so and maximizes profit by making Plaintiffs absorb the environmental cost that Defendant should bear.

156. Recognizing the unsustainable and injurious nature of the "lagoon and sprayfield" system, North Carolina, in 1997, banned further construction of CAFOs that use the design. This ban was re-enacted in 2007. Under this "moratorium," in fact hog producers are free to build

new facilities so long as, among other things, they will not cause odor to cross onto neighboring land. On information and belief, no new CAFOs have been built using the old design, in an admission of its nuisance-causing nature.

157. The 1997 moratorium was enacted only after CAFO construction began to threaten the Pinehurst golf course. The bill was sponsored by North Carolina State House Representative Richard Morgan who was reported to describe his concern "about industrial-style hog farms cropping up near golf courses in Moore County" and that his aim was to "draw a distinction between farming and the mass production of swine." Indeed, the CAFOs are not traditional family farms by any measure and rather are animal factories.

158. Under the "lagoon and spray" design, hogs step, sit, and lie on the raw manure and it gets on their bodies closely packed in the sheds. The hogs squish and push it down through the slatted floor. It drips into a holding pond below the floor where it sits like an unflushed toilet and the urine and feces mix. Some sites use a method of periodically flushing the waste out with water, while others use a "pull-plug" system in which the waste is periodically drained. Large fans at the ends of the sheds ventilate to keep the hogs from suffocating on the gases. The hogs create dust that dries and turns into floating particles, and smells from the feces and urine goes into the air and is blown out by the fans. The fans have no filters or scrubbers to take out the fumes and germs.

159. After manure collects under the slatted floors, it gets flushed or drained out through pipes into the nearby open-air, uncovered, artificial cesspool filled with millions of gallons of hog urine, feces, and flush water. Because the cesspool is uncovered, it is free to evaporate bad odors into the air. There is no effort to separate out solids from liquids or treat the waste in a contained digester. There is no effort to capture the methane and odorous gases or use

33

it as biogas for electricity.  Defendant refuses to reduce the crowded hog counts while aware that more hogs means more waste means more nuisance.

160.    The manure fills the "lagoons" and is spread on the fields.  Often this is done by a "traveling gun" system in which liquid is sprayed up into the air.  Other times, a "center-pivot" system is used, which ejects it into the air by means of pressurized spraying.  The use of subsurface injection or "knifing" the effluent into the ground can help reduce odor.  In other States Defendant as abandoned spray guns but not here.

161.    In 2000, due to widespread concerns about lagoon and spray CAFO environmental harm, damage, vulnerability to hurricanes, odor and other ill effects, North Carolina commissioned a multi-year study known as the "Smithfield Agreement."  This agreement allocated funds for research into superior alternatives to the lagoon and spray system. Various candidate technologies were reviewed for feasibility.  In 2003, under the Agreement, the non-partisan RTI institute issued a report regarding the nuisance and other bad impacts of the lagoon-and-sprayfield CAFOs.  The report found that the sites have a negative impact on "measures of human well-being." It found:  "Odor emissions from hog farms are a continuing concern in North Carolina, particularly for residents living in close proximity to farms."  It noted how "using data on housing prices in nine counties in southeastern North Carolina … found that proximity to hog farms had a significantly negative impact on housing values and that these effects varied by the size of the operation."  Finally it noted "disease-transmitting vectors."

162.    In December 2005, a majority of the ten members of the economics subcommittee under the Smithfield Agreement found that "the range of benefits predicted to flow" from new technology appeared to justify increased costs.  By contrast, a minority of the members insisted that any new technology that "raises the net cost of production in North Carolina is not

economically feasible." The minority report was signed by Bart Ellis of Smithfield Foods, Inc., Dave Townsend of Premium Standard Farms (acquired by Smithfield), Bundy Lane of Frontline Farmers (a group supported by Murphy), Richard Eason, President, Cape Fear Farm Credit (a company that upon information and belief benefited from CAFO construction loans set up by Smithfield), and Dennis Dipietre, Economic Advisor, Premium Standard Farms (later acquired by Smithfield). Because of the staunch opposition of these Smithfield-aligned representatives, the Smithfield Agreement ultimately failed to lead to the adoption of new control technologies for the swine CAFOs in North Carolina.

