Case No. _____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## IN RE MURPHY-BROWN LLC,
*Petitioner*.

Petition for Writ of Mandamus to the
United States District Court for the Eastern District of North Carolina in
*McKiver v. Murphy-Brown, LLC*, No. 7:14-cv-180-BR,
*McGowan v. Murphy-Brown, LLC*, No. 7:14-cv-182-BR,
*Anderson v. Murphy-Brown, LLC*, 7:14-cv-183-BR,
*Gillis v. Murphy-Brown, LLC*, 7:14-cv-185-BR, and
*Artis v. Murphy-Brown, LLC*, 7:14-cv-237-BR

## PETITION FOR WRIT OF MANDAMUS ON BEHALF OF
## MURPHY-BROWN LLC

Stuart A. Raphael
Robert M. Tata
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 419-2021
sraphael@HuntonAK.com
btata@HuntonAK.com

Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
(804) 788-8656
kelliker@HuntonAK.com

*Counsel for Petitioner Murphy-Brown LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..........................................................i

TABLE OF AUTHORITIES .......................................ii

PRELIMINARY STATEMENT .........................................1

STATEMENT OF FACTS ...............................................1

    A.  The Swine Farm Nuisance Litigation. .............1

    B.  The District Court's Gag Order....................4

STATEMENT OF THE ISSUES PRESENTED ......................6

STATEMENT OF RELIEF SOUGHT ..................................6

STATEMENT OF WHY THE WRIT SHOULD ISSUE...........6

I.   MANDAMUS IS THE PROPER METHOD TO REVIEW AN UNCONSTITUTIONAL GAG ORDER. ...........................7

II.  THE GAG ORDER VIOLATES THE FIRST AMENDMENT.......................7

    A.  The Gag Order is a Prior Restraint Subject to First Amendment Scrutiny. ...........................7

    B.  The District Court Entered the Gag Order Without Any Factual Findings or Support........................9

    C.  Less Restrictive Alternatives Would Protect the Proceedings from Potential Prejudice. ........................12

    D.  The Gag Order Irreparably Harms First Amendment Freedoms. ...............15

III. THE GAG ORDER IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD. ........................16

CONCLUSION .............................................................20

STATEMENT REGARDING ORAL ARGUMENT ...............20

CERTIFICATE OF COMPLIANCE....................................22

CERTIFICATE OF SERVICE ..........................................23

i

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Capital Cities Media, Inc. v. Toole*,
  463 U.S. 1303 (1983) ........................................................................7, 15

*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................7, 15

*Gentile v. State Bar*,
  501 U.S. 1030 (1991) ................................................................. 13, 16, 17

*In re Charlotte Observer*,
  882 F.2d 850 (4th Cir. 1989) ..................................................... passim

*In re First Fed. Sav. & Loan Ass'n of Durham*,
  860 F.2d 135 (4th Cir. 1988) ................................................................6

*In re Morrissey*,
  168 F.3d 134 (4th Cir. 1999) ................................................................8

*In re Russell*,
  726 F.2d 1007 (4th Cir. 1984) ................................................. 8, 10, 11

*In re State-Record Co., Inc.*,
  917 F.2d 124 (4th Cir. 1990) ..................................................... 10, 11

*In re The Wall Street Journal*,
  601 F. App'x 215 (4th Cir. 2015) ........................................................7

*In re Wash. Post Co.*,
  807 F.2d 383 (4th Cir. 1986) ........................................................7, 10

*Johnson v. Bergland*,
  586 F.2d 993 (4th Cir. 1978) ..............................................................15

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ................................................................. 7, 9, 12

ii

*Press-Enterprise Co. v. Superior Court of Calif.*,
   478 U.S. 1 (1986) ........................................................................................12

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) .................................................................................8, 15

*Skilling v. United States*,
   561 U.S. 358 (2010) .................................................................................9, 12

*Tory v. Cochran*,
   544 U.S. 734 (2005) ...................................................................................19

*United States v. King*,
   192 F.R.D. 527 (E.D. Va. 2000)...................................................................18

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ...............................................................................1, 6

U.S. Const. amend. V................................................................... 1, 6, 16

## RULES

N.C.R.P.C. 3.6(a) ......................................................................................14

## SECONDARY SOURCES

Valerie Bauerlein, *Pork Giant Loses Essential Legal Battle in Manure Case*, Wall
   Street Journal (June 29, 2018), https://www.wsj.com/articles/pork-giant-loses-
   essential-legal-battle-in-manure-case-1530314322 ...........................................15

iii

## PRELIMINARY STATEMENT

Petitioner Murphy-Brown LLC (dba Smithfield Hog Production Division) challenges an unconstitutional gag order that enjoins Petitioner and hundreds of other individuals from speaking publicly about matters in twenty-six cases pending in the Eastern District of North Carolina. *See* Ex. 1. The district court entered the order *sua sponte* with no forewarning, without a sufficient basis to conclude that such a sweeping prior restraint is necessary, and without evaluating whether less restrictive measures would protect the impartiality of the potential jury pool. Because the order plainly violates the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment, the Court should issue a writ of mandamus and vacate the order.

## STATEMENT OF FACTS

### A.     The Swine Farm Nuisance Litigation.

In twenty-six separate cases filed in the Eastern District of North Carolina, more than five hundred plaintiffs have brought private nuisance claims against Murphy-Brown LLC alleging, among other things, that odors, flies, and truck traffic from hog farms have substantially interfered with the use and enjoyment of their properties. In 2015, the district court consolidated the lawsuits into a Master Case docket. *In re: N.C. Swine Farm Nuisance Litigation*, Master Case No. 5:15-cv-00013-BR. The court selected five lawsuits for detailed discovery, designating

1

those cases as the "Discovery Pool Cases."[1]  *See* No. 5:15-cv-00013-BR, ECF No. 476 at 1.  After discovery in those cases concluded, the court ordered a series of staggered trials for the Discovery Pool Cases.  *See* No. 5:15-cv-00013-BR, ECF No. 488.

Eleven separate trials involving plaintiff subgroups are contemplated for the first five Discovery Pool Cases.  At the current rate of progress, those trials will not be completed until sometime in 2019.  The court is beginning to open discovery in the next batch of cases and will set them for trial in turn.  All told, final resolution of the pending twenty-six nuisance cases will take several years.

The first trial—involving a subgroup of ten plaintiffs in *McKiver v. Murphy-Brown, LLC*, No. 7:14-cv-180-BR—commenced on April 2, 2018.  During jury selection, the district court conducted *voir dire* to determine whether potential jurors could be impartial.  Two admitted they had heard about the case before coming to court.  The first potential juror had seen a news story about the case and admitted that he had formed an opinion about the merits.  *See* Ex. 2 at 43:17-44:21.  The district court excluded him from the jury pool.  *Id.* at 67:16-17.  The second potential juror also heard a story on the news but said he could remain impartial.

---

[1] The Discovery Pool Cases are *McKiver v. Murphy-Brown, LLC*, No. 7:14-cv-180-BR; *McGowan v. Murphy-Brown, LLC*, No. 7:14-cv-182-BR; *Anderson v. Murphy-Brown, LLC*, No. 7:14-cv-183-BR; *Gillis v. Murphy-Brown, LLC*, No. 7:14-cv-185-BR; and *Artis v. Murphy-Brown, LLC*, No. 7:14-cv-237-BR.

2

*See id.* 60:2-61:6. The judge permitted him to remain but plaintiffs' counsel used a peremptory strike to remove him. *Id.* at 121:5. At the end of the eighteen-day trial, the jury awarded each of the ten plaintiffs $75,000 in compensatory damages and $5,000,000 in punitive damages (reduced to $250,000 each under North Carolina law). *See McKiver*, No. 7:14-cv-180-BR, ECF Nos. 267, 277.

The second trial—involving two plaintiffs in *McGowan v. Murphy-Brown, LLC*, No. 7:14-cv-182-BR—started on May 29. As before, the district court conducted *voir dire* of the jury venire. This time, eleven of fifty potential jurors said they had heard about the case, but ten said it would not prevent them from being impartial.[2] Two of those ten ended up on the jury. *See* Ex. 3 at 113:10-16.

During the *McGowan* trial, the district judge was informed that a juror had been conducting internet research during the trial and speaking to other jurors about it. *See* Ex. 4 at 2. The court's inquiry revealed conflicting accounts of what happened, but jurors who learned some of that information assured the court that they could remain impartial. *Id.* at 19:18-21, 26:11-15, 30:12-18, 33:9-13, 39:4-10, 45:22-46:5, 54:3-9. Although Petitioner requested a mistrial, *id.* at 57, the

---

[2] *See* Ex. 3 at 34:8-25; 35:1-25; 36:3-21; 36:24-37:17; 38:23-39:12; 41:3-19; 43:13-19; 48:7-49:2; 52:14-53:3; 54:16-55:8. The district court excused one member of the venire because she had formed an opinion about the issues in the case. *See id.* 47:9-48:4. Murphy-Brown struck for cause one other member of the venire who had read media reports about the case. *See id.* 90:3-13.

3

court denied the motion. *See McGowan*, No. 7:14-cv-182-BR ECF (June 22, 2018 Dkt ref.).

At the end of that twenty-three-day trial, the jury awarded each of the plaintiffs $65,000 in compensatory damages and $12,500,000 in punitive damages. *See McGowan*, No. 7:14-cv-182-BR, ECF No. 279.

The third trial commences on July 11, 2018, involving a subgroup of plaintiffs in *Artis v. Murphy-Brown, LLC*, 7:14-cv-237-BR.

### B.    The District Court's Gag Order.

On June 27, 2018, two days before the jury verdict in *McGowan*, the district court *sua sponte* entered a broad order limiting the freedom of persons involved in the litigation to speak about the cases. *See* Ex. 1 (the "Gag Order").[3] The Gag Order prohibits all parties and their lawyers, representatives, and agents, as well as "all potential witnesses," from

> giv[ing] or authoriz[ing] any extrajudicial statement or
> interview to any person or persons associated with any
> public communications media or that a reasonable person
> would expect to be communicated to a public
> communications media relating to the trial, the parties or
> issues in this case which could interfere with a fair trial
> or prejudice any plaintiff, the defendant, or the
> administration of justice and which is not a matter of
> public record. Statements of information intended to

---

[3] The district court entered the Gag Order under the captions of the Discovery Pool Cases, but in a footnote the court noted that "this litigation" entailed twenty-six cases filed against Murphy-Brown. *See* Gag Order at 2. n.1.

4

> influence public opinion regarding the merits of this case
> are specifically designated as information which could
> prejudice a party.

*Id.* at 3.  The order does not define "public communications media."  The district

court made no factual findings of what actions or events necessitated the Gag

Order except to say that it was based on "the volume and scope of prejudicial

publicity observed" in the first two trials and "the substantial risk of additional

publicity tainting or biasing future jury pools."  *Id.*  The Gag Order will not expire

"until the final verdict in these cases."  *Id.*

The Gag Order includes certain exceptions.  Provided they do so "without

elaboration or any kind of characterization whatsoever," covered individuals may

make statements about "the general nature of an allegation or defense";

"information contained in the public record of this case"; "scheduling

information"; and "any decision made or order issued by the court which is a

matter of public record."  *Id.* at 3-4.  Covered individuals may also "[e]xplain[],

without any elaboration or any kind of characterization whatsoever, the contents or

substance of any motion or step in the proceedings, to the extent such motion or

step is a matter of public record," as well as "any ruling made thereon to the extent

that such ruling is a matter of public record."  *Id.* at 4.[4]

---

[4] The Gag Order also restricts court personnel from making unauthorized
disclosures of "information relating to this case that is not part of the public
records of this court."  Gag Order at 4.

5

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the Gag Order violates the Free Speech Clause of the First Amendment because it prohibits all known and potential trial participants from expressing opinions about matters in the pending cases without any basis in the record to show that such an extreme restriction on protected speech is necessary to protect the right to a fair trial.

2.      Whether the Gag Order violates the Due Process Clause of the Fifth Amendment because it is unduly vague and open-ended.

## STATEMENT OF RELIEF SOUGHT

Petitioner seeks a writ of mandamus vacating the Gag Order.

## STATEMENT OF WHY THE WRIT SHOULD ISSUE

Mandamus should be granted when (1) "the petitioner has shown a clear right to the relief sought"; (2) the respondent has "a clear duty" to perform the act requested; and (3) "no other adequate remedy is available." *In re First Fed. Sav. & Loan Ass'n of Durham*, 860 F.2d 135, 138 (4th Cir. 1988).

Petitioner satisfies these elements.  Petitioner and other trial participants have a clear First Amendment right to speak and express opinions about matters involved in pending litigation without fear that comments reported directly or indirectly to "public communications media"—whatever that means—will constitute "elaboration or any kind of characterization" that will subject them to contempt proceedings.  The district court has a clear duty to respect those

6

constitutional rights and the Gag Order is facially defective.  And Petitioner lacks

an adequate remedy because the "loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Capital Cities Media,*

*Inc. v. Toole*, 463 U.S. 1303, 1304 (1983) (Brennan, J., in chambers) (same).

## I.    MANDAMUS IS THE PROPER METHOD TO REVIEW AN UNCONSTITUTIONAL GAG ORDER.

Fourth Circuit precedent makes clear that mandamus is the "preferred

method of review" of orders restricting First Amendment rights in the context of

ongoing trial proceedings.  *In re The Wall Street Journal*, 601 F. App'x 215, 218

(4th Cir. 2015); *In re Charlotte Observer*, 882 F.2d 850, 852 (4th Cir. 1989)

(same); *In re Wash. Post Co.*, 807 F.2d 383, 388 (4th Cir. 1986) (same).

## II.   THE GAG ORDER VIOLATES THE FIRST AMENDMENT.

### A.    The Gag Order is a Prior Restraint Subject to First Amendment Scrutiny.

The Gag Order is an impermissible prior restraint on free speech because it

prohibits dozens—if not hundreds—of individuals from speaking freely about facts

related to the nuisance cases.  Prior restraints "are the most serious and the least

tolerable infringement on First Amendment rights" and constitute "one of the most

extraordinary remedies known to our jurisprudence."  *Neb. Press Ass'n v. Stuart*,

427 U.S. 539, 559, 562 (1976).  The judicial disfavor of prior restraints derives

from "a theory deeply etched in our law: a free society prefers to punish the few

7

who abuse rights of speech *after* they break the law than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (emphasis added). Even when imposed by courts, "the barriers to prior restraint remain high and the presumption against its use continues intact." *Neb. Press*, 427 U.S. at 570.

To be sure, this Court has held that limited restrictions on the comments of lawyers and parties to a lawsuit may be appropriate in some circumstances to ensure the fairness of trial proceedings. *See In re Russell*, 726 F.2d 1007 (4th Cir. 1984). But that restriction must be "no greater than necessary." *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999). Trial courts considering an order restricting speech must therefore carefully consider the needs and circumstances of a specific case and the character of the media coverage that might prejudice the jury pool. *See In re Charlotte Observer*, 882 F.2d at 854-56 (rejecting order restricting access to court documents despite "pervasive, sensational, [and] inflammatory" media attention). Only then may a court impose a prior restraint on the communications of trial participants.

A trial court must also remember that publicity—even significant publicity—does not automatically jeopardize the empaneling of an impartial jury. As the Supreme Court has emphasized, "[p]rominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require

8

*ignorance*." *Skilling v. United States*, 561 U.S. 358, 381 (2010); *see Neb. Press*, 427 U.S. at 554, 565 (rejecting prior restraint despite media coverage that was "pervasive," "concentrated," and "adverse" to a particular party).  The district court must consider whether the "publicity, unchecked, would *so* distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Neb. Press*, 427 U.S. at 569 (emphasis added); *see also Skilling*, 561 U.S. at 384 (explaining that publicity must be "the kind of vivid, unforgettable information" that is "particularly likely to prejudice" to implicate the right to an impartial jury).

> ### B.   The District Court Entered the Gag Order Without Any Factual Findings or Support.

At the threshold, the Gag Order must be vacated because it is facially invalid: the district court failed to make the necessary findings to warrant such drastic relief.  Whenever a trial court restrains First Amendment rights in a judicial proceeding,  it must make specific findings to support the infringement and to explain why less restrictive measures would not suffice.  *Cf. In re Charlotte Observer*, 882 F.2d at 853 (holding that, before closing proceedings, trial courts must "give interested parties prior notice and an opportunity to be heard before deciding the issue" and should "support any decision to close with reasons and findings of record, including why no less drastic alternatives to closure are

9

feasible"); *In re Wash. Post Co.*, 807 F.2d at 391 (emphasizing the need for a record "specific enough to enable the reviewing court to determine whether closure was proper"). The lack of a detailed explanation not only prevents the parties from understanding what conduct led to the gag order but also thwarts appellate review. *See In re State-Record Co., Inc.*, 917 F.2d 124, 129 (4th Cir. 1990) ("[W]e have required specific reasons and findings on the record, because without such findings, *de novo* review is difficult.") (internal citation omitted).