163.    Meanwhile, in States such as Missouri and Colorado, hog CAFOs have adopted controls to abate the nuisance and stop the harm to the neighbors. Defendant has hog sites in those States and has implemented control measures there.

164.    Defendant is a multi-state corporation, wholly-owned by an even larger multinational corporation which itself is owned by Shuanghui, now WH Group after an acquisition valued at more than $7 billion. The Smithfield integrated annual report for 2012 describes how Defendant is "the world's largest producer of pork" and fiscal 2012 sales were $3.1 billion. Defendant is much larger than and earns far greater revenues and profits from the hog operations than the local growers.

165.    In one "integrated" enterprise, Smithfield owns the hogs through its hog production division, owns the processing plants through its Smithfield Packing subsidiary, and controls other aspects of the pork production process. The relationship between Defendant and its contract growers is part of "vertical integration" in which Defendant is the "integrator."

166.    Smithfield has touted how "Smithfield manages every aspect of the pork production process. Vertical integration is a key point of difference and a unique selling

proposition for our products and brands, allowing us to drive changes through the supply chain." Murphy-Brown micromanages and controls the local growers, but has not abated the nuisance.

167.    The growers must follow the orders and rules from Defendant or risk losing the hogs, which they never even own.  The 2012 annual report describes how "All company-owned and contract farms are subject to random third-party audits and site assessments" and how "Members of our production management staff … visit every contract and company-owned farm at least once a month."  Defendant constantly sends specialists to the site such as engineers, technicians, inspectors, and veterinarians and controls relevant details of operation.

168.    As of 1995, it was reported that a typical contract grower borrowed anywhere from $200,000 to $1 million to construct hog sheds.  Murphy specified the CAFO design and equipment.  Murphy financed or facilitated the financing for many growers.  While the grower carried the debt for a multi-year loan term, under the form contracts, Murphy could pull its hogs out at any time for a variety of reasons.  The CAFOs are "single use" facilities designed for raising hogs and no other purpose.  Wendell Murphy, Sr. has described the situation with words to the effect of "once you pour the concrete, you are committed."

169.    Mr. Murphy and his family businesses continue to this day to be heavily involved with Smithfield.  According to a Smithfield Foods Form 10-KT/A filed April 28, 2014, the current Smithfield Board of Directors consists of "Long Wan" (more commonly known in the media as Wan Long; Chairman of the Board since September 26, 2013 and Chairman of the Board of WH Group/Shuanghui), Larry Pope, Shuge Jiao and Zhijun Yang.  Wendell Murphy, Sr. was until recently also a Smithfield Director and continues to be heavily involved with the company via his family business. The Form 10-KT/A states that Smithfield and Murphy-Brown continue to have business relationships with entities owned in whole or part by Mr. Murphy and

his family members and for fiscal 2013, Smithfield paid $23.1 million to those entities. According to reported corporate filings, in 2004, various Smithfield transactions with the family of Mr. Murphy added up to around $41 million. By 2012, corporate filings reflected approximately $52 million of transactions with business interests controlled by the Murphy family, including a $23.3 million payment to DM Farms of Rose Hill, LLC, 100% owned by Murphy's son, Wendell H. "Dell" Murphy Jr.

170.    Over the years Murphy has required some or all growers to accept terms under which if a grower fell into some lower percentage of all the growers on various metrics, such as the lowest 25%, Murphy could cancel the contract. These provisions incentivize the contract growers to work to maximize growth of the hogs at the expense of all other considerations. Meanwhile, at all times Defendant still owns the hogs.  This system sometimes known as the "tournament" system pits contract growers against each other to cut costs and raise productivity above all other considerations.  The system is palpably unreasonable as there will always be a bottom fourth of growers even if they all perform well.  On information and belief, the metrics Defendant uses to rank the growers do not include such things as, whether the odors, flies and fumes are harming the neighbors.  Defendant during the pertinent times has known that its "tournament" system and other aspects of its management of the growers, the feed and the hogs causes the nuisance to increase.

171.    Murphy has admitted the control it has over the hog CAFOs and its direct involvement in the swine sites.  In 2011, Wendell Murphy, Sr. described that "The typical livestock or poultry agreement is that the farmer or contract producer provide the facilities and labor, but in this case, to enhance the idea, to cause more people to come forward, we agreed to supply their materials... the fence and the posts, the feeders, everything."  However in grower

bankruptcy proceedings Murphy-Brown has also contended that it had no duty to keep pigs at the site if it wanted to remove them for a variety of reasons.