This Court's decision in *Russell* outlines the vigilant approach that a trial court should take before restricting the First Amendment rights of trial participants. In that case, the trial court prohibited potential witnesses in a high-profile criminal prosecution from speaking about their proposed testimony. *Russell*, 726 F.2d at 1008. The court's order defined a "potential witness," leaving no doubt to whom the proscription applied. *See id.* at 1009. In a ten-page opinion accompanying the order, the court explained the basis for its decision, describing the "intense local and national publicity" surrounding the proceedings and recounting that the statements and representations made by the witnesses and their counsel would be "highly prejudicial" to the defendants. *Id.* And the court considered—and rejected—alternatives to the prior restraint, including "a change of venue" or "the possibility of using only jury control measures." *Id.* At the end of its analysis, the trial court found "a reasonable likelihood that the defendants would be denied a

fair trial without proscribing certain of [the witnesses'] extrajudicial statements."
*Id.* at 1010. This Court upheld the legality of the order and denied mandamus
relief. *Id.* at 1011.

The district court took none of those essential steps here. The court did not
enter the Gag Order on the motion of any party, nor did it seek out the parties'
positions on the matter or hold a hearing on the issue. More critically, the court
failed to identify the specific basis for the Gag Order except to refer vaguely to
"prejudicial publicity observed in *McKiver* and *McGowan*." Gag Order at 3. Yet
the Gag Order did not identify that publicity, let alone explain how it was
prejudicial or why the parties and witnesses should be muzzled to try to stop it.
Even though the Gag Order suggests that publicity will risk tainting future
potential jury pools, the district court never explained how it reached that
conclusion or identified which side was likely to bear the risk of that prejudice.
The lack of any such supporting record invalidates the Gag Order. *See In re State-
Record Co.*, 917 F.2d at 129 ("On the present record, we cannot adequately review
the trial court's finding that there is no adequate alternative to sealing the public
record until such time as it no longer poses a threat to the selection of an impartial
jury.").

11

### C.    Less Restrictive Alternatives Would Protect the Proceedings from Potential Prejudice.

A trial court must also consider less restrictive alternatives before subordinating the First Amendment rights of persons involved in judicial proceedings. *See Neb. Press*, 427 U.S. at 565 (rejecting prior restraint where "the record is lacking in evidence to support" the conclusion that alternative "measures might not be adequate"). The district court failed to address any such alternatives. Yet numerous alternatives exist to protect the impartiality of jury pools without severely restricting the speech rights of trial participants.

*Voir dire* provides the "preferred safeguard against" pretrial publicity. *In re Charlotte Observer*, 882 F.2d at 855. Indeed, courts should have "confidence that *voir dire* can serve *in almost all cases* as a reliable protection against juror bias however induced." *Id.* at 856 (emphasis added); *see also Press-Enterprise Co. v. Superior Court of Calif.*, 478 U.S. 1, 15 (1986) ("Through *voir dire*, cumbersome as it is in some circumstances, a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict."). Through that process, a court can assure "that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." *Skilling*, 561 U.S. at 399 n.34.

The district court's *voir dire* when empaneling jurors in *McKiver* and *McGowan* showed the effectiveness of that traditional safeguard. Nothing about

12

jury selection in those cases suggested that it would not be an effective tool in future cases.  That experience in the first two cases echoes the Supreme Court's observation in *Gentile v. State Bar*, 501 U.S. 1030 (1991),  that "[e]mpirical research suggests that in the few instances when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it and base the verdict upon the evidence presented in court." *Id*. at 1054.

More to the point, the Gag Order does not reflect that the district court even considered whether a more searching *voir dire* would address concerns down the line.[5]  And failing to consider that preferred alternative to a sweeping prior restraint gave it "much too short shrift." *In re Charlotte Observer*, 882 F.2d at 855.

Although *voir dire* is the best prophylactic, other alternatives would also protect the parties' trial rights without treading on their First Amendment freedoms.  The vast majority of the members of the jury pool in the *McKiver* and *McGowan* trials did not report prior knowledge of the litigation.  But if the district

---

[5] Even when a juror improperly conducted outside internet research in *McGowan* in violation of the district court's instructions, the district court did not find that it warranted a mistrial.  To the extent that episode motivated the Gag Order, the district court failed to match the remedy to the problem.  A trial court cannot prevent members of the jury from violating their oaths by limiting the parties' abilities to make public statements.  Of course, because the district court provided no specific basis for entering the Gag Order, we do not know if the juror-misconduct issue in *McGowan* played any role in its issuance.

13

court in future cases finds otherwise, it could expand the size of the pool as needed. The court could also consider sequestering the jury if it thought that necessary to ensure that outside communications do not influence their views of the case. (Murphy-Brown does not favor sequestration, however, in light of the other alternatives.)  And barring the effectiveness of those remedies, the court could transfer venue to another district or division.  The Gag Order did not consider any of those alternatives, let alone explain why they were not preferable to a multi-year prior restraint on the speech of the parties and trial participants.

Finally, to the extent that the district court worried that attorneys' statements would prejudice the potential jury pool, the court not only failed to identify any such statements, but it also overlooked the less restrictive measure imposed by North Carolina's Rules of Professional Conduct.  Rule 3.6(a) already prohibits a lawyer from making "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."  That standard (prohibiting statements that pose a "*substantial likelihood* of materially prejudicing" the proceeding) is far more narrowly tailored than the one imposed by the Gag Order (barring statements that "*could* interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice").  *Compare* N.C.R.P.C. 3.6(a) *with* Gag Order at 2.

14

Relying on the Professional Rules to punish specific misconduct is consonant with the Supreme Court's preferred method to "punish the few who abuse rights of speech *after* they break the law," instead of "throttl[ing] them and all others beforehand." *Se. Promotions*, 420 U.S. at 559.

### D. The Gag Order Irreparably Harms First Amendment Freedoms.

As noted above, "even a short-lived 'gag' order in a case of widespread concern to the community constitutes a substantial prior restraint and causes irreparable injury to First Amendment interests as long as it remains in effect." *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1304 (1983) (Brennan, J., in chambers). The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Thus, "[v]iolations of first amendment rights constitute per se irreparable injury." *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978).

The speech-stifling effect of the Gag Order was evident when the *Wall Street Journal* reported on the verdict in *McGowan* on June 29, shortly after the Gag Order issued. Valerie Bauerlein, *Pork Giant Loses Essential Legal Battle in Manure Case*, Wall Street Journal (June 29, 2018), https://www.wsj.com/articles/pork-giant-loses-essential-legal-battle-in-manure-case-1530314322 (Ex. 5). Murphy-Brown's representatives, as the article noted,

15

"declined to comment, citing a gag order." *Id.* The gag order not only precluded Murphy-Brown from identifying the many legal errors that led to the verdict but even from saying that it disagrees with the verdict and intends to appeal. In the meantime, the article reported how

> Environmentalists cheered the verdict, saying it could force a change in how hog manure is handled here. "In the end, it would be much better for the swine industry to replace all the lagoons and sprayfields so that our state's rural economy can grow with the new construction activity that lagoon conversion would bring," said Ryke Longest, professor at Duke University's law school.

*Id.*

The Gag Order thus prevents Murphy-Brown from defending itself while giving its critics free reign to publish factually erroneous claims and slanted opinions without rebuttal. Such one-sided treatment both violates Murphy-Brown's free speech rights and jeopardizes the impartiality of a jury pool that is exposed to a lopsided message critical of Murphy-Brown's business practices.

## III.    THE GAG ORDER IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD.

Separate from its First Amendment defects, the Gag Order should also be vacated because it is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. Due process requires fair notice of what the law prohibits. *See Gentile*, 501 U.S. at 1048. The use of general or vague terms in a court order violates that requirement if the reader must "guess at its contours." *Id.*

16

In *Gentile*, the Supreme Court struck down a state bar rule prohibiting speech about a lawsuit that went beyond discussing the "general nature" of the defense "without elaboration." *Id.* Because the terms "'general' and 'elaboration' are both classic terms of degree . . . [t]he lawyer has no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated." *Id.* at 1048-49.

So too here. The Gag Order permits statements about "the general nature of an allegation or defense," so long as the individual does so "without elaboration or any kind of characterization whatsoever." Order at 3. The Gag Order allows an individual to explain "the contents or substance of any motion or step in the proceeding," but that explanation must be "without any elaboration of any kind of characterization whatsoever." *Id.* at 4. The Gag Order's relative terms—general, substance, elaboration, characterization—defy fair notice. Just as in *Gentile*, therefore, an individual reading the Gag Order "has no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated." 501 U.S. at 1049.

The scope of the Gag Order is also unclear. The district court entered the Gag Order under the docket number for the *McGowan* case, but the caption lists all five Discovery Pool Cases. Then, when referring to "this litigation," the Gag Order references all twenty-six private-nuisance cases. *See* Gag Order at 2 n.1.

17

And the Gag Order lasts "until the final verdict in *these* cases," *id.* at 3, but the individuals covered by the order must not make prejudicial statements "relating to the trial, the parties or issues in *this* case," *id.* So does the Gag Order apply to the five Discovery Pool Cases or all twenty-six lawsuits? The Gag Order does not say. That ambiguity chills the First Amendment rights of everyone involved in all twenty-six cases.

The Gag Order also fails to make clear exactly to whom it applies. For example, it enjoins statements by "all potential witnesses," but unlike the order in *Russell*, that term remains undefined and open-ended. Discovery has not yet proceeded in 21 of the 26 cases, so the pool of "all potential witnesses" is not yet known. The universe of individuals who must watch what they say remains undefined and unclear. *Cf. United States v. King*, 192 F.R.D. 527, 536 (E.D. Va. 2000) (requiring service of a gag order on all those subject to its provisions).

The Gag Order is plagued by other vague terms as well. Individuals may not make statements to "public communications media," but what does that mean? Gag Order at 3. Does it mean traditional media outlets, like newspapers and television, or does it include anyone's social media account? Does it matter if the social media account is public or private? Compounding that uncertainty, the proscription extends to statements "that a reasonable person *would expect to be*

18

*communicated to* a public communications media." *Id.* Does that prohibit conversations with persons who might be interviewed by bloggers or journalists?

The Gag Order also restricts dissemination of information "which is not a matter of public record," but it fails to explain what constitutes the "public record." *Id.* at 3. Does the public record include only statements made to the court in these proceedings, or does it capture any information that is generally known to the public?

Finally, the Gag Order is overbroad in scope and insufficiently limited in duration. *See Tory v. Cochran*, 544 U.S. 734, 738 (2005) (recognizing that an injunction without a sustained "plausible justification" "amounts to an overly broad prior restraint upon speech"). By covering all parties and "all potential witnesses," the Gag Order applies not only to future trials but to trials that have already ended. In extreme cases when a gag order is necessary to protect the fairness of the proceeding, the order will expire when the jury returns its verdict. The Gag Order here purports to live on indefinitely until, apparently, the last trial is finished involving the last of the plaintiffs in the twenty-sixth case.

Given that it will take years to finally resolve the trials and appeals in the twenty-six pending cases, the Gag Order will muzzle the parties and witnesses from publicly expressing their opinions about the correctness of the trial court's

19

rulings, the impact on the pork industry, and the effect on the community and the State of North Carolina.  That wildly overbroad prohibition cannot be sustained.

## CONCLUSION

Such a long-lasting and open-ended restriction on the First Amendment rights of so many people is unprecedented and cannot stand.  The Court should issue a writ of mandamus declaring the Gag Order unconstitutional and barring the district court from enforcing it.

## STATEMENT REGARDING ORAL ARGUMENT

Because the Gag Order at issue in this case is facially invalid and overbroad, lacking any factual record to support the extreme measure of an open-ended prior restraint, the Court should issue a summary order granting mandamus and vacating the Gag Order.  If the Court is not inclined to issue a summary determination, Petitioner submits that the unprecedented nature of the Gag Order warrants oral argument to consider the significant constitutional issues presented.

Dated:  July 6, 2018

Respectfully submitted,

 /s/  Stuart A. Raphael

Stuart A. Raphael
Robert M. Tata
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 419-2021
sraphael@HuntonAK.com
btata@HuntonAK.com

20

Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
(804) 788-8656
kelliker@HuntonAK.com

*Counsel for Petitioner*
*Murphy-Brown LLC*

21

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1.    This petition complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because the portion of the petition subject to that rule is 4,377 words and therefore does not exceed the 7,800-word limit.

2.    This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman typeface using Microsoft Word.

/s/ Stuart A. Raphael

Stuart A. Raphael
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 419-2021
sraphael@huntonAK.com

*Counsel for Petitioner Murphy-Brown LLC*

22

## CERTIFICATE OF SERVICE

I certify that on July 6, 2018, I caused true and correct copies of the Petition for a Writ of Mandamus to be served upon counsel for the parties and upon the District Court as follows:

**By Overnight Delivery:**

>The Honorable W. Earl Britt
>United States District Court
>Eastern District of North Carolina
>310 New Bern Avenue
>Raleigh, NC 27601

**And Email to:**

>Ms. Amy Petty
>Staff Attorney to Senior U.S. District Judge W. Earl Britt
>United States District Court
>Eastern District of North Carolina
>310 New Bern Avenue
>Raleigh, NC 27601
>amy_petty@nced.uscourts.gov

**By Email and Overnight Delivery:**

>Mona Lisa Wallace
>John Hughes
>WALLACE & GRAHAM, P.A.
>525 North Main Street
>Salisbury, NC 28144
>Telephone: (704) 633-5244
>mwallace@wallacegraham.com
>jhughes@wallacegraham.com

>Michael Kaeske
>Lynn Bradshaw
>Eric Manchin
>KAESKE LAW FIRM
>1301 W. 25th Street, Suite 406
>Austin, Texas 78705
>Telephone: (512) 366-7300
>mkaeske@kaeskelaw.com
>lbradshaw@kaeskelaw.com
>emanchin@kaeskelaw.com

>*Counsel to Plaintiffs in:*

>*In re: NC Swine Farm Nuisance Litig., Master Case No. 5:15-CV-13-BR*
>*Anderson, et al. v. Murphy-Brown, LLC, 7:14-CV-183-BR*

23

*Artis, et al. v. Murphy-Brown, LLC, 7:14-CV-237-BR*
*Baker, et al. v. Murphy-Brown, LLC, 7:14-CV-227-BR*
*Barton, et al. v. Murphy-Brown, LLC, 7:14-CV-218-BR*
*Bennett, et al. v. Murphy-Brown, LLC, 7:14-CV-236-BR*
*Blanks, et al. v. Murphy-Brown, LLC, 7:14-CV-219-BR*
*Blow, et al. v. Murphy-Brown, LLC, 7:14-CV-232-BR*
*Branch, et al. v. Murphy-Brown, LLC, 7:14-CV-200-BR*
*Brown, et al. v. Murphy-Brown, LLC, 7:14-CV-245-BR*
*Collier, et al. v. Murphy-Brown, LLC, 2:14-CV-56-BR*
*Cromartie, et al. v. Murphy-Brown, LLC, 7:14-CV-238-BR*
*Faison, et al. v. Murphy-Brown, LLC, 7:14-CV-229-BR*
*Farrior, et al. v. Murphy-Brown, LLC, 7:14-CV-184-BR*
*Fullwood, et al. v. Murphy-Brown, LLC, 7:14-CV-228-BR*
*Gillis, et al. v. Murphy-Brown, LLC, 7:14-CV-185-BR*
*C. Herring, et al. v. Murphy-Brown, LLC, 7:14-CV-233-BR*
*E. Herring, et al. v. Murphy-Brown, LLC, 7: 14-CV -199-BR*
*Humphrey, et al. v. Murphy-Brown, LLC, 7:14-CV-234-BR*
*Lisane, et al. v. Murphy-Brown, LLC, 7:14-CV-201-BR*
*McGowan, et al. v. Murphy-Brown, LLC, 7:14-CV-182-BR*
*McKiver, et al. v. Murphy-Brown, LLC, 7:14-CV-180-BR*
*McMillon, et al. v. Murphy-Brown, LLC, 7:14-CV-181-BR*
*Miller v. Murphy-Brown, LLC, 7:14-CV-217-BR*
*Pearson, et al. v. Murphy-Brown, LLC, 5:14-CV-663-BR*
*Webb, et al. v. Murphy-Brown, LLC, 4:14-CV-152-BR*

*/s/ Stuart A. Raphael*
Stuart A. Raphael
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 419-2021
sraphael@HuntonAK.com

24

# Exhibit 1

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOYCE MCKIVER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 7:14-CV-180-BR |
| | ) | |
| MURPHY-BROWN, LLC, d/b/a | ) | |
| SMITHFIELD HOG PRODUCTION | ) | |
| DIVISION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| WOODELL MCGOWAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 7:14-CV-182-BR |
| | ) | |
| MURPHY-BROWN, LLC, d/b/a | ) | |
| SMITHFIELD HOG PRODUCTION | ) | |
| DIVISION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| EUNICE ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 7:14-CV-183-BR |
| | ) | |
| MURPHY-BROWN, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

EXHIBIT 1

ANNJEANETTE GILLIS, et al.,            )
                                       )
            Plaintiffs,                )
                                       )
            v.                         )        No. 7:14-CV-185-BR
                                       )
MURPHY-BROWN, LLC,                     )
                                       )
            Defendant.                 )
_____)


 BEN ARTIS, et al.,                    )
                                       )
            Plaintiffs,                )
                                       )
            v.                         )        No. 7:14-CV-237-BR
                                       )
MURPHY-BROWN, LLC d/b/a                )
SMITHFIELD HOG PRODUCTION              )
DIVISION,                              )
                                       )
            Defendant.                 )
_____)


ORDER

This matter is before the court sua sponte.  See Capital Cities Media, Inc. v. Toole, 463

U.S. 1303, 1305 (1983).  Given the continuing nature of this litigation,[1] and significant increase

in trial publicity, the court issues an order to protect the parties' fundamental "right to a fair trial

by impartial jurors."  Gentile v. State Bar of Nevada, 501 U.S. 1030, 1075 (1991); see Thiel v. S.