172.    Smithfield controls an estimated 90 percent of all hog production in North Carolina.  Defendant owns the hogs at as many as two-thirds of all North Carolina sites.  State records confirm Defendant's control over the hogs and the odors and nuisance that they cause. On multiple occasions, when a grower has encountered problems, Defendant has intervened to contest any efforts to impose fines or require changes, and has closely controlled and supervised any corrections.

173.    Wan Long is now Smithfield's Chairman of its Board of Directors.  Mr. Long has is also the Chairman and CEO of Shuanghui.

174.    Shuanghui recently changed its formal English-language name to "WH Group."

175.    Shuanghui has announced that its top priority is to increase exports to China and on information and belief Smithfield pork is already sold there.   Its Chairman and CEO Wan Long states: "Following our acquisition of Smithfield in 2013 we will focus on growth initiatives, such as increasing exports from the United States to Asia, building a global trading platform and exploring opportunities to work with Smithfield to develop premium products for the Chinese market."

176.    Larry Pope in testimony to Congress in 2013 stated that "[t]he new combined company expects to meet the growing demand for pork in China by exporting high-quality pork products from the US. This means more production for US producers…."  He also stated that "China is responsible for 50 percent of the world's pork consumption and their demand is still growing…. At Smithfield, we see this valuable market as an undeniable opportunity to grow our

business and produce more here in the US." He also stated that "This transaction is about exporting high-quality meat products from the US to China."

177. More recently, in 2014 Mr. Pope described: "Half of all the world's pork is eaten in that one country [i.e., China] and growing, and growing steadily. Every two or three years, China's consumption demand grows by the whole size of the U.S. market."

178. In short, it is clear that Defendant following the directives of its owners intends to increase pork production for export. North Carolina produces more hogs for Smithfield than most or all other States. Clearly a massive increase in exports is foreseen as Shuanghui paid 30% more than market value for Smithfield's stock. An increase in pork production in North Carolina, in which Smithfield controls upwards of 90% of hog production, will greatly increase the nuisance to the Plaintiffs.

179. Furthermore, the economic opportunity to increase exports to China increases the reasonability of expecting Defendant to abate the nuisance herein.

**E. Evidence of Negligent, Willful and Wanton Conduct.**

180. Defendant and its predecessors, in placing tens of thousands of hogs at the facilities, acted negligently and in willful disregard of the harm known to be caused by the hogs. Over the years, Defendant has continued to cause its hogs to create nuisance and injury without taking action to end the nuisance despite repeated episodes of damage and mounting scientific research verifying the harm suffered by the Plaintiffs.

181. The 2012 Smithfield annual report claims that "Murphy-Brown is committed to … protecting the environment…" However, the studies, reports, incidents and complaints that have amassed since Murphy first started the CAFO system clearly show predictable nuisance

caused by swine sites to nearby neighbors. Defendant has not stopped the nuisance, even after Plaintiffs have complained and even sent nuisance mediation demands over a year ago.

182. From the early 1990s to the present, due chiefly to Defendant and its predecessors' efforts, hog production greatly expanded and CAFOs were placed near community members such as the Plaintiffs. Production in North Carolina tripled between 1990 and 1995, growing from 5 million hogs produced in 1990 to 15 million in 1995. The hogs at the subject facilities were part of this rapid expansion. Multiple spills, lagoon breaches, episodes of odor and harm have occurred. Numerous reports have confirmed the injury suffered by community members. The Legislature has banned any new CAFOs using the Defendant's old system due to the indisputable evidence of harm and damage to neighbors and the environment.

183. Defendant and its predecessors have acted improperly during prior incidents caused by the CAFOs. As an example, on May 8, 1991, a 10-acre feces and urine cesspool ruptured on Murphy's Magnolia No. 1 facility in Duplin County. After the lagoon collapsed, tons of water flowed into Millers Creek. According to news reports, Wendell Murphy, Sr. knew about the incident within hours and personally visited the site. It took four days to find and patch the leak. But Murphy never notified the State about the spill.

184. Mr. Murphy in a news article dated February 19, 1995 stated there was "not one shred, not one piece of evidence anywhere in this nation" that hog lagoons were harming the groundwater." In fact, hog CAFOs do harm the groundwater. Studies have reviewed lagoons in the coastal plain of North Carolina and found seepage losses to the surficial aquifer.