Pac. Co., 328 U.S. 217, 220 (1946).

Court orders which limit extrajudicial statements by trial participants must balance the

parties' Sixth Amendment rights with the guarantees of the First Amendment.  See Gentile, 501

_____

[1] There are 26 cases involved in this litigation.  See Case No. 5:15-CV-00013-BR.  To date, there are nine jury trials
scheduled sequentially until the end of this calendar year.

2

EXHIBIT 1

U.S. at 1075; <u>Sheppard v. Maxwell</u>, 384 U.S. 333, 361-62 (1966). "In the Fourth Circuit, district courts may restrict extrajudicial statements by parties and counsel only if those statements present a reasonable likelihood of prejudicing a fair trial." <u>United States ex rel. Davis v. Prince</u>, 753 F. Supp. 2d 561, 568 (E.D. Va. 2010) (internal quotations omitted); <u>see</u> <u>In re Russell</u>, 726 F.2d 1007, 1010 (4th Cir. 1984); <u>Am. Science & Eng'g. Inc. v. Autoclear, LLC</u>, 606 F. Supp. 2d 617, 625–26 (E.D. Va. 2008); <u>accord</u> <u>United States v. Brown</u>, 218 F.3d 415, 427 (5th Cir. 2000). Given the volume and scope of prejudicial publicity observed in <u>McKiver</u> and <u>McGowan</u>, and the substantial risk of additional publicity tainting or biasing future jury pools, the court adopts the following order:

IT IS ORDERED that from now until the final verdict in these cases, the plaintiffs, their counsel, representatives and agents, and defendant, its counsel, representatives and agents, and all potential witnesses shall not give or authorize any extrajudicial statement or interview to any person or persons associated with any public communications media or that a reasonable person would expect to be communicated to a public communications media relating to the trial, the parties or issues in this case which could interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice and which is not a matter of public record. Statements or information intended to influence public opinion regarding the merits of this case are specifically designated as information which could prejudice a party. Nothing set forth above shall prohibit any of the above parties from the following:

(1) Stating, without elaboration or any kind of characterization whatsoever:

(a) the general nature of an allegation or defense made in this case;

(b) information contained in the public record of this case;

(c) scheduling information; or,

3

(d) any decision made or order issued by the court which is a matter of public

record.

(2) Explaining, without any elaboration or any kind of characterization whatsoever, the

contents or substance of any motion or step in the proceedings, to the extent such motion or step

is a matter of public record in this case and any ruling made thereon to the extent that such ruling

is a matter of public record.

IT IS FURTHER ORDERED that all courthouse personnel, including marshals, deputy

marshals, guards, court clerks, deputy clerks, law clerks, secretaries, bailiffs and court reporters,

shall under no circumstances disclose to any person, without express authorization by the court,

information relating to this case that is not part of the public records of this court.

The court direct the parties' and public's attention to Local Civil Rules 83.4, 83.6, and

83.1(k).

This 27 June 2018.


_____

W. Earl Britt
Senior U.S. District Judge

4

# Exhibit 2

EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

```
_____   )
JOYCE McKIVER, et al,           )
                                )
             Plaintiffs         )
                                )
          vs.                   )CASE NO. 7:14-CV-180-BR
                                )
                                )
MURPHY-BROWN, LLC,              )
                                )
                                )
             Defendant          )
_____   )
```

**MONDAY, APRIL 2, 2018**
**JURY TRIAL/JURY SELECTION**
**BEFORE THE HONORABLE W. EARL BRITT**
**SENIOR UNITED STATES DISTRICT JUDGE**

**MICHELLE A. McGIRR, RPR, CRR, CRC**
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

EXHIBIT 2

<u>APPEARANCES</u>:


<u>On Behalf of the Plaintiffs</u>:

**MICHAEL KAESKE, JR., Esquire**
**KAESKE LAW FIRM**
1301 West 25th Street, Suite 406
Austin, Texas  78705


**MONA LISA WALLACE, Esquire**
**WALLACE and GRAHAM, P.A.**
525 North Main Street
Salisbury, North Carolina  28144




<u>On Behalf of the Defendant</u>:

**MARK E. ANDERSON, Esquire**
**McGUIRE WOODS, LLP**
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina  27601


**TENILLE J. CHECKOVICH, Esquire**
**VALYCE DAVIS, Esquire**
800 East Canal Street
Richmond, Virginia  23219

EXHIBIT 2

```
 1              (Monday, April 2, 2018 commencing at 9:06 a.m.)
 2                        P R O C E E D I N G S
 3
 4              THE COURT:  Good morning, everyone.  The
 5    long-anticipated day has arrived.  I hope everybody is ready.
 6              MR. KAESKE:  So do I, Your Honor.
 7              JUDGE BRITT:  I have a handful of stuff when I was
 8    coming in here and I left it somewhere.  Go find it, Lauren.
 9    My laptop and a file.
10              (The Clerk providing items to the Court)
11              JUDGE BRITT:  Okay.  All right.  The first thing I
12    want to do is go over with counsel the order in which we're
13    going to proceed today once the jury comes in.  I will begin,
14    of course, by swearing the panel as a whole, which is part of
15    the normal procedure.  Then I'll call the case for trial and
16    introduce the parties that are here and the lawyers and then
17    I will ask the jurors some questions designed to find out if
18    they have any hardship that is materially different from
19    their neighbor and for that purpose, the -- well, all the
20    jurors are going to be seated on the first five rows -- and
21    for that purpose, I've had Scott prepare me a chart.  You
22    can't have it because it's -- I want to know who I'm talking
23    to there at the beginning and it includes the randomization.
24    It would do away with the randomization so I'm sure you
25    understand that, but neither side is going to get it.
```

EXHIBIT 2

1  relatives work at Smithfield.

2  JUDGE BRITT:  Okay.  That was the questions that

3  you -- that you checked off, is that correct?

4  THE JUROR:  Yes, sir.

5  JUDGE BRITT:  Do you think because of that it would

6  be difficult for you to be fair and impartial if you're

7  selected, sir?

8  THE JUROR:  No, sir.

9  THE COURT:  You think in spite of the fact that a

10  lot of your relatives work at Smithfield and you formerly

11  lived in that area -- did you live near a hog farm?

12  THE JUROR:  Actually, yes.  It was maybe about

13  20 feet from my house.

14  JUDGE BRITT:  I see.  I would say that's near.

15  All right.  Thank you very much.  You may have a

16  seat.

17  THE COURT:  ██████████.

18  THE JUROR:  Yes, sir.

19  JUDGE BRITT:  Did you answer any yes?

20  THE JUROR:  Yes, sir.

21  JUDGE BRITT:  Which ones?

22  THE JUROR:  I do believe I've heard about this

23  case, a small story, before and I've heard of Murphy-Brown

24  and I know somebody that's worked on a hog farm.

25  JUDGE BRITT:  All right.  Can you tell me the

EXHIBIT 2

```
 1   source of your information about the case, if you say you've

 2   heard about it.

 3           THE JUROR:  I believe it was a small story on the

 4   local news channel, WRAL.

 5           JUDGE BRITT:  Would that have been in the last few

 6   days?

 7           THE JUROR:  I think it was a couple weeks ago.  It

 8   wasn't in the last day or two.

 9           JUDGE BRITT:  All right.  Well, after you heard

10   that story, did you form or express any opinion as to the

11   merits of the case, that is, one side or the other?

12           THE JUROR:  I kind of did.

13           JUDGE BRITT:  All right.  Well don't tell me how

14   though.  Did you -- whatever you discovered about the case,

15   do you think it would take some evidence on the part of the

16   other side to remove that?

17           THE JUROR:  Yes, sir.

18           JUDGE BRITT:  I take it that you feel like because

19   of what you have heard, it would be difficult for you to be

20   fair and impartial if you're selected.

21           THE JUROR:  Yes, sir.

22           JUDGE BRITT:  All right.  You may have a seat.

23           THE COURT:  ███████████.

24           THE JUROR:  No, Your Honor, I didn't check yes.

25           THE COURT:  ████████████.
```

EXHIBIT 2

```
 1   much.  You may have a seat.
 2                 On the next row, ███████████████ .
 3                 THE JUROR:  Yes, Your Honor.
 4                 JUDGE BRITT:  One and four.  Okay.  You've heard
 5   something about the case before coming to court today?
 6                 THE JUROR:  Yeah.  I think I heard something about
 7   it on the news just in passing.  Might not have been this
 8   one, but it was about a hog farm.
 9                 JUDGE BRITT:  Well, if it's in the last few days.
10                 THE JUROR:  Been over a week, I think.
11                 JUDGE BRITT:  Okay.  Well, whatever you heard, did
12   you form or express any opinion about the matter?
13                 THE JUROR:  Nah, I take all news with a grain of
14   salt.
15                 JUDGE BRITT:  And did you -- you haven't heard of
16   Murphy-Brown in that same regard?
17                 THE JUROR:  Yeah, I could be impartial.
18                 JUDGE BRITT:  Regardless whatever you have heard,
19   you haven't formed or expressed any opinion?
20                 THE JUROR:  No.  Could you repeat the question.
21                 JUDGE BRITT:  Have you formed or --
22                 THE JUROR:  No.
23                 JUDGE BRITT:  -- expressed any opinion --
24                 THE JUROR:  No Your Honor.
25                 JUDGE BRITT:  --as a result of what you heard?
```

EXHIBIT 2

1       THE JUROR:  No.

2       JUDGE BRITT:  And you feel that you could be fair

3  and impartial and base your verdict solely on the evidence

4  that comes from the witness stand and my instructions to you

5  on the law.

6       THE JUROR:  Yeah, I think so, Your Honor.

7       JUDGE BRITT:  Have a seat.

8       ███████████████████.

9       THE JUROR:  I said yes to number four and number

10 six.

11      JUDGE BRITT:  All right.  Can you tell me how you

12 know about Murphy-Brown.

13      THE JUROR:  Just heard of the company.  Just in

14 passing.  Don't know any details.

15      JUDGE BRITT:  How about number six.

16      THE JUROR:  Number six, my husband was a former

17 employee of Smithfield Foods.  He's been gone probably ten

18 years or so.

19      JUDGE BRITT:  Do you think either of those factors

20 would in any way interfere with your ability to be a fair and

21 impartial juror in this case where Murphy-Brown is -- or

22 Smithfield Foods are parties.

23      THE JUROR:  No, sir.

24      THE COURT:  Do you feel like you could listen to

25 the evidence as it comes from the witness stand, my

EXHIBIT 2

1   ourselves about a 10-minute recess and come back in.

2                         (Brief Recess)

3           JUDGE BRITT:  Can anybody tell me where plaintiffs'

4   counsel is?

5           MR. ANDERSON:  I think I know where their room is.

6   I can run back and get them.

7           JUDGE BRITT:  Glenna will go get them.

8          (Plaintiffs counsel entering the courtroom)

9           JUDGE BRITT:  All right.  Counsel, I'm going to go

10  through the list and tell you the jurors that I have excused.

11  This may -- it will include the ones that I excused earlier

12  for -- under the first round.  And the others are ones I am

13  excusing and I may not have it indicated on here which one I

14  was excusing them under so you need to mark these on your

15  list.

16          Number 10, ███████████ is out.  Number 17, ██████

17  ███████.  Number 19, ████████████.

18          MR. KAESKE:  Excuse me, sir.  Could you go a little

19  slower.  I have to find them on the list, please.

20          JUDGE BRITT:  Absolutely.

21          MR. KAESKE:  Sorry.  I lost you right after ██████.

22  Sorry.

23          JUDGE BRITT:  17.  Did you get 17?

24          MR. KAESKE:  We don't have numbers so I have to

25  look for the names and that's why it took me a minute.

EXHIBIT 2

1          JUDGE BRITT:  Oh, okay.  All right.  ███████████ .

2          MR. KAESKE:  Thank you, sir.

3          JUDGE BRITT:  ██████████ .  She was on the end

4  of the first row.  Do you have her?

5          MR. KAESKE:  Yes, sir.  Thank you.

6          JUDGE BRITT:  ██████████ , ██████████ , ██████████

7  ██████ , ██████████ .  I know that was one that was

8  earlier.  ██████████ , ██████████ , ██████████ and ██████

9  ██████ .

10        Now I'll be glad to hear from you lawyers with

11  respect to challenges for cause for any others who have

12  answered the questions.

13        And Mr. Kaeske, I'll start with you.

14        MR. KAESKE:  Your Honor, I would like to make a

15  suggestion, since it seems clearly like we have enough jurors

16  so far -- well, first a question.  Are there more questions

17  you're going to ask or is this the questions?

18        JUDGE BRITT:  Oh, Lord, there is a pile more

19  questions I'm going to ask.

20        MR. KAESKE:  Okay.

21        JUDGE BRITT:  We're going to put 24 in the box.

22        MR. KAESKE:  Yes, sir.

23        JUDGE BRITT:  And then I'm going to ask questions

24  and some of which will be the questions that you all

25  submitted and then I anticipate it will take us another 30,

EXHIBIT 2

120

```
 1            JUDGE BRITT:  That's one.

 2            THE CLERK:  Do you want to mark from this?  It

 3   might be easier.

 4            JUDGE BRITT:  Thank you.  Let me go back and get

 5   that.

 6            MR. ANDERSON:  Your Honor, we have Ms. ████    who

 7   is right there.  Juror number 12.

 8            JUDGE BRITT:  You can call them by numbers if -- if

 9   you don't have this.

10            MR. ANDERSON:  I don't have the numbers yet.

11            MR. KAESKE:  ██████████████████████.

12            MR. ANDERSON:  Should be down in front.  ███████

13   ████.

14            JUDGE BRITT:  That's two for the defendant.

15            I did not tell you all, but I assume you're going

16   to exercise all your peremptories, but if you should happen

17   not to, then I will --

18            MR. ANDERSON:  Go by your list.

19            JUDGE BRITT:  I'll be required to excuse until we

20   get down to 12 and I would do so in the reverse order in

21   which they're called.

22            MR. ANDERSON:  Okay.

23            JUDGE BRITT:  Just so you know what I'll do.  You

24   can --

25            MR. KAESKE:  ██████████.
```

EXHIBIT 2

121

```
1          JUDGE BRITT:  That's three for the plaintiff.

2          MR. ANDERSON:  My third, ███████.

3          JUDGE BRITT:  Okay.  That's three for the

4   defendant.

5          MR. KAESKE:  ████████.

6          JUDGE BRITT:  Four for the plaintiff.

7          MR. ANDERSON:  ████████.  Number 16.

8          JUDGE BRITT:  Four for the defendant.

9          MR. KAESKE:  ████████.

10          JUDGE BRITT:  Did you see that --

11          MR. ANDERSON:  ██████.

12          JUDGE BRITT:  Okay.

13          MR. ANDERSON:  ███████████.

14          JUDGE BRITT:  You know we had an assistant U.S.

15   Attorney here with the same name.  ██████.

16          You have one more.

17          MR. KAESKE:  ██████████.

18          JUDGE BRITT:  You have one more.

19          MR. ANDERSON:  ███████.

20          JUDGE BRITT:  All right.  That's six each.  Hold

21   on.  (Highlighting remaining juror names).

22          The ones who are highlighted are the ones you have

23   approved.

24          MR. KAESKE:  Now what do I do.

25          JUDGE BRITT:  Just look at it.
```

EXHIBIT 2

1          MR. KAESKE:  Okay.

2          JUDGE BRITT:  If you disagree with me, that means

3    you have approved one --

4          MR. KAESKE:  I understand and I do.  (Tendering

5    document to Attorney Anderson).