185. Mr. Murphy as reported on February 24, 1995 represented that CAFOs increased property values: "Wendell Murphy, founder and chairman of Murphy Family Farms, rejects claims that hog farms devalue nearby property. In fact, he says the opposite is true: 'Property

values have gone up, and I mean seriously gone up, as a result of this industry being here.' … 'If somebody has property near us and they say their property is worth less and they have to leave -- tell us about it. We'll buy it.'" Those statements were inaccurate. Numerous studies have shown that swine sites hurt property values. According to subsequent news reports, when one or more CAFO neighbors later sought to take Mr. Murphy up on his offer to buy their properties, Mr. Murphy backed out and refused to do so.

186.    In August of 1997, Smithfield was fined $12.6 million for violating the U.S. Clean Water Act. This was reported to be the largest fine ever imposed under the Clean Water Act. Smithfield was found to be dumping into the Pagan River, a tributary flowing into the Chesapeake Bay. The company's failures resulted in more than 5,000 violations of permit limits over five years. These violations caused harm to the water quality of the Pagan River, the James River, and the Chesapeake Bay. Further, the Courts found that the company had falsified documents and destroyed water quality records.

187.    In April 1999, a spill at Vestal Farms, owned by Murphy, dumped over a million gallons of water in Duplin County. Murphy and the NC Pork Council claimed the spill was caused by vandals. The State found zero evidence to back up Murphy's claim. In fact there was vegetation growing near the lagoon, tree roots weakened the wall, and there were erosion issues. Murphy had been warned to clear the trees. The State concluded that excessive seepage through the dike wall was the probable cause. Nearly two million gallons spilled into a tributary of the Northeast Cape Fear River. Murphy was fined $40,650.

188.    In September 1999, Hurricane Floyd caused flooding in Eastern North Carolina. Many hog farms flooded and thousands of dead pigs floated to nearby areas. This hurricane and other rain events have caused flooding from hog facilities and highlighted the vulnerabilities in

our state. However in 2011, Wendell Murphy, Sr. stated the harm caused by the hog facilities in the hurricane was "minimal."

189. Murphy has added special controls at sites in other states and has publically admitted that it was to "reduce the level of odor produced by the farms." Defendant has added controls at some sites in North Carolina such as the Mitchell Norris facility in Bladen County due to odor and has installed a partial lagoon cover at Kenansville Farm in Duplin County "to respond to odor complaints from neighbors." Defendant is aware that the hog sites cause odor and nuisance, but willfully refuses to install improvements where its hogs are stored herein.

190. In contrast to Defendant's assertions that its hogs do not cause nuisance or injury, numerous scientific reports and studies have found that they do. These reports show that Defendant has actual knowledge of the nuisance caused by its swine, or is willfully blind to that fact. They also support the fact that the Plaintiffs suffer adverse effects from the odors such as nausea, congestion, wheezing and difficulty breathing, loss of enjoyment, and have reasonable fears regarding the effect of the nuisance upon them and their families, including young children or grandchildren, elderly and disabled family members, and other loved ones.

191. Because Murphy recklessly failed to perform proper studies to determine the harmful effects of the swine CAFOs before building them in the 1980s-early 90s, scholars were obligated to work to assess the health risks after the fact. Numerous studies have now documented the injuries and harms and the nuisance caused by hog CAFOs.

192. Defendant knew from those studies, its own experience, from neighbor complaints, from lawsuits, governmental enforcement actions, consent orders and verdicts against it, in multiple states, that hog urine and feces causes a nuisance to neighbors, hog emissions contain disease-causing pathogens and chemicals, and this is harmful to humans.

42

Defendant's ongoing failure to take reasonable steps to abate the nuisance caused by its hogs reflects willful and wanton conduct under the circumstances. After over than 20 years of a moratorium on new construction of harmful lagoon and spray facilities, Defendant still sends its hogs to such facilities under a one-sided contract grower system designed to maximize integrator profit without abating the nuisance.

## COUNT I: RECURRING, TEMPORARY, ABATABLE, PRIVATE NUISANCE

193.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

194.    Plaintiffs, and each of them, are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences or for other legitimate uses.