6          MR. ANDERSON:  That looks correct.

7          JUDGE BRITT:  Speak now or forever hold your peace.

8    Thank you.

9                   **CONCLUSION OF BENCH CONFERENCE**

10                        (Open Court)

11          JUDGE BRITT:  We now have our jury.  I'm going to

12   call the names of those of you who have been excused from

13   serving in this case.  I would ask that you wait until I

14   complete the calling of all the names before you start filing

15   out.  And when these jurors start filing out, the ones of you

16   who remained in the courtroom may file out also because you

17   will not be needed.

18          And all of you who are leaving will go with my

19   thanks for making yourselves available for jury service and

20   for coming here today and being questioned about this case.

21   You have served your -- you have satisfied your obligation of

22   serving on a jury in this district of the Federal Court for a

23   period of two years so you won't be invited back during that

24   time.  And if you happen to be, if you tell the folks down in

25   the clerk's office that you served here on April the 2nd --

# Corrected
# Exhibit 3

CORRECTED EXHIBIT 3

Petitioner Murphy-Brown LLC originally filed an uncertified, realtime unedited transcript of the *McGowan* jury selection proceedings as Exhibit 3 to its Petition for Writ of Mandamus. Since filing the Petition, Petitioner has received a certified copy of the transcript from those proceedings. Excerpts from the certified transcript are being provided as Corrected Exhibit 3. The below table shows the locations of cited portions from the *McGowan* jury selection proceedings in Corrected Exhibit 3.

| Citation used in Petition | Location in Corrected Ex. 3 |
|---|---|
| 34:8-25 | 35:4-21 |
| 35:1-25 | 35:22-36:20 |
| 36:3-21 | 36:23-15 |
| 36:24-37:17 | 37:18-38:11 |
| 38:23-39:12 | 39:19-40:8 |
| 41:3-19 | 41:22-42:17 |
| 43:13-19 | 44:13-19 |
| 47:9-48:4 | 48:8-49:2 |
| 48:7-49:2 | 49:6-50:1 |
| 52:14-53:3 | 53:15-54:4 |
| 54:16-55:8 | 55:17-56:9 |
| 90:3-13 | 93:8-18 |
| 113:10-16 | 116:25-117:8 |

CORRECTED EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

```
_____
                              )
McGOWAN, et al,               )
          Plaintiffs          )
                              )   7:14-CV-00182-BR
          vs.                 )
                              )
MURPHY-BROWN, LLC,            )
          Defendant.          )
_____)
```

MAY 29, 2018
JURY SELECTION and VOIR DIRE
BEFORE THE HONORABLE W. EARL BRITT
SENIOR UNITED STATES DISTRICT JUDGE

On Behalf of the Plaintiffs:

MICHAEL KAESKE, Jr., Esq.
KAESKE LAW FIRM
1301 West 25th Street, Suite 406
Austin, Texas  78705

MONA LISA WALLACE, Esq.
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, North Carolina  28144

On Behalf of the Defendant:

MARK E. ANDERSON, Esq.
JOCELYN MALLETTE, Esq.
McGUIRE WOODS, LLP
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina  27601

TENNILLE J. CHECKOVICH, Esq.
McGUIRE WOODS, LLP
800 East Canal Street
Richmond, Virginia  23219

AMY M. CONDON, CRR, RPR, CSR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

CORRECTED EXHIBIT 3

PROCEEDINGS

1

2          (Tuesday, May 29, 2018, commencing at 9:42 a.m.)

3              THE COURT:  Good morning, everyone.  Glad to see

4    everybody again after what, about a month?

5              MR. ANDERSON:  Time flies.

6              THE COURT:  I hope you had a good Memorial Day

7    weekend and are ready to proceed with this case.

8              There's a few matters we need to take up in the

9    absence of the jury.

10             The Court has some motions in limine that it has not

11   ruled on and I need to do that at this time.  Let me see, do we

12   have everybody here just like we did before?

13             Is Ms. Mallette, was she here before?

14             MR. ANDERSON:  She was not, Your Honor.

15             THE COURT:  Glad to have you with us.

16             MS. MALLETTE:  Thank you, Your Honor.  Happy to be

17   here.

18             THE COURT:  All right.  The first one I have here to

19   rule on is the motion by the defendant to reconsider the

20   decision of the Court allowing plaintiffs' motion for summary

21   judgment on the applicability of the Farm Act defense.  That

22   motion is denied.

23             The next motion is defendant's motion in limine to

24   exclude evidence of diagnoseable medical conditions.  My ruling

25   on that motion is the same as it was in the first trial.  And I

1  damages.

2      Plaintiffs are not claiming physical injury.  They

3  are also not claiming damage to their property from the hog

4  operation.

5      Murphy-Brown contends that it is reasonable for it to

6  contract with Joey Carter; that defendant and the operation

7  comply with all existing regulations; that the operations are

8  safe, and that the odors are properly managed.

9      I believe one -- at least one of you jurors has a

10 problem hearing and we have provided you with a device.  Are

11 you able to hear okay?

12     PROSPECTIVE JUROR:  Yes, sir.

13     THE COURT:  You can hear me?

14     PROSPECTIVE JUROR:  Yes, sir.

15     THE COURT:  Good.  Okay.  Thank you.

16     All right.  If one of the staff will hand out the

17 sheets that I'm going to distribute to the jurors.

18     Members of the jury, my staff is going to hand you

19 out a sheet and if you want to be reading it, you can.  I'm

20 going to go over it with you in a moment.  You'll be provided

21 with a pencil to indicate on there if you want to, unless you

22 already have one, do you have pencils, Amy?

23     MS. PETTY:  No.  Scott should have handed them out.

24     THE COURT:  Were you given pencils earlier?

25     ALL JURORS:  No.

1          THE COURT:  Maybe you can -- listen to this and then

2     if anybody else wants -- needs a writing instrument, they can

3     get it.

4          I want you to mark on the line indicated there if

5     this applies to you.  For example, the first question is:  Have

6     you heard anything about this or similar so-called hog farm

7     cases, including any that have already been tried?

8          Now, if your answer to that question is yes, check

9     that there.  You're not going to be passing these back in so if

10    you can remember, that would be just as well, or if you already

11    have a pen.  The way I'm going to do this is after I've gone

12    through all the questions, I'm going to give you an opportunity

13    to stand and tell me about your answers.

14          There's the man with the pencils.

15          The next thing is:  Do you know any of the attorneys?

16    If you do, check that yes.

17          Third question is:  Do you know the plaintiffs or

18    members of their families?

19          Now, as I've indicated -- what are the two

20    plaintiffs' names, Counsel?

21          MR. KAESKE:  Elvis and Vonnie Williams, Your Honor.

22          THE COURT:  Members of the jury, I read out to you

23    earlier the name of the case and that's Woodell McGowan and

24    others, but this is just two of the plaintiffs who appear in

25    that case and their names are Elvis and Vonnie Williams.  They

live just outside of Beulaville down in Duplin County, North
Carolina.

Have any of you ever heard of Murphy-Brown, LLC?  If
you have, check that.

Now I'm going to read to you a list of witnesses who
may testify in this case.  The fact that I read the names does
not necessarily mean that they will testify.  The purpose of
reading this list is to find out if you know any of these
people.  Now, if you -- if the name sounds familiar, resolve
any doubt in favor of checking it and let's talk about it
because if it's somebody you think you know we might ask some
questions like where they live or that type thing that would
clarify who it is and we make sure that we on the same page.

Now, listen to the list and if you need to make some
notes, do so.

Shane Rogers, Canton, New York; James Merchant, Iowa
City, Iowa, Steve Wing, who is deceased, but he'll be
testifying by a depo vision that was taken before his death.
Kendall Thu, DeKalb, Illinois; Thomas Hubbard, Evanston,
Illinois; Jeffrey Tomberlin, College Station, Texas; Larry
Baldwin, Morehead City; Donald Butler, Smithfield, Virginia;
Tom Butler, Lillington; Corey Robinson, Dolores, Colorado; John
Sargent, Warsaw, North Carolina; Gregg Schmidt, Warsaw; John
Wathen, Tuscaloosa, Alabama; Kraig Westerbeek, Warsaw; Derl
Walker, Kenansville; Al Hodge, Washington, North Carolina;

CORRECTED EXHIBIT 3

1  Richard Shiver, Wilmington; Regina Frederick, Warsaw; Henrietta
2  Maddox, Beulaville; Ray Outlaw, Beulaville; Samantha Pickett,
3  Chinquapin; Darlene Bynum, Albertson; Dwayne Boyce, Lendora
4  Farland, Beulaville; Marria McGowan, Turkey, North Carolina;
5  Mary Miller, Beulaville; Mary Jo Loftin, Mt. Olive; Glenn Wade,
6  Beulaville; Serena Sumler, Beulaville; Oscar Ellis, Beulaville;
7  Leslie Leatherberry, Beulaville; Becky Lancaster, Sylva, North
8  Carolina; Roger Pickett, Jacksonville, North Carolina; Richard
9  Pickett, Beulaville; Samuel Branch, Mt. Olive; Jacqueline
10 Valerio, Beulaville; Thelma Collins, Beulaville; Sheila Wimmer,
11 Beulaville; Nancy Lambertson, Rich Square, North Carolina;
12 Elvis Williams and Vonnie Williams both, they're the
13 plaintiffs, from Beulaville; Elain Carlton, Beulaville; Anthony
14 Carlton, Beulaville; David Carter, Beulaville; Dreama Carter,
15 Beulaville; Kenneth Carter, Beulaville; LaTonya Carter, Robert
16 Carter, Beulaville, Sabena Carter, Beulaville; James Davis,
17 Senior, Beulaville; Jacqueline Davis, Beulaville; James Davis,
18 Junior, Beulaville; Linnill Farland, Beulaville; Georgia
19 Farland, Beulaville; Woodell McGowan, Beulaville; Dorothy Hill,
20 Pink Hill, North Carolina; Cartha Williams, Beulaville, NC;
21 Barbara Gibbs, Beulaville; Dale Bollinger, Elizabethtown; Ray
22 Campbell, Raleigh; Matias Vanotti, Florence, South Carolina;
23 Debra Taylor, Boone, North Carolina; Joey Carter, Matthew
24 Carter, Cynthia Watson, Rose Hill, North Carolina; Jesse
25 Ladson, Warsaw; Dr. Pamela Dalton, Philadelphia, Pennsylvania;

CORRECTED EXHIBIT 3

1  Dr. Herman Gibb, Arlington, Virginia; Dr. Richard Houseman,

2  Columbia, Missouri; William Kreutzberger, Charlotte; Dr.

3  Nicolas Piggott, Raleigh; Dr. Keith Ramsey, Greenville, North

4  Carolina; Dr. Today See, Raleigh; Roger Waldon, Chapel Hill;

5  Dr. Jennifer Clancy, St. Albans, Vermont; Dr. Lowery A. Harper,

6  Watkinsville, Georgia; Dr. Terry Coffey, Rose Hill; Kraig

7  Westerbeek, Warsaw; Dr. Gregg Schmidt, Warsaw; Dexter Edwards,

8  Beulaville; Al Searles, Warsaw; Lynwood Harper, Warsaw; Alex

9  Kennedy, Warsaw; Timothy -- or Timmy Nethercutt, Warsaw; Joey

10 Carter, Beulaville; Neil Russell Barbee, Beulaville; Justin

11 Davis, Beulaville; Greg Drinkwater, Beulaville; Justin Blake

12 Hunter, Beulaville; John Clayton Kenan, Beulaville; Bobby

13 Lanier, Beulaville; Lee Roy Leatherberry, Beulaville; James

14 Newkirk, Beulaville; Wanda Newkirk, Beulaville; Paige Campbell

15 Pickett, Beulaville; Jeremy Street, Beulaville; Jennifer

16 Street, Beulaville; Willie Street, Beulaville; Debbie Street,

17 Beulaville; Wes Trejo, Beulaville; Leslie Leatherberry,

18 Beulaville; Kim Whaley, Beulaville; Davis Brinson, Kenansville;

19 Doug Grady, Mt. Olive; Dr. Austin Obasohan, Kenansville; Robert

20 Ross, Beulaville; David Powell, Wilmington; Howard Hobson,

21 Clinton; Christine Lawson, Raleigh; Gary Saunders, Raleigh;

22 Zettie Williams, Magnolia, North Carolina; Dr. Lawrence Rouse,

23 Kenansville; Mark Williams, Raleigh; Everett Murphrey,

24 Farmville, North Carolina; Catherine Flowers, Raleigh; Michael

25 Flowers, Raleigh; Oscar Ellis, Beulaville; Kevin Ellis,

```
 1   Beulaville; Thelma Ellis, Beulaville and Corey Robinson,

 2   Dolores, Colorado.

 3           You know some of those names I read more than once

 4   and that's because they are both plaintiffs' and defendant's.

 5   Some of them have the same witnesses listed.

 6           Now, if you know any of those witnesses you need to

 7   check yes for question five so you can talk to me about that.

 8           Number six:  Have you had any business dealings with

 9   or do you know anyone who works or has worked for WH Group

10   Limited, Smithfield Foods Incorporated, Shuanghui International

11   Holdings Limited, Murphy-Brown, LLC, Murphy Family Farms,

12   Murphy Family Ventures, Prestage, Goldsboro Mills, Browns of

13   North Carolina, Premium Standard Farms or Carroll's Foods.

14           Question seven:  Have you or do you own shares of

15   stock in Murphy-Brown, Smithfield Foods, Inc., WH Group

16   Limited, Shuanghui International Holdings Limited?

17           Have you ever lived on or been employed by a large

18   farm?

19           Number nine:  Do you know anyone who has?  Of course

20   that refers back to eight.

21           Number ten:  Do you have any negative opinions about

22   lawyers, hog farming operations that would interfere with your

23   ability to be a fair and an impartial juror in a trial of this

24   action?

25           Number 11:  Have you or your family or close personal
```

1  friends had any association with the National Pork Producers

2  Council, the National Pork Board, the North Carolina Pork

3  Council or other similar organization.

4             Number 12:  Are you a vegan or vegetarian?

5             Number 13:  Do you belong to or contribute to PETA,

6  which is People for the Ethical Treatment of Animals, or any

7  other adversary groups like Sierra Club, River Keepers, the

8  Natural Resources Defense Council, the North Carolina

9  Environmental Justice Network, Rural Empowerment Association,

10  Forbe Community Health, Southern Environmental Law Center or

11  Water Keeper Alliance?

12             Number 14:  Do you feel that you cannot listen to the

13  evidence and my instruction on the law and deliberate in good

14  faith?

15             Number 15:  Do you know of any reason that you can't

16  be fair and impartial?

17             Contemplate your answers there for a moment.  Make

18  sure you check if you need to tell me about them.

19             I have a hand raised there.

20             PROSPECTIVE JUROR:  Can we ask for a bathroom break?

21             THE COURT:  All right.  Let's take a 15-minute

22  recess.  Everybody come back right where you are.

23      (The proceedings were recessed at 11:15 a.m. and reconvened

24  at 11:30 a.m.)

25             THE COURT:  All right.  Got somebody ready with the

1  microphone?  Let me ask you, anybody on the first row who

2  answered any question yes, checked any question?  All right.

3  Pass the mic down to the lady.

4         PROSPECTIVE JUROR:  My name is ███████████.  I

5  heard of things like this on the news on and off.  I don't know

6  if it's specifically these plaintiffs, but I'm aware that

7  there's been complaints about the odors.

8         THE COURT:  Based on what you've heard from whatever

9  source, did you discuss the matter with anyone?

10         PROSPECTIVE JUROR:  No, sir.

11         THE COURT:  Did you form or express any opinion about

12  the merits or demerits of the case?

13         PROSPECTIVE JUROR:  Well, I feel for the people who

14  have to live around those odors, but I also respect that an

15  industry has a right to run a business, so...

16         THE COURT:  Well, do you feel that based on what

17  you've heard, that you would have any difficulty being a fair

18  and impartial juror, listening to the evidence as it comes from

19  the witness stand, listening to the law as I define it for you,

20  and rendering your verdict based solely on that?

21         PROSPECTIVE JUROR:  No, sir, I don't think so.

22         THE COURT:  Did you answer any other question?

23         PROSPECTIVE JUROR:  As yes?  No, sir.

24         THE COURT:  Pass the mic down to somebody else I

25  believe raised their hand.