195.    Defendant, during the pertinent times, owned and materially controlled the hogs in close proximity to Plaintiffs' properties so as to cause a private nuisance.

196.    Plaintiffs' right to use and enjoy their properties has been impaired by recurring foul and offensive odors; hog manure and urine; flies or other insects; buzzards or other scavenger animals; vectors of disease; trucks that cause noise and lights at night and foul smells; dead hogs; and other sources of nuisance.

197.    The nuisance periodically caused by Defendant's swine has substantially impaired Plaintiffs' use and enjoyment of their property, and has caused anger, embarrassment, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of opportunity to continue to develop properties, physical and mental discomfort, and reasonable fear of disease and adverse health effects.

43

198.     Defendant has engaged in improper or negligent operation of swine sites during some or all of the pertinent times, causing harm to the Plaintiffs.

199.     Defendant's conduct has been unreasonable.   Reasonable persons, generally, looking at Defendant's conduct, the problems caused by it, the character of the neighborhood, the nature, utility and social value of the use of land, and the extent, nature, and recurrent nature of the harm to Plaintiffs' interests, would consider Defendant's conduct to be unreasonable.

200.     The invasions, harms and injuries complained of herein by Plaintiffs are more than slight inconveniences or petty annoyances, but rather substantial invasions, harms, and injuries to Plaintiffs' comfort, property, and use of their land.

201.     Defendant had actual knowledge during some or all of the pertinent times that the subject hogs were causing a nuisance.

202.     Defendant knew or should have known that foul and offensive odors, hog manure and urine, flies and other insects, and other causes of nuisance from their hogs would recurrently encroach upon and invade Plaintiffs' properties, and substantially impair Plaintiffs' use and enjoyment of their properties.

203.     While knowing that practicable technologies and methods are readily available to abate the nuisances and problems, Defendant has failed to abate the foul and offensive odors and other causes of nuisance.

204.     During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facility in a manner which caused a nuisance to the Plaintiffs.

205. Alternatively, during the pertinent times, Defendant's own direct involvement in material aspects of the operation of the facilities and management of the hogs renders Defendant independently liable for the nuisance with regard to the Plaintiffs.

206. Alternatively, during the pertinent times, Defendant employed contract growers to do work which Defendant knew or had reason to know would likely involve the creation of a nuisance, and is therefore subject to liability for harm resulting to Plaintiffs.

207. Defendant's conduct described above constitutes a series of recurring temporary abatable private nuisances, which Defendant has failed to remedy within a reasonable period of time, and for which Defendant is liable.

208. As a result of Defendant's liability for private temporary recurring abatable nuisance, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

## COUNT II: PUNITIVE DAMAGES

209. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

210. Defendant's above-described recurring conduct, acts, omissions, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

211. Pursuant to N.C. Gen. Stat. § 1D-15(a), Defendant is properly liable for punitive damages in this action in that Defendant is liable for compensatory damages and has committed one or more aggravating acts or omissions justifying an award of punitive damages, including without limitation, recurring acts of egregious and reckless behavior, and specific instances of willful and wanton conduct.

212.    The recurring conduct, acts, omissions, negligence, and impropriety of the Defendant were willful, wanton, malicious, and in reckless disregard for the rights and interests of the Plaintiffs and justify an award of punitive damages.    Accordingly, Plaintiffs demand judgment against Defendant for punitive damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court:

A.    Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B.    Award the Plaintiffs punitive damages;

C.    Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses or fees to which they may be entitled by law; and

D.    Award the Plaintiffs such other and further relief as is just and proper.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.

Respectfully submitted, this the 21st day of May, 2018.

By:    s/Mona Lisa Wallace
Mona Lisa Wallace
NCSB #9021
John Hughes
NCSB #22126
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC  28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

## CERTIFICATE OF SERVICE

I do hereby certify that on the 21st day of May, 2018, I filed a true and correct copy of the above and foregoing **THIRD AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to all CM/ECF registered attorneys indicated on the NEF, including counsel for Defendant.

By:     s/Mona Lisa Wallace
        Mona Lisa Wallace, NCSB #9021
        John Hughes, NCSB #22126
        Wallace & Graham, P.A.
        525 North Main Street
        Salisbury, NC 28144
        Phone: 704-633-5244
        Fax: 704-633-9434
        mwallace@wallacegraham.com
        jhughes@wallacegraham.com