CORRECTED EXHIBIT 3

36

```
1           PROSPECTIVE JUROR:  I also heard about the case on

2   the news; but no, it would not interfere with my choice or

3   decision.

4           THE COURT:  Let me ask you another question, too.

5   State your name, if you will.

6           PROSPECTIVE JUROR:  ███████████████████.

7           THE COURT:  Was it from the news media?

8           PROSPECTIVE JUROR:  Yes, sir.

9           THE COURT:  After hearing whatever you heard, did you

10  discuss the matter with anyone?

11          PROSPECTIVE JUROR:  No, sir.

12          THE COURT:  Did you form any opinion about it?

13          PROSPECTIVE JUROR:  No, sir.

14          THE COURT:  And I believe you already said you feel

15  that it would not interfere with your ability to be a fair and

16  impartial juror.

17          PROSPECTIVE JUROR:  That's correct.

18          THE COURT:  Did you answer any other question on the

19  sheet?

20          PROSPECTIVE JUROR:  No, sir.

21          THE COURT:  Thank you, ma'am.

22          PROSPECTIVE JUROR:  Thank you.

23          THE COURT:  Second row.  Anybody on the second row?

24  State your name, sir.

25          PROSPECTIVE JUROR:  ██████████████████.
```

1          THE COURT:  Mr. ███████, which one did you answer?

2          PROSPECTIVE JUROR:  The same as the other two, the

3     question.

4          THE COURT:  Where did you obtain your information?

5          PROSPECTIVE JUROR:  Reading online about cases

6     that -- that the cases exist.

7          THE COURT:  All right.  And after you gained that

8     information, did you discuss the matter with anyone?

9          PROSPECTIVE JUROR:  No, sir.

10         THE COURT:  Did you form any opinion about it?

11         PROSPECTIVE JUROR:  No, sir.

12         THE COURT:  Do you feel that whatever you heard would

13    interfere with your ability to be a fair and impartial juror if

14    you're selected?

15         PROSPECTIVE JUROR:  No, sir.

16         THE COURT:  Pass the mic down unless you got another

17    one.

18         PROSPECTIVE JUROR:  ███████.  I also answered

19    number one yes for the same reason, just the news media

20    coverage.

21         THE COURT:  I got to ask you these same questions.

22    After you obtained whatever knowledge you obtained, did you

23    discuss the matter with anyone?

24         PROSPECTIVE JUROR:  Just my spouse, Your Honor.

25         THE COURT:  Okay.  And did you form or express any

CORRECTED EXHIBIT 3

38

1  opinion about it with regard to --

2          PROSPECTIVE JUROR:  I probably did, but it was only

3  based on the information I heard on the news.

4          THE COURT:  Do you feel that anything that you may

5  have heard on the news created an impression on your part that

6  you feel that it would take some evidence on behalf of the

7  other party to remove?

8          PROSPECTIVE JUROR:  No, sir.

9          THE COURT:  Do you know of any reason why you feel

10 you couldn't be fair and impartial?

11         PROSPECTIVE JUROR:  No, I do not.

12         THE COURT:  Is that the only question you answered?

13         PROSPECTIVE JUROR:  Yes, sir.

14         THE COURT:  Pass the mic down, please.

15         I believe the next one is the gentleman I met on the

16 elevator this morning.

17         PROSPECTIVE JUROR:  Yes, sir.

18         THE COURT:  What is your name?

19         PROSPECTIVE JUROR:  ██████████.

20         THE COURT:  Mr. ██████, which one did you check?

21         PROSPECTIVE JUROR:  Number four and number six.  In a

22 previous employment I was sales manager for Ford Clinton and we

23 sold fleet vehicles to Murphy Brown and Prestage Farms.

24         THE COURT:  Number six, you had business dealings?

25         PROSPECTIVE JUROR:  Yes, sir.

CORRECTED EXHIBIT 3

1          THE COURT:  Do you feel that this past experience

2     would in any way interfere with your ability to be a fair and

3     impartial juror in a trial of this case?

4          PROSPECTIVE JUROR:  I don't believe so, sir.

5          THE COURT:  Living where you were, were you familiar

6     with large hog farm operations?

7          PROSPECTIVE JUROR:  Yes, sir, familiar with them

8     because we did a lot of business with the area farmers.

9          THE COURT:  Okay.

10         PROSPECTIVE JUROR:  Yes, sir.

11         THE COURT:  But you don't think any information you

12    may have gained would in any way interfere with your ability to

13    be fair and impartial?

14         PROSPECTIVE JUROR:  I don't believe so, no, sir.

15         THE COURT:  Do you know anything that would keep you

16    from being fair and impartial if you're selected?

17         PROSPECTIVE JUROR:  No, sir.

18         THE COURT:  Anybody on the next row?

19         PROSPECTIVE JUROR:  ███████████  and I answered yes

20    to question number one, I heard it on the media.

21         THE COURT:  And after hearing whatever you heard from

22    the media, did you discuss the matter with anyone?

23         PROSPECTIVE JUROR:  I believe I discussed it with my

24    husband at the time and my question to myself was which came

25    first, the chicken or the egg?  But once the story ended, I

```
 1  moved on, didn't think about it again.
 2          THE COURT:  Did you feel like you have formed any
 3  opinion on the matter as a result of what you heard?
 4          PROSPECTIVE JUROR:  No, I have not.
 5          THE COURT:  Do you know -- do you feel that it,
 6  whatever you heard, would in any way interfere with your
 7  ability to be fair and impartial in a trial of this case?
 8          PROSPECTIVE JUROR:  No, it would not.
 9          THE COURT:  Did you answer any other question?
10          PROSPECTIVE JUROR:  No, I did not.
11          THE COURT:  You may pass the mic down to the next
12  one, whoever, if there is another one.  Anybody else on that
13  row?
14          PROSPECTIVE JUROR:  ███████████.  I answered yes to
15  four, five and nine.
16          THE COURT:  Okay.  Four, five and nine.  All right.
17  Four, tell me about your knowledge, just heard about them or do
18  you know more about them?
19          PROSPECTIVE JUROR:  I work for a parent company and
20  we deal with a lot of farmers.
21          THE COURT:  And so you're familiar with Murphy-Brown?
22          PROSPECTIVE JUROR:  Yeah.
23          THE COURT:  All right.  Who among the witnesses did
24  you know?
25          PROSPECTIVE JUROR:  Tom Butler.
```

CORRECTED EXHIBIT 3

41

```
 1              THE COURT:  And how do you know Mr. Butler?

 2              PROSPECTIVE JUROR:  He lives on our system, he's got

 3   a microgrid on his farm, I've done a lot of work on his farm,

 4   sent crews to his farm, know him personally.

 5              THE COURT:  You know him personally?

 6              PROSPECTIVE JUROR:  Yes.

 7              THE COURT:  Do you feel that your knowledge of

 8   Mr. Butler would cause you to place greater weight or

 9   credibility on his testimony or lesser weight or credibility on

10   his testimony than you would on the testimony of some witness

11   you did not know?

12              PROSPECTIVE JUROR:  No, I would believe him.

13              THE COURT:  You would believe him?

14              PROSPECTIVE JUROR:  Sure.

15              THE COURT:  So you feel like it would -- whatever he

16   said about it, you'd be inclined to believe?

17              PROSPECTIVE JUROR:  I would believe that he was

18   telling the truth.

19              THE COURT:  Yeah, okay.  I believe I'm going to

20   excuse you, sir.  You may step aside.  Thank you very much.

21              All right.

22              PROSPECTIVE JUROR:  It's ███████.

23              THE COURT:  I see you there.

24              PROSPECTIVE JUROR:  I did answer yes to one, four,

25   six and 13.
```

1          THE COURT:  One, you heard something about it in the

2    media?

3          PROSPECTIVE JUROR:  Yes, probably radio and read it

4    right in the paper.

5          THE COURT:  And based on what you may have --

6    whatever knowledge you gained by whatever media source, did you

7    discuss the matter with anyone?

8          PROSPECTIVE JUROR:  No, no, sir.

9          THE COURT:  Did you form any opinion about the

10   matter?

11         PROSPECTIVE JUROR:  I may have -- nothing lasting,

12   no, no, sir.

13         THE COURT:  Okay.  And what else -- well, based on

14   whatever you may have heard in the media, do you feel that it

15   created in your mind an impression that would take some

16   evidence on behalf of the other side to remove?

17         PROSPECTIVE JUROR:  No, sir.

18         THE COURT:  Now, which -- what's the next one you --

19   number four?

20         PROSPECTIVE JUROR:  Number four.

21         THE COURT:  Tell me about your knowledge of

22   Murphy-Brown.

23         PROSPECTIVE JUROR:  I work for Cargill and they're

24   both a purchaser of soybeans from Murphy-Brown and they sell

25   meal to Murphy-Brown.

```
1              THE COURT:  All right.  So do you feel that

2    experience would in any way affect your ability to be fair and

3    impartial in a trial of this case?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  And six I believe you said.

6              PROSPECTIVE JUROR:  Yeah.  Six.  I'm not -- I'm a

7    production manager at Cargill's facility, but I do work in

8    parallel with people that enter into contracts with several of

9    those companies.

10             THE COURT:  Okay.  And do you feel that that

11   experience would in any way cause you to find it difficult to

12   be fair and impartial in a trial of this case?

13             PROSPECTIVE JUROR:  No, sir, I think I could be fair.

14             THE COURT:  And the final one was 13?

15             PROSPECTIVE JUROR:  Yes, sir.  I'm a member of the

16   Sierra Club.

17             THE COURT:  All right, sir.

18             Do you feel like your membership in that club has

19   affected your way of thinking to the extent that it would

20   interfere with your ability to be fair and impartial in the

21   trial of this case?

22             PROSPECTIVE JUROR:  No, sir.  I could just listen to

23   the law.

24             THE COURT:  Do you know any reason -- number 15, you

25   didn't check that one, I take it?
```

CORRECTED EXHIBIT 3
44

1          PROSPECTIVE JUROR:  I said no.

2          THE COURT:  You may pass it to whoever else.

3          PROSPECTIVE JUROR:  ████████.  I answered yes to

4    one, four, and nine and 14.

5          THE COURT:  And how did you -- you answered number

6    14, you feel you cannot listen to the evidence and be fair and

7    impartial?

8          PROSPECTIVE JUROR:  I'm sorry.  I misunderstood.  I

9    thought I'd be fair.

10          THE COURT:  So let's go back then and go in order.

11    You say you checked one?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Was the information you gained through

14    the news media?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  And after gaining whatever knowledge you

17    did gain, did you form any opinion about the matter with any

18    one side or the other?

19          PROSPECTIVE JUROR:  Not really.

20          THE COURT:  Did you discuss the matter with anyone?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  You said you heard of Murphy-Brown?

23          PROSPECTIVE JUROR:  Yeah.  I'm assuming that's

24    Wendell Murphy, part of the Murphy that -- I'm going to assume.

25          THE COURT:  I think it's a fair assumption.  The

```
 1   Murphy name as used in this case, and it's several places down

 2   in number six, derive from Mr. Wendell Murphy.  I think

 3   everyone will agree to that.

 4            Do you know him personally?

 5            PROSPECTIVE JUROR:  No, sir.

 6            THE COURT:  Is it just the fact you heard the name

 7   Murphy-Brown and others in the news media?

 8            PROSPECTIVE JUROR:  Just over the years being a

 9   benefactor for NC State, owned rights to PNC, you know, naming

10   rights and things like that.

11            THE COURT:  What else have you answered?

12            PROSPECTIVE JUROR:  Number nine.

13            THE COURT:  All right.  You know someone who lived on

14   or been employed by a large hog farm?

15            PROSPECTIVE JUROR:  Just not those farms, but I do

16   know one of the guys, I do work for his family, has a farm in

17   Belvedere, you know, hog farm and chicken farm in Belvedere.

18            THE COURT:  In Belvedere?

19            PROSPECTIVE JUROR:  Yes, sir.

20            THE COURT:  Do you know what kind of production they

21   have?

22            PROSPECTIVE JUROR:  They do chickens and hogs.  I've

23   never been out there to see it.

24            THE COURT:  Do you feel that that friendship you have

25   with whoever that gentleman is along or in combining with the
```

CORRECTED EXHIBIT 3

1  other things that you have cited here, your knowledge about

2  Mr. Murphy and heard about the case, would in any way interfere

3  with your ability to be fair and impartial?

4          PROSPECTIVE JUROR:  I don't believe so, sir.  I think

5  I'll be fair.

6          THE COURT:  How about the next row?

7          PROSPECTIVE JUROR:  One and nine.

8          THE COURT:  Your name?

9          PROSPECTIVE JUROR:  ███████████.  I don't know

10  anything about this particular case, but when I lived in Las

11  Vegas there was a large case very similar to this.

12          THE COURT:  Did you gain whatever knowledge you knew

13  about the Las Vegas thing from what you read in the news media?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Any other sources?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  After receiving any knowledge you did

18  about that matter, did you form or express any opinion about

19  the merits of either side of the case?

20          PROSPECTIVE JUROR:  Yes, with my wife and sister and

21  her husband.

22          THE COURT:  Did you form any opinion as a result of

23  what you read that you think that would take some evidence or

24  convincing on the part of the other side to remove?

25          PROSPECTIVE JUROR:  Well, my sister and her

CORRECTED EXHIBIT 3

1  husband -- I'm from Minnesota originally and they own a large

2  hog farm in Minnesota, so I talked to both of them about the

3  case in Las Vegas.

4          THE COURT:  Do you feel all of that would interfere

5  with your ability to be fair and impartial in a trial of this

6  case?  Be candid with yourself.

7          PROSPECTIVE JUROR:  Possibly, yeah.

8          THE COURT:  You may be excused.

9          PROSPECTIVE JUROR:  My name is ████████████.  I

10 said yes to number six.

11         THE COURT:  Tell me about that.

12         PROSPECTIVE JUROR:  I have a coworker that owns a hog

13 farm.  I believe his last name is on that sheet, Prestage.  We

14 really don't discuss it at work, but he does own a hog farm.

15         THE COURT:  Okay.  Is that coworker listed as a

16 witness in this case?

17         PROSPECTIVE JUROR:  I don't know if he was or not.

18 Prestage, Robert, goes by Bob Prestage at work.

19         THE COURT:  Where do you work?

20         PROSPECTIVE JUROR:  I work at American Airlines.

21         THE COURT:  Okay.  Do you feel that your knowledge of

22 him would in any way have any impact on your feelings about

23 this case separate and apart from any evidence you may hear?

24         PROSPECTIVE JUROR:  No, sir, we don't discuss it at

25 work.  I just knew he owned one.

```
 1              THE COURT:  Was that the only one you checked?

 2              PROSPECTIVE JUROR:  Yes, sir, number six.

 3              THE COURT:  Do you feel that would in any way affect

 4   your ability to be fair and impartial?

 5              PROSPECTIVE JUROR:  No, sir, I would be fair.

 6              THE COURT:  Thank you, ma'am.  You may have a seat.

 7   Pass it on down.

 8              PROSPECTIVE JUROR:  ████████.  I answered yes to

 9   number one.

10              THE COURT:  Did you gain your knowledge through the

11   news media?

12              PROSPECTIVE JUROR:  Yes, sir.

13              THE COURT:  And after gaining whatever knowledge you

14   did, did you form or express any opinion about the matter?

15              PROSPECTIVE JUROR:  Yes, sir.

16              THE COURT:  Did whatever opinion you arrived at, was

17   it sufficient that it would require some evidence or convincing

18   on behalf of the other side to change your mind on it?

19              PROSPECTIVE JUROR:  Yes, sir.

20              THE COURT:  I take it then that you feel you couldn't

21   be fair and impartial?

22              PROSPECTIVE JUROR:  I wouldn't say that, but based on

23   the information that was presented in the articles I've read,

24   I've formed an opinion knowing that it's based on the

25   information that was available.
```

CORRECTED EXHIBIT 3

49

```
1              THE COURT:  All right.  You may step aside.  Thank

2   you, ma'am.  Thank you for your candor.

3              Anyone else in that row?

4              PROSPECTIVE JUROR:  I'm ████████.  I answered yes

5   to one, five, six, nine and 13.

6              THE COURT:  Number one, was your knowledge derived

7   from the news media?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  After gaining whatever knowledge that you

10  gathered there, did you form an opinion about the merits of the

11  matter?

12             PROSPECTIVE JUROR:  No, I only read one article.

13             THE COURT:  Did you discuss the matter with anyone?

14             PROSPECTIVE JUROR:  My husband.  We read the news

15  together.

16             THE COURT:  You do?  Good.

17             PROSPECTIVE JUROR:  Like I'm sitting on the couch

18  reading, I found this interesting thing and he does the same

19  thing.

20             THE COURT:  That's great.

21             I hope that didn't convey anything that I think there

22  is anything wrong with that.  I think it's wonderful.

23             You feel as a result of anything you may have read

24  there that it would interfere with your ability to be fair and

25  impartial?
```

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  What was the next number?

 3              PROSPECTIVE JUROR:  Five.

 4              THE COURT:  Who do you know?

 5              PROSPECTIVE JUROR:  Dr. Ramsey, is he based out of

 6    Greenville, ECU Physicians, an older gentleman, rheumatologist?

 7    He was a doctor of mine.

 8              THE COURT:  Do you feel that you would be inclined to

 9    give the testimony of that, Dr. Ramsey, any greater weight or

10    credibility or lesser weight or credibility than you would any

11    other witness?

12              PROSPECTIVE JUROR:  No.  I've had so many

13    rheumatologists.

14              THE COURT:  Okay.  What was the next one?

15              PROSPECTIVE JUROR:  Six.

16              THE COURT:  Which among those?

17              PROSPECTIVE JUROR:  I know people.  I grew up in

18    Johnston County.  I grew up actually right near the big

19    distribution plant that Smithfield has, and I've had a friend

20    who was a hog farmer, or his parents were, growing up and they

21    worked with Smithfield.

22              THE COURT:  Okay.  Do you -- all right.  What other

23    did you check yes?

24              PROSPECTIVE JUROR:  Do I know anyone who has worked

25    or owned a large hog farm?  Yes.
```

CORRECTED EXHIBIT 3

51

```
 1              THE COURT:  Anybody else --
 2              PROSPECTIVE JUROR:  They were actually in Chinquapin
 3    in Duplin County.  They don't own it anymore.  They do chickens
 4    and hogs, Rockey and Joan Mugley, their son Dustin is my best
 5    friend.
 6              THE COURT:  Okay.  Did you answer any others yes?
 7              PROSPECTIVE JUROR:  Thirteen.  I belong to PETA.
 8              THE COURT:  Okay.  Now, do you think that any of the
 9    factors which you have indicated, the yeses to the questions,
10    standing alone or in combination with each other, would in any
11    way impair your ability to be fair and impartial?
12              PROSPECTIVE JUROR:  Possibly.
13              THE COURT:  You may step aside.
14              Anyone else on that row?
15              PROSPECTIVE JUROR:  ███████.  I checked one,
16    four, five and six.
17              THE COURT:  Tell me about four.  Did you learn about
18    the matter through the news media?
19              PROSPECTIVE JUROR:  Partly.  I'm an environmental
20    engineer and in the environmental consulting business so just
21    aware of environmental issues in our state.
22              THE COURT:  Okay.  And did you read -- have you read
23    media reports about the case or cases?
24              PROSPECTIVE JUROR:  No, not particularly this case,
25    just environmental operations in the state.
```

CORRECTED EXHIBIT 3

1          THE COURT:  All right.  Have you formed or expressed

2   any opinion about the matter?

3          PROSPECTIVE JUROR:  No, I have not.

4          THE COURT:  What other question did you say you --

5          PROSPECTIVE JUROR:  Number four, I've heard of

6   Murphy-Brown; and number five, I think you listed Richard

7   Shiver as a witness, if he's with the Department of

8   Environmental Quality, if that's the same person, I just know

9   of him being in the business.

10          THE COURT:  Is that the only witness?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Let me ask you, do you feel that the fact

13   that he -- you know him and where he works would cause you to

14   give his testimony any greater weight or credibility or lesser

15   weight or credibility than that of any other witness?

16          PROSPECTIVE JUROR:  No, it would not impact me, sir.

17          THE COURT:  And what other did you answer?

18          PROSPECTIVE JUROR:  Just number six, my engineering

19   firm.  I worked with Murphy Farms -- I've been with the firm 13

20   years, so probably 12 or 13, before I came to the firm, I

21   didn't work directly with the people at the farm, didn't know

22   what they were working on, but my firm did work with Murphy

23   Farms.

24          THE COURT:  Okay.  Let me ask you:  What is your

25   firm?

1           PROSPECTIVE JUROR:  It's S&ME Engineering here in

2  Raleigh.

3           THE COURT:  How long have you been there?

4           PROSPECTIVE JUROR:  Thirteen years.

5           THE COURT:  Did you check any other --

6           PROSPECTIVE JUROR:  No.  Just one, four, five and

7  six.

8           THE COURT:  Okay.  Would any of the things that you

9  told me in and of itself or in combination, do you feel any of

10 that would interfere with your ability to be a fair and

11 impartial juror?

12          PROSPECTIVE JUROR:  No, sir, I would be fair.

13          THE COURT:  Okay.  You may have a seat and pass the

14 mic on to someone else.

15          PROSPECTIVE JUROR:  ████████, Your Honor.  I just

16 checked off number one.

17          THE COURT:  Tell me, did you gain knowledge off the

18 news media?

19          PROSPECTIVE JUROR:  Just the news media, yes, sir.

20          THE COURT:  After gaining whatever knowledge you

21 gained, did you discuss the matter with anyone?

22          PROSPECTIVE JUROR:  No, sir.

23          THE COURT:  Did you form or express any opinion about

24 the matter?

25          PROSPECTIVE JUROR:  No, sir.

CORRECTED EXHIBIT 3

```
1              THE COURT:  Do you feel that whatever you learned
2    would in any way impair your ability to be fair and impartial
3    in a trial of this case?
4              PROSPECTIVE JUROR:  No, sir.
5              THE COURT:  You may have a seat.
6              Pass it on to someone else.  Are we on the last row,
7    now?
8              PROSPECTIVE JUROR:  My name is ████████, and I
9    have a possibility of two and five.
10             THE COURT:  Two, which attorney do you think you may
11   know?
12             PROSPECTIVE JUROR:  I don't know her personally, but
13   depending on how she spells her last name and where her family
14   is from, we might be related.
15             THE COURT:  Who is that?
16             PROSPECTIVE JUROR:  Mattix.
17             THE COURT:  Which other one?
18             PROSPECTIVE JUROR:  It was a witness that last name
19   was Mattix also.
20             MS. MALLETTE:  My last name is Mallette, not Mattix.
21             PROSPECTIVE JUROR:  I'm sorry.  I thought you talked
22   about --
23             THE COURT:  M-A-D-D-I-X?
24             PROSPECTIVE JUROR:  No, M-A-T-T-I-X.
25             THE COURT:  She spells her name M-A-L-L-E-T-T-E.
```

CORRECTED EXHIBIT 3

```
1              PROSPECTIVE JUROR:  Maybe that was one of the

2    witnesses you stated was the last name Mattix, but I don't know

3    how to spell it.

4              THE COURT:  Anybody familiar with the witness I may

5    have read?

6              MR. KAESKE:  That name, I believe has -- the witness

7    has two Ds.

8              THE COURT:  M-A-D-D-O-X?

9              MR. KAESKE:  Yes, sir.

10             THE COURT:  M-A-D-D-O-X.

11             PROSPECTIVE JUROR:  It's not a problem if it's not

12   spelled that way.

13             THE COURT:  So you think you can be fair and

14   impartial?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Thank you, ma'am.  You may have a seat.

17             PROSPECTIVE JUROR:  My name is                      .

18   Mine was number one.

19             THE COURT:  Did you gain your knowledge through the

20   news media?

21             PROSPECTIVE JUROR:  Not really.  I just saw like an

22   article scrolling through the paper.

23             THE COURT:  All right.  However you learned it and

24   whatever you learned, did you form or express any opinion about

25   the merits of the matter?
```

CORRECTED EXHIBIT 3

56

```
 1            PROSPECTIVE JUROR:  No, sir.

 2            THE COURT:  Is that the only one you would have

 3   checked?

 4            PROSPECTIVE JUROR:  Yes, sir.

 5            THE COURT:  Is there anything about whatever you --

 6   knowledge you gained, do you think it would interfere in any

 7   way with your ability to be fair and impartial in a trial of

 8   this case?

 9            PROSPECTIVE JUROR:  No, sir.

10            THE COURT:  You may pass it on to the next one.

11   Anybody else?

12            PROSPECTIVE JUROR:  ███████████, and I checked one

13   and ten.

14            THE COURT:  All right.  One is did you gain that

15   through your -- you checked number ten?

16            PROSPECTIVE JUROR:  Yes, sir.

17            THE COURT:  I'm not even getting into it.  Excuse

18   you.

19            PROSPECTIVE JUROR:  I'm sorry?

20            THE COURT:  I'm going to let you step aside.  I'm

21   going to let you step aside.

22            PROSPECTIVE JUROR:  My name is ███████████.  I

23   answered one and ten, half of only because I lived a short

24   distance from a hog farm for awhile.

25            THE COURT:  Just a minute, don't get into it.  But
```

1  you checked ten "yes?"

2         PROSPECTIVE JUROR:  Yes.

3         THE COURT:  You may go as well.

4         Anybody on that last row?

5    (No hands raised.)

6         THE COURT:  Okay.  Is that everybody that wants to be

7  heard?

8    (No hands raised.)

9         THE COURT:  Counsel, I can well imagine that some of

10 the questions or comments the jurors made might generate

11 questions on your part.  So if they make it to the next round

12 if you will write that out or approach the bench to discuss

13 that.  I can imagine that either way I might expect it.

14        Members of the jury, while you're here during this

15 case you will no doubt have questions that you want answered,

16 particularly about schedule or where the bathroom is or

17 anything of that nature that don't relate to the case itself.

18 There are a lot of people around that can answer those

19 questions for you.  I already introduced Lauren Herrmann, my

20 courtroom deputy.  Sitting to the left of me is Amy Condon,

21 she's the court reporter.  Over here is Amy Petty and Melissa

22 Morgans and Eric Steber, who are all part of my staff, and

23 Mr. Bruce Holt, he's a court security officer.  And you will

24 see others that are dressed similarly to Mr. Holt.  So any time

25 during the trial, if you have any question you want answered,

CORRECTED EXHIBIT 3

1  lagoons.

2          THE COURT:  Okay.  There will be issues of

3  environmental engineering and technical feasibility.  These

4  issues must be decided based only on the evidence presented at

5  the trial and not your personal expertise or experience.  Do

6  you think it will be difficult for you to do that?

7          PROSPECTIVE JUROR:  Yes, I can do that.

8          THE COURT:  The way I asked the question was:  Do you

9  think it would be difficult for you to do that?

10          PROSPECTIVE JUROR:  No, no, no.  I can be fair and

11  impartial.

12          THE COURT:  All right.  Your firm has been hired both

13  by the defendant and this law firm to consult in environmental

14  issues, would you be uncomfortable rendering a verdict against

15  them?

16          PROSPECTIVE JUROR:  No, I would not.

17          THE COURT:  Okay.  Thank you very much.

18          MR. KAESKE:  Your Honor, would I be able to follow up

19  with Ms. ██████████?

20          THE COURT:  No.  You can approach the bench.

21          MR. KAESKE:  Thank you, Your Honor.

22       (Bench conference held off the record.)

23          THE COURT:  Ms. ██████████, let me ask you again.  You

24  have expressed some sympathies for people living near a hog

25  farm.  Do you feel that in spite of those feelings that you can

1  be fair and impartial in the trial in this case, rendering your

2  verdict based solely on the evidence that comes from the

3  witness stand and my instructions to you on the law?

4          PROSPECTIVE JUROR:  Yes, sir, I think so, yes, sir.

5          THE COURT:  All right.  Thank you.

6      (Bench conference held on the record.)

7          THE COURT:  The defendant makes --

8          MR. ANDERSON:  Murphy-Brown challenges the juror for

9  cause.  She disclosed in the first question and again that she

10 comes to court with information she learned --

11         MR. KAESKE:  I'm just saying if she said she can be

12 fair, if that's the standard, then I think they need to use a

13 strike on her.

14         THE COURT:  I haven't made up my mind.

15         MR. KAESKE:  Yes, sir.  That's what I would say.  I

16 think she says she can be fair.  Everybody has ideas.

17     (Bench conference concluded.)

18         THE COURT:  We'll seat another juror.

19         Ms. ████████, we're going to let you step aside.

20 Thank you very much for coming and making yourself available

21 for jury service.

22         Madam Clerk, call an additional juror.

23         THE CLERK:  ████████████.

24         THE COURT:  Mr. ████, do you have your cheat sheet?

25         PROSPECTIVE JUROR:  Yes, sir.

CORRECTED EXHIBIT 3

1  took offense at me telling a witness to answer the question.  I

2  really don't see how you found anything offensive about that,

3  but if you did, the Fourth Circuit can say so.

4        I commend you on standing up for what you believe in

5  and arguing with me and -- but by the same token, I've got to

6  tell you that I think you're getting close to the edge.

7        MR. ANDERSON:  Yes, sir.  With all due respect, I

8  have a great deal of respect for the judicial system and for

9  the jury process, trying to do everything I can, as I'm sure

10  the Court is, to see to a fair trial.

11        If I could have a moment because based on what the

12  Court has done, I --

13        THE COURT:  You can have as much time as you want.

14        MR. ANDERSON:  Thank you.

15      (Pause in the proceeding.)

16        THE COURT:  Mr. Anderson, you ready?

17        MR. ANDERSON:  Yes, Your Honor.  Let me make sure I

18  have the right juror number.  Your Honor, we would strike juror

19  number 14, Mr. ███████.

20        THE COURT:  All right.  I'm going to call the ones

21  that I think have survived my rulings and the challenges by the

22  parties, and I'm doing a lot of this to make sure that the

23  record reflects it right.  So listen carefully.

24        The following jurors will be seated:

25        ████████████████████ -- I'm beginning on the

CORRECTED EXHIBIT 3

1  back row. ███████████████████; ████████████;

2  ███████████; ████████████.

3          On the second row, middle row: ████████; ████████

4  ███████; ██████████████; and ██████████.

5          On the outside row: ██████████; ████████, and

6  █████████.

7          Does anybody challenge the correctness of what I've

8  stated?

9          MR. KAESKE:  No, sir, Your Honor.

10          THE COURT:  All I'm asking is if you agree or

11  disagree that I have correctly recorded what the rulings were,

12  not that you agree with the rulings.

13          MR. ANDERSON:  You read Ms. ████; is that correct?

14          THE COURT:  I'm sorry?

15          MR. ANDERSON:  I think I heard the answer that you

16  did read out Ms. ██████'s name?

17          THE COURT:  Yes, yes.  On the back row: ████████

18  █████████████; ██████████████; ██████████████; ██████

19  ████.

20          On the middle row: █████████; ██████████████;

21  ██████████; ██████████ and ██████████.

22          On the front row: ██████████; ██████████ and

23  █████████.  I believe that makes 12.

24          MS. CHECKOVICH:  Your Honor, I'd like to note for the

25  record that we would, once again, request that the Court strike

118

1  the jury and start over with a new venire or a any alternative

2  grant in this trial based on the improper grant of a Batson

3  challenge where the plaintiffs have shown no intentional

4  discrimination and based on the Court's improper remedy in not

5  striking the venire and starting over with jury selection.

6          THE COURT:  Okay.  Motion denied.

7          Can I get an answer out of you whether I correctly

8  recorded after the rulings?

9          MR. ANDERSON:  Yes, I apologize.  I asked for

10 clarification on one juror but to the best of my knowledge you

11 have.

12         THE COURT:  Okay.  And Mr. Kaeske, you said you

13 agreed?

14         MR. KAESKE:  Yes, sir.

15         THE COURT:  Bring the jury back in.

16 (The prospective jury entered the courtroom at 4:00 p.m.)

17         THE COURT:  Members of the jury, I apologize for the

18 lengthy recess.  I assure you that the Court was busy in

19 talking to counsel about things that I have to decide outside

20 of your presence.

21         Having arrived at the decisions that the Court was

22 required to rule on and exercising the challenges that the

23 parties are entitled by law to have, the following jurors have

24 been excused from the trial of this case.  And when I -- if you

25 will wait until I have called all names before you get up, and

# Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION


_____       )
WOODELL McGOWAN, et al.,              )
                                     )
                Plaintiffs,          )
                                     )
            vs.                      )CASE NO. 7:14-CV-182-BR
                                     )
                                     )
MURPHY-BROWN, LLC,                   )
                                     )
                Defendant.           )
_____       )


WEDNESDAY, JUNE 13, 2018
JURY TRIAL
BEFORE THE HONORABLE W. EARL BRITT
SENIOR UNITED STATES DISTRICT JUDGE


REPORTER'S NOTE:



        This trial transcript is being provided in rough
draft form.  Please be aware that there will be discrepancies
regarding page and line number when comparing the rough draft
and the final certified transcript.  Also please be aware
that the uncertified rough draft transcript may contain
untranslated steno, misspelled proper names, incorrect or
missing Q/A symbols or punctuation, and/or nonsensical
English word combinations.  All such entries will be
25 | corrected on the final, certified transcript.

EXHIBIT 4

2

```
 1              (Wednesday, June 13, 2018 commencing at 9:27 a.m.)

 2                        P R O C E E D I N G S

 3

 4                   (In chambers)

 5              REPORTER'S NOTE:  PRESENT:  Mona Lisa Wallace,

 6   Jocelyn Mallette, Mark Anderson, Mike Kaeske, Tennille

 7   Checkovich, Lauren Herman and Amy Petty.

 8              THE COURT:  I have called you in here to report to

 9   you some information which I have just obtained and which is

10   that one of the jurors asked -- happened to bump in to Scott

11   Cannon who'S the jury administrator this morning and told

12   Scott that he needed to talk to him.  And Scott said, if you

13   want to talk about procedure, I can talk about that but I

14   can't talk to you about substance of the case.  And so he

15   said, well, it may get into both.  So Scott, before he let

16   the guy talk at all, called a court security officer over to

17   be present, at which time the juror, Mr. ███, number 4 in

18   the front row, reported that another juror had been going out

19   and doing research and coming back and reporting to the other

20   jurors such things as the fact that you are an out of state

21   attorney, the results of the first trial, the legislation

22   that has been introduced by the General Assembly.  That's

23   about as far as I got.

24              Of course, I realized at that point it was serious

25   enough that I needed to do a lot more and my proposed
```

EXHIBIT 4

1   procedure is to ask Mr. ███ to come back here now before us

2   and have him to tell us whatever it was he was going to tell

3   Scott and I would invite your -- well, at some time we need

4   to go back in the courtroom about it, but I thought at the

5   outset, that it would be best to do it in here because Mr.

6   Gaus may be intimidated by us speaking in the big open

7   courtroom with all the people out there.  But at some time I

8   need to go back in there and make a record.

9        And then I think -- and this has all happened so

10  fast -- I think I probably need to call the jurors in one by

11  one to get different versions as to what has happened and

12  then finally at the end, call in the juror, whoever it might

13  be, that is supposed to have done this and then, after that,

14  depending on what's said, looking to me like it probably

15  means I have no choice but to declare a mistrial, but we'll

16  see.

17        MR. ANDERSON:  Yes.

18        THE COURT:  Mr. Kaeske.

19        MR. KAESKE:  I would ask that -- obviously I'm

20  trying to react as quickly as I can.  I would ask that we

21  not -- that we be mindful of the possibility or maybe even

22  the likelihood that there is not a need for a mistrial and

23  that we do what we can do to protect the integrity of the

24  trial that we've got so far to the extent that we can.  My

25  concern would be -- and I don't know the law, I don't know

EXHIBIT 4

18

```
 1   where all the people are out there.  And there is only two

 2   lawyers here, the two main lawyers.

 3              THE JUROR:  Good morning.  I didn't see you.

 4              MR. ANDERSON:  We're not really hiding back here.

 5              THE COURT:  And Michelle, of course, the court

 6   reporter.  Now everything I say has to be on -- and you

 7   say --

 8              THE JUROR:  Yes, sir.

 9              THE COURT:  -- has to be on the record.  So first

10   let me ask you, it's been brought to my attention that there

11   has been some discussion back in the jury room about

12   information that someone has been receiving on the Internet.

13   Have you heard any discussion about that?

14              THE JUROR:  The only thing I have heard was -- it

15   was goats -- fainting goats.

16              THE COURT:  About what?

17              THE JUROR:  Fainting goats.  It's a joke about some

18   goats or whatever that was fainting.  Goats that faint when

19   they are afraid or whatever.

20              THE COURT:  Have you heard anybody refer to having

21   done some research on the Internet and found out anything

22   about, for example, the lawyers?

23              THE JUROR:  I did hear that one of the lawyers was

24   from Texas or something like that.

25              THE COURT:  Okay.  And did you hear any other
```

EXHIBIT 4

19

```
 1   discussion --
 2            THE JUROR:  Not to my knowledge.
 3            THE COURT:  -- about what somebody may have found
 4   out on the Internet?
 5            THE JUROR:  No, I haven't.
 6            THE COURT:  Nothing about other trials that may
 7   have been conducted --
 8            THE JUROR:  No, sir.  No, I haven't.
 9            THE COURT:  Nothing about what the North Carolina
10   legislature may be doing?
11            THE JUROR:  No, sir.
12            THE COURT:  Okay.
13            THE JUROR:  Only that I did hear -- I heard
14   something about -- something about lawsuits or whatever.  I
15   did hear something about lawsuits and that was, like,
16   yesterday.  Somebody said something about lawsuits, but I
17   don't know what the details were on that.
18            THE COURT:  Have you heard anything in this case
19   that you feel would make it -- would interfere with your
20   ability to be fair and impartial in the trial?
21            THE JUROR:  No, sir.
22            THE COURT:  Nothing you've heard has caused you to
23   suddenly and somehow favor one side or the other?
24            THE JUROR:  No, sir.  Not at all.
25            THE COURT:  All right.  And you wracked your memory
```

EXHIBIT 4

```
 1   now and that's all you can tell me about it?

 2            THE JUROR:  Yes, sir.

 3            THE COURT:  All right.  I thank you.

 4            THE JUROR:  You're welcome.

 5            THE COURT:  I'm going to let you go back and our

 6   clerk will carry you back to the jury room.

 7            THE JUROR:  Okay.

 8            THE COURT:  Go through that door there.

 9            THE JUROR:  Okay.  Thank you.

10       (Juror #1 ████████████ escorted out of chambers)

11            THE COURT:  Just hold up a minute, Lauren.

12            Okay.  Mr. Kaeske.

13            MR. KAESKE:  Your Honor, I was just going to say,

14   it seems from what Mr. ████████

15            MS. HERMANN:  ████████████.

16            MR. KAESKE:  From what Mr. ██████ said, it's

17   possible -- maybe even likely -- that some or more of the

18   jurors haven't heard anything.  And so I would -- in order to

19   protect, like I said, what might be the integrity of the jury

20   going forward with -- or all of the jury that we do it -- the

21   questioning in such a way that they not be -- it not be

22   suggested rather than asked whether and what they've heard.

23   Of course, you need to find out everything, but I just wonder

24   if there is a way to do it so that they don't know --

25            THE COURT:  Well, do you feel that you lawyers
```

*~ ROUGH DRAFT ~*
*NOT A CERTIFIED TRANSCRIPT*

EXHIBIT 4

1 Michelle, who's the court reporter -- I have to make a record

2 of everything -- and the two lawyers who you know back there.

3     MR. ANDERSON:  Good morning.

4     THE COURT:  And Lauren, of course.  And I want you

5 to relax and know that the only reason I've asked you to come

6 back here is that I have to assure myself that anything that

7 goes on in the jury room does not in any way bring any

8 outside information in that might affect the jury.  Having

9 said that, have you heard any discussion by other jurors

10 about doing any Internet research about the case or about

11 individuals or about any other part of it?

12     THE JUROR:  Not about the case.

13     THE COURT:  Have you heard some of them say

14 anything about Internet research?

15     THE JUROR:  No.  I mean, like with dogs, like

16 animal stuff, not anything related to the case itself.

17     THE COURT:  So have you -- okay.  And you can't

18 recall any discussion at all about -- by anybody about

19 anything about this case or other cases or the legislature or

20 North Carolina --

21     THE JUROR:  Not anybody doing research.  I know the

22 discussion about the bill that may or may not have been

23 passed, that was ongoing, but not anybody that actually was

24 researching it or trying to --

25     THE COURT:  Tell me more about that.

1          THE JUROR:  Just that the bill that was going

2     through the Senate related to the farm.  I don't know the

3     details myself because I haven't looked, that there was

4     something like that going on and whether that may or may not

5     have been passed.  I heard some discussion about that but I

6     wasn't involved in the discussion to know what the results

7     were.  But other than that, not anything that's --

8          THE COURT:  You heard any discussion of -- anybody

9     mention any names of any lawyers?

10          THE JUROR:  Huh-uh, no.

11          THE COURT:  Well, whatever you've heard, do you

12     feel that it would in any way impair your ability to be fair

13     and impartial?

14          THE JUROR:  No.

15          THE COURT:  All right.  I'm going to let you go

16     back to your jury room and ask if you will to please not

17     discuss with the other jurors anything that we've said in

18     here.

19          THE JUROR:  Yes.

20          THE COURT:  Thank you.

21          THE JUROR:  Thank you.

22     (Juror #3 █████████ escorted out of chambers)

23          THE COURT:  Maybe I'll stack around a little bit.

24     Bring in Mr. ████████.

25     (Juror #7 ████████., escorted into chambers)

```
 1              THE COURT:  Come in, Mr. ███████.
 2          THE JUROR:  How are you?
 3          THE COURT:  I'm fine.  How are you this morning?
 4          THE JUROR:  I'm doing okay.
 5          THE COURT:  Are you awake?
 6          THE JUROR:  I am awake.  I got caffeine and
 7   everything this morning.
 8          THE COURT:  Okay.  I'm just kidding you.  I know
 9   how hard it is to stay awake sometimes.
10          THE JUROR:  I don't know how you do it.
11          THE COURT:  The reason I've asked you to come back
12   here -- and you'll notice that there is nobody here except
13   the court reporter and Lauren and the two main lawyers back
14   there.  You remember them.
15          THE JUROR:  Yep.
16          THE COURT:  And I just called you back, some things
17   have come to my attention this morning that's caused me to
18   feel like I need to question the jurors privately about some
19   things and the reason -- that's the reason I've asked you
20   back here.  And having said that, have you heard any
21   discussion by any of the jurors about the results of any
22   research on the Internet?
23          THE JUROR:  No.
24          THE COURT:  It's important you be level with me
25   now.
```

1              THE JUROR:  Right, right, right.  I'm trying to

2    think back.  No, not really.  Very little discussion -- like

3    kind of like different things, like, I guess, like small

4    comments and stuff like that, but nothing like -- as far as

5    small comments, kind of like coming back from the thing, and

6    like knee high and stuff like that, like different --

7              THE COURT:  About what?

8              THE JUROR:  What's that?  Like different comments

9    like as far as minor stuff like in the trial, but nothing

10   like as far as results or anything like that.

11             THE COURT:  You mean there's been discussion about

12   what somebody has learned on the Internet about that?

13             THE JUROR:  What's that?  Yeah, like different

14   things like that, but --

15             THE COURT:  Well, let me ask you specifically.

16   Have you heard any discussion about other trials?

17             THE JUROR:  Yeah.

18             THE COURT:  Okay.  And what did you hear about

19   other trials?

20             THE JUROR:  Well, people were just talking about

21   different like -- different court cases and stuff like that.

22   Just different things as far as how different court cases and

23   things like that go.  Trying to think of something specific.

24   But it just was, like, hey, when I was watching TV and I saw

25   this and that, as far as court cases.

EXHIBIT 4

```
 1              THE COURT:  Have you heard any discussion about
 2   the -- anybody naming any of the particular lawyers?
 3              THE JUROR:  No, no, I haven't.  I've heard -- like
 4   me, typically when I'm back there, I'll sit back there -- and
 5   most of the time I go out for lunch, other than the last
 6   two days so -- but other than that, like, I've heard -- like
 7   I said -- let's see, like if I have, I can't really --
 8              THE COURT:  Have you heard anybody discussing
 9   anything about actions by the North Carolina legislature?
10              THE JUROR:  Yes.
11              THE COURT:  Tell me about that.
12              THE JUROR:  One of the jurors mentioned something
13   about there is -- the legislature passing like a law or
14   something or talking about passing a law.
15              THE COURT:  Was there anything about what the law
16   is about?
17              THE JUROR:  It was something dealing with --
18   something dealing with the hogs or something like that,
19   something dealing with something along those lines.  They
20   didn't get too much in detail or I didn't hear too much of
21   the detail on it, but they were saying something about -- I
22   came in on the end of that, but it was something dealing with
23   some type of law that could affect the case or something
24   similar along those lines.  So I did hear that.
25              THE COURT:  Do you remember who you heard
```

EXHIBIT 4

30

1    discussing it?

2            THE JUROR:  That was -- I'm trying to think of his

3    name.  It was -- it was the -- I want to say it was ███.

4            THE COURT:  Mr. ███████, who sits on the back row

5    next to the end?

6            THE JUROR:  Yeah.  I want to say it was him --

7    yeah, I want to say it was him and, I think, ████ or he was

8    talking to ███ or somebody or something along those lines

9    when I came back from the bathroom or something like that.

10            THE COURT:  Okay.

11            THE JUROR:  But...

12            THE COURT:  Have you heard anything, any discussion

13    at all that you feel at this time would interfere with your

14    ability to be fair and impartial --

15            THE JUROR:  No.

16            THE COURT:  -- and the decisions you're going to

17    have to make about the case we're trying?

18            THE JUROR:  No.

19            THE COURT:  Have you got anything else you can tell

20    me about any discussion among the jurors?

21            THE JUROR:  No.  I think the biggest thing --

22    probably the biggest thing I heard was the whole thing as far

23    as what I just told you as far as that.  Other than that,

24    it's just been kind of the -- where we're going to go for

25    lunch and stuff like that.  Basic stuff.  Like I said, the

1    knee high thing, looked that up and some other stuff like

2    that which was kind of funny.  I've never heard of that

3    before for that -- before that.

4           THE COURT:  Okay.  I'm going to let you go back to

5    the jury room and I would ask when you go back you not

6    discuss what we've discussed.

7           THE JUROR:  Okay.

8           THE COURT:  Thank you a lot.  See you in a little

9    bit.

10          THE JUROR:  Okay.

11       (Juror # 7 ███████████████████  escorted out of

12                          chambers)

13          THE COURT:  ████████████.

14       MR. ANDERSON:  Judge I think one suggestion is they

15   seem to be taking Internet research pretty literally.  It may

16   help to ask information from outside sources or news media,

17   make it a little bit broader.

18          THE COURT:  Okay.

19       MR. KAESKE:  It sounded like when he said --

20   literally he meant anything.  One person said somebody was

21   talking about research on dogs, somebody else was talking

22   about the knee high thing.  And so maybe my suggestion got

23   too broad.

24       (Juror #10 ██████████  escorted into chambers)

25          THE COURT:  Come right in, Ms. ██████.

*~ ROUGH DRAFT ~*

EXHIBIT 4

```
1               THE JUROR:  Good morning.

2               THE COURT:  How are you?

3               THE JUROR:  Okay.

4               THE COURT:  I guess there may be some apprehension

5   about in the jury room what's going on.

6               THE JUROR:  Yes, yes.

7               THE COURT:  I can understand that.  As you can see

8   there is nobody here but Michelle and the deputy clerk and

9   the two main lawyers.

10              THE JUROR:  Um-hum.

11              THE COURT:  Some things have come to my attention

12  that's caused me to bring the jurors back here individually

13  and talk to you about some things.  It's important -- of

14  course you know how important it is -- to be completely

15  honest about everything so the Court -- I have a duty looking

16  into things when something comes to my attention.

17              THE JUROR:  Um-hum.

18              THE COURT:  With that in mind, let me ask you if

19  you have heard any discussions among the other jurors about

20  any information they may have gained from sources outside the

21  courtroom.

22              THE JUROR:  No, I haven't heard anything.

23              THE COURT:  Is there any -- have you heard anything

24  about any discussion about other trials?

25              THE JUROR:  No, sir.
```

*~ ROUGH DRAFT ~*
*NOT A CERTIFIED TRANSCRIPT*

```
 1                THE COURT:  How about any of the lawyers by name?
 2                THE JUROR:  From other trials you mean?
 3                THE COURT:  No, any of the lawyers in this case by
 4     name discussing -- other than in -- well, again I'm referring
 5     to outside information or --
 6                THE JUROR:  No.
 7                THE COURT:  -- Internet research.
 8                THE JUROR:  No, sir.
 9                THE COURT:  Do you remember making the comment that
10     it's getting difficult to stay impartial because of some of
11     the things you've heard?
12                THE JUROR:  No, sir.  I'm open minded this whole
13     time.
14                THE COURT:  Okay.  And what about the -- have you
15     heard anything at all about the actions by the North Carolina
16     legislature?
17                THE JUROR:  No, sir.
18                THE COURT:  So you're telling me that as far as you
19     have observed and heard, there's been no discussion by
20     anybody about any outside information or Internet research or
21     things of that nature?
22                THE JUROR:  No, sir.
23                THE COURT:  Okay.  Well, I'm going to let you go on
24     back to the jury room and when you do, please don't discuss
25     with the other jurors what you and I may have talked about.
```

EXHIBIT 4

```
 1                  THE JUROR:  Okay.
 2                  THE COURT:  Thank you.
 3            (Juror #10 ██████████  escorted out of chambers)
 4                  THE COURT:  ██████████.
 5            That's a direct conflict.
 6            (Juror #12 ████████████  escorted into chambers)
 7                  THE COURT:  Good morning, Ms. ██████.
 8                  THE JUROR:  Good morning.
 9                  THE COURT:  How are you this morning?
10                  THE JUROR:  Fine.
11                  THE COURT:  I guess there's a little apprehension
12      back in the jury room as to what's going on.
13                  THE JUROR:  A little bit.
14                  THE COURT:  As you can tell, this is sort of a
15      private conversation.  I don't have anybody in here except
16      the people that absolutely have to be here like the court
17      reporter --
18                  THE JUROR:  Okay.
19                  THE COURT:  -- and the two lawyers sitting back
20      there.  You know them.
21                  THE JUROR:  Um-hum.
22                  THE COURT:  And Lauren.
23                  THE JUROR:  Um-hum.
24                  THE COURT:  The reason I asked you to come back
25      here is to discuss with you and follow up on some information
```

EXHIBIT 4

1    talking to feel as at ease as you possibly can when you're

2    talking to me.  And the thing I want to talk to you about is

3    whether you have gained any information or have you heard

4    anybody in the courtroom -- in the jury room, any other

5    jurors, talking about information that they may have obtained

6    from another source, like something they researched on the

7    Internet or something of that nature.

8            THE JUROR:  I don't really pay any attention to it

9    but -- not really.

10           THE COURT:  Have you heard anybody -- any other

11   jurors discussing other trials that may have taken place?

12           THE JUROR:  Not really.  I think somebody said

13   something about the legislator but not really any trials.

14           THE COURT:  Can you recall what you heard?

15           THE JUROR:  They said something that they were

16   working on something about lawsuits and the legislature or

17   something and I can't remember which one it was.  Everybody

18   is in there talking at the same time.

19           THE COURT:  All right.  What about the lawyers,

20   have you heard anybody mention any of the lawyers who are in

21   this case or any information they might have learned about

22   the lawyers from outside sources?

23           THE JUROR:  No, sir.

24           THE COURT:  Okay.  Well, it sounds like the only

25   thing you've heard any discussion on was about the

EXHIBIT 4

```
 1  legislation --
 2          THE JUROR:  I'm not sure what kind of cases -- what
 3  it was that they were talking about exactly but --
 4          THE COURT:  Well, whatever you heard, has it in any
 5  way impaired your ability to be fair and impartial in the
 6  trial of this case?
 7          THE JUROR:  No, sir.
 8          THE COURT:  You don't think it will have any effect
 9  at all?
10          THE JUROR:  Not even close.
11          THE COURT:  I'm going to let you go back to the
12  jury room and I would ask when you go back that you not
13  discuss what we've talked about.
14          THE JUROR:  Okay.
15          THE COURT:  All right.  See you in a little bit.
16      (Juror #5 ▓▓▓▓▓▓ escorted out of chambers)
17          THE COURT:  ▓▓▓▓▓▓▓▓.
18      (Juror #9 ▓▓▓▓▓▓▓ escorted into chambers)
19          THE COURT:  There is my favorite nurse.
20          THE JUROR:  Hi.
21          THE COURT:  Hey, Ms. ▓▓▓▓.  How are you?
22          THE JUROR:  Okay.  How are you?
23          THE COURT:  Did you work last night?
24          THE JUROR:  No.
25          THE COURT:  I saw Ms. ▓▓▓▓ coming in the other
```

```
 1   morning and -- I guess it was Monday morning -- and you said
 2   you had been working all week.
 3              THE JUROR:  The weekend, yes, sir.
 4              THE COURT:  The reason I've asked you to come back
 5   here is I want to discuss with you in just as private a
 6   conversation as we can.  I have to have the court reporter
 7   here because I have to take down everything and we just got
 8   the two main lawyers here.  You know them and Lauren, of
 9   course.
10              THE JUROR:  Um-hum.
11              THE COURT:  And it has to concern -- it has to do
12   with any discussions that you may have had yourself or heard
13   others having with regard to any information that a juror may
14   have obtained either through searching the Internet or from
15   other sources.  Have you heard any of that?
16              THE JUROR:  I have not, no.
17              THE COURT:  Well, let me get into a few specifics.
18   Have you had any -- have you heard any discussion by other
19   jurors about any action by the North Carolina legislature?
20              THE JUROR:  Not that I recall, no.
21              THE COURT:  Have you had any -- do you recall
22   having any or hearing any discussion about other jurors
23   having any information with regard to other trials?
24              THE JUROR:  No.
25              THE COURT:  What about the lawyers who are involved
```

EXHIBIT 4

```
 1    in any way interfere with your ability to be fair and
 2    impartial?
 3              THE JUROR:  No.  Not at all because that's
 4    something else.  This is -- it's the first time, you know --
 5    it's new for me.
 6              THE COURT:  Thank you very much.  I want to let
 7    Lauren carry you back to the jury room and I would ask you to
 8    not discuss with your other jurors what you and I have talked
 9    about.
10              THE JUROR:  Okay.
11              THE COURT:  Okay.  Thank you, ma'am.
12              THE JUROR:  Yes.
13         (Juror #6 ███████████  escorted out of chambers)
14              THE COURT:  I guess that's everybody but Mr.
15    ██████.
16           (Juror #11 ███████████  escorted into chambers)
17              THE COURT:  Good morning, Mr. ███████.
18              THE JUROR:  Good morning.
19              THE COURT:  How are you, sir?
20              THE JUROR:  I'm doing well.
21              THE COURT:  I just called you back because I want
22    to have a little private conversation with you.
23              THE JUROR:  Yes, sir.
24              THE COURT:  And it's about as private as I can make
25    it without -- obviously without having it in the courtroom,
```

EXHIBIT 4

47

1  but I have to have the court reporter here and my courtroom

2  deputy and the two lawyers are here because I need to report

3  to them what is happening in here to let them hear it.

4  That's the only reason.

5            THE JUROR:  Understood.  Yes, sir.

6            THE COURT:  What I need to talk to you about is to

7  ask you whether you have heard other jurors or have you

8  yourself discussed things that may have come from a source

9  outside the courtroom such as from the Internet?

10           THE JUROR:  So, no, sir.

11           THE COURT:  Have you yourself done any Internet

12 research?

13           THE JUROR:  No, sir.

14           THE COURT:  And you haven't discussed with any of

15 the jurors any of the -- about results of what Internet

16 research you may have done?

17           THE JUROR:  No, sir.

18           THE COURT:  Specifically, did you do any research

19 about the -- any other trials that had been --

20           THE JUROR:  No, sir.

21           THE COURT:  -- conducted?  Did you do any research

22 about what the North Carolina legislature may be doing with

23 regard to --

24           THE JUROR:  No, sir.

25           THE COURT:  Have you heard anyone else have any

EXHIBIT 4

1          THE JUROR:  That was ████ and whatever -- I don't

2     know how to pronounce his last name.

3          THE COURT:  Yes.  And he's the one that said that

4     he had heard that Mr. Houston was about to be indicted.

5          THE JUROR:  That's what he said.

6          THE COURT:  Okay.  Did that in any way -- do you

7     feel that whatever you heard about that would -- Mr. Houston

8     has not been a witness in the case.

9          THE JUROR:  No, he has not.  He's just been

10    referred to in this case.

11         THE COURT:  Well, do you feel that that would in

12    any way impair your ability to be fair and impartial?

13         THE JUROR:  I would hope not.  I don't know what

14    Mr. Houston is going to be indicted for.  Doesn't seem to be

15    common knowledge out there except for maybe -- I don't get on

16    the Internet a lot.  I only get on the Internet to pay my

17    taxes most of the time and e-mail my sister a couple times a

18    week.  I'm pretty illiterate on it.

19         THE COURT:  Well, of course, if Mr. Houston is not

20    a witness, the only thing you heard about him is something

21    outside the courtroom and your instructions, as I've told you

22    all along, would be to decide this case based solely on what

23    you hear inside the courtroom uninfluenced by any other

24    outside information you may have received.  Now, as I

25    mentioned to you a minute ago, that's something that only you

EXHIBIT 4

1    can answer.  If --

2                THE JUROR:  Correct.

3                THE COURT:  -- if you feel it would in any way

4    affect you, you need to let me know and say so and if not,

5    say so.

6                THE JUROR:  All right.  I really still think I

7    could be impartial.  I'm actually -- I wouldn't say totally

8    enjoying it, but it's quite -- it's been quite the experience

9    to be part of.

10               THE COURT:  Yeah.  Okay.  Well, again, I appreciate

11   you bringing this to my attention and I'm going to let you go

12   on back to the jury room and I would ask you not discuss with

13   the jurors anything we've talked about.

14               THE JUROR:  I will.  I've had to tell them five or

15   ten times, I do not know a thing, already.  So thank you.

16               THE COURT:  Thank you, sir.

17         (Juror #4 ███████████ escorted out of chambers)

18               THE COURT:  Would you all like to confer with your

19   other attorneys and argue the matter in here or you want to

20   go back and argue it in the courtroom or what's your

21   feelings?

22               MR. KAESKE:  I don't feel a need to argue it in the

23   courtroom.

24               THE COURT:  Mr. Anderson.

25               MR. ANDERSON:  I think we should spend some time

EXHIBIT 4

1    conferring.  I'm happy to --

2          THE COURT:  Well, go and talk to your lawyers, your

3    colleagues, your advisors or make any phone calls you need to

4    make to whoever, and come back in about 15 minutes and let's

5    talk again, okay?

6          MR. ANDERSON:  Yes, sir.

7          MR. KAESKE:  Thank you, sir.

8       (Attorneys Kaeske and Anderson escorted out of chambers)

9              (Brief recess at 11:04 a.m.)

10      (Chambers conference resuming at 11:58 a.m.)

11         REPORTER'S NOTE:  PRESENT:  Tennile Checkovich,

12   Mark Anderson, Jocelyn Mallette, Mona Wallace, Mike Kaeske,

13   Amy Petty, Melissa Morgan, and Lauren Hermann.

14         THE COURT:  Okay.  Let the record reflect we are

15   gathered back in the Judge's chambers following an interview

16   with all the witnesses -- all the jurors with regard to

17   allegations by one juror that there was some outside

18   information obtained by at least one or some jurors and the

19   purpose of gathering back together now is to answer or to get

20   input from counsel on how we should proceed forward.  And the

21   first thing is should we -- whatever we do, do it in the

22   Judge's chambers or in the courtroom.

23         Second thing is what should we do.  If either of

24   you have any motions to make, you may make them when you get

25   the floor.  And if you'll address those aspects of the

*~ ROUGH DRAFT ~*
*NOT A CERTIFIED TRANSCRIPT*

1   matter, if I have any questions of you, I'll ask you, and

2   then I'll try to make a decision.

3           Mr. Kaeske.

4           MR. KAESKE:  Your Honor, if there is anything to be

5   said about this, we should say it here on the record.  I

6   don't think there is any point in calling any public

7   attention.  The media is already an issue for the case.  We

8   talked about that last week or the week before, whenever I

9   asked to come in chambers, and we're obviously dealing with

10  it again today.  I don't think we need to deal with more of

11  that.

12          And so if there is anything -- if the defendant

13  wants to make a motion or we need to have motions with

14  respect to this issue, I think it should be done here.  I

15  don't think it needs to be done publicly.

16          THE COURT:  Do you have any motion?

17          MR. KAESKE:  I do not.

18          THE COURT:  Mr. Anderson.

19          MR. ANDERSON:  Your Honor, I think it's -- this is

20  a serious and unfortunate matter that unfortunately goes to

21  the integrity of the courts.  Obviously we're here -- we will

22  have a motion.  We do have a motion.  We have no choice but

23  to have a motion.  I think Ms. Checkovich has been pulling up

24  the law while I was in here with the court.  We had the

25  unfortunate situation during those interviews -- I think it's

1    clear that there was a lack of candor with the Court on the

2    part -- the unavoidable conclusion is there was a lack of

3    candor with the Court on the part of a number of individuals.

4    I don't see --

5              THE COURT:  Are you making a motion --

6              MR. ANDERSON:  We do, yes, your Honor.

7              THE COURT:  -- for a mistrial?

8              MR. ANDERSON:  Yes.  Ms. Checkovich is happy to go

9    through --

10             THE COURT:  Do you want to have it heard in here?

11             MR. ANDERSON:  I think we're willing to have it

12   heard in here, yes.

13             THE COURT:  Okay.  Let me hear you.

14             MS. CHECKOVICH:  Yes, your Honor.  In determining

15   whether to grant a mistrial this court should consider the

16   degree of prejudicial influence possibly resulting from the

17   information that the jurors have obtained.  In making this

18   determination of jurors' statements on whether they can be

19   fair and impartial are not determinative.  The Court must

20   conduct an objective analysis considering the probable effect

21   of the allegedly prejudicial information on the hypothetical

22   average juror.  And what that basically means is you look to

23   whether the information they have obtained from outside

24   sources is admissible or not and when it's not and is

25   prejudicial, then a mistrial is required regardless of

# Exhibit 5



DOW JONES, A NEWS CORP COMPANY

DJIA Futures **24329**  -0.06% ▼    S&P 500 F **2739.25**  0.03% ▲    Stoxx 600 **381.03**  -0.15% ▼    U.S. 10 Yr **5/32 Yield**  2.815% ▲    Crude Oil **72.32**  -0.85% ▼

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

https://www.wsj.com/articles/pork-giant-loses-essential-legal-battle-in-manure-case-1530314322

BUSINESS

# Pork Giant Loses Essential Legal Battle in Manure Case

A federal jury awarded $25 million to a rural couple in their suit against Smithfield Foods Inc.



Kenneth Sullivan, chief executive of Smithfield Foods Inc., speaks during an interview in Hong Kong, China, in March 2017.
**PHOTO:** WEI LENG TAY/BLOOMBERG NEWS

*By Valerie Bauerlein*

June 29, 2018 7:18 p.m. ET

RALEIGH, N.C.—Chinese-owned pork giant Smithfield Foods Inc. lost a pivotal legal battle on Friday, as a federal jury awarded $25 million to a rural couple for the nuisance caused by living near a Smithfield contractor's hog farm.

The lawsuit is the second in a series of complaints brought by 500 rural North Carolinians who live near Smithfield contractors storing manure in open pools.

Smithfield lost the first case earlier this spring, when a jury in the U.S. District Court for the Eastern District of North Carolina awarded $50 million to 10 families in Bladen County in the eastern part of the state. That amount was reduced to $3.25 million to align with state caps on damages.

The earlier case was chosen by plaintiffs' attorneys as their best argument in the bellwether cases setting the tone for the handling of the hundreds of others.

Friday's verdict was a particular blow for Smithfield because the company chose the case as its best chance to convince a jury that its contract farms did not pose a nuisance.

The couple in Friday's verdict, Elvis and Vonnie Williams of rural Duplin County, moved in after the hog farm was established and did not complain to officials before filing their suit, according to court filings.

Representatives of Smithfield and the plaintiffs declined to comment, citing a gag order.



Young hogs at Everette Murphrey Farm in Farmville, N.C., July 2017 **PHOTO:** GERRY BROOME/ASSOCIATED PRESS

But in a recent interview, Smithfield Chief Executive Ken Sullivan said the lawsuits pose "an existential threat" to Smithfield's business in the state. He said abandoning the practice of storing solid waste in open lagoons and spraying liquid waste on farmland, as suggested by the plaintiffs, would undermine Smithfield's business.

North Carolina produces 8.9 million hogs annually, more than any other state except Iowa. Smithfield owns the vast majority of the hogs produced here, both on company-owned farms and farms run by contractors.

"The verdict is heartbreaking and could have severe and unforeseen economic consequences," according to the NC Pork Council, a trade group.

Environmentalists cheered the verdict, saying it could force a change in how hog manure is handled here. "In the end, it would be much better for the swine industry to replace all the lagoons and sprayfields so that our state's rural economy can grow with the new construction activity that lagoon conversion would bring," said Ryke Longest, professor at Duke University's law school.

Earlier this week, North Carolina's legislature adopted a law restricting future lawsuits over hog farm nuisances. The new law does not affect the ongoing complaints.

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _____        Caption: In re Murphy-Brown LLC _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Murphy-Brown LLC _____
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:
      The sole member of Murphy-Brown LLC is John Morrell & Co., which is a wholly-owned
      subsidiary of Smithfield Foods, Inc. In turn, Smithfield Foods, Inc. is owned by United Global
      Foods (US), Inc., which is owned by Ipopema 127, which is owned by SFDS Malta Limited,
      which is owned by Rotary Vortex Limited, which is owned by WH Group Limited.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                       ☐ YES ☑ NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                          ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Stuart A. Raphael                         Date:        7/9/2018

Counsel for: Murphy-Brown LLC

# CERTIFICATE OF SERVICE
**************************

I certify that on        July 9, 2018        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mona Lisa Wallace                          Michael Kaeske
John Hughes                                Lynn Bradshaw
WALLACE & GRAHAM, P.A.                      Eric Manchin
525 North Main Street                      KAESKE LAW FIRM
Salisbury, NC 28144                        1301 W. 25th Street, Suite 406
Telephone: (704) 633-5244                  Austin, Texas 78705
mwallace@wallacegraham.com                 Telephone: (512) 366-7300
jhughes@wallacegraham.com                  mkaeske@kaeskelaw.com
                                           lbradshaw@kaeskelaw.com
                                           emanchin@kaeskelaw.com

/s/ Stuart A. Raphael                                      7/9/2018
(signature)                                                (date